**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL PRUITT,** | : | **Civil Action** |
| | : | |
| **Pruitt,** | : | |
| | : | |
| **v.** | : | **No. 09-cv-1625** |
| | : | |
| **LAUREL R. HARRY, *ET AL.*,** | : | |
| | : | |
| **Respondents.** | : | |
| | : | |

**<u>MEMORANDUM OPINION</u>**

Goldberg, J.                                                                            September 17,  2025

Before me is a petition pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus wherein

Petitioner Michael Pruitt seeks relief from his 2005 conviction and death sentence for first-degree

murder, rape, and robbery.  Pruitt appealed his conviction and sentence in state court, but the

Pennsylvania Supreme Court upheld both.  Pruitt also previously petitioned for collateral relief

under Pennsylvania's Post Conviction Hearing Act.  In those proceedings, he developed eighteen

claims, and marshalled strong evidence that both of his trial counsel were grossly ineffective by,

*inter alia*, failing to present any evidence supporting his voluntary intoxication defense and by

failing to present available expert testimony showing serious errors in the Commonwealth's DNA

analysis.  Nevertheless, after a brief and confusing post-hearing colloquy following appointment

of new PCRA counsel, the state court found Pruitt had abandoned all but three of those developed

claims, and denied all relief.  The state supreme court again affirmed, this time with one justice

dissenting.

1

Pruitt's current petition for writ of habeas corpus re-raises the eighteen claims which he originally asserted in the PCRA proceedings. He argues that all are reviewable, and as I agree, I have set forth my review of these claims in this necessarily lengthy opinion. Because I find Pruitt did not receive effective assistance of counsel from his attorneys resulting in prejudice under Strickland v. Washington, 466 U.S. 668 (1984), the petition shall be granted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

On the night of September 28, 2002, in response to a report of shots fired and an open side door, Reading Police were dispatched to the home of 69-year-old Greta Gougler, at 521 North Ninth Street in Reading, Pennsylvania. (N.T.G., 16-18). Upon arrival, the responding officer, Christopher Cortazzo, found Gougler deceased, lying on her dining room floor, naked, with a "rag or towel of some kind wrapped around her head that covered her mouth." (N.TG., 22). Officer Cortazzo also observed a number of bruises over various parts of Gougler's body. (Id.) Judge Stallone's opinion[2] goes on to recite the following additional facts as having been adduced at trial:

> Officer Cortazzo immediately called for backup and then examined the rear of the residence to secure it. N.T.G, 24-25. While doing so, he observed the exterior handle from the storm door lying on the ground. N.T.G., 25. In the meantime, Officer Michael Dobrosky of the Reading Bureau of Police, who had also been dispatched to the scene, discovered that the second-floor bedroom had been completely ransacked, including a metal box which had been opened and had

---

[1]    The factual summary of the events underlying Pruitt's arrest is taken from the June 26, 2006 Opinion of the trial court (Hon. Albert A. Stallone) for Pruitt's direct appeal. ("Trial Ct. Op."). Citations to the Notes of Testimony from the trial's guilt phase (4/25/05 – 4/28/05) are cited here as "N.T.G." and from the penalty phase (5/2/05 – 5/3/05) as "N.T.P." Although Judge Stallone used "N.T., Trial" to designate to which part in the trial transcripts he was referring, for consistency, I have modified the excerpted portion of his opinion to align with this one by using "N.T.G."

[2]    In reviewing the voluminous record, I found several disparities between the record evidence and Judge Stallone's factual recitation in his June 26, 2006 opinion, particularly with regard to the taking of a sperm sample from Pruitt, the presence of a phone cord which had ostensibly been used to tie the victim up, and the tying of the cloth around the victim's neck.

various papers inside of it.  N.T.G., 58.  Other police officers on the scene collected blood samples and other evidence from various places in the house, including blood found on a utility sink in the "mud room" located between the dining room and the outside storm door.  N.T.G., 54-57, 135-137.

The following day, September 29, 2002, at approximately 10:35 A.M., the body of Greta Gougler was tagged and placed into a "body bag," which was sealed by the Berks County Coroner and then transported to the Lehigh Valley Hospital for an autopsy conducted the following day, September 30, 2002, by Dr. Samuel Land, a forensic pathologist, at the Lehigh Valley Hospital.  N.T.G., 62-63, 347-348.

At the autopsy, Dr. Land observed massive abrasions to Greta Gougler's head and neck, along with her back and legs, and further examination revealed that she had also been anally and vaginally raped.  N.T.G., 35, 352-357.  Accordingly, a "rape kit" was performed for the purpose of taking samples of Greta Gougler's blood, pubic and other hair and other physical evidence found on her body, including a swabbing taken of a substance found on her left inner thigh.  N.T.G., 283-298, 351. Later testing of this substance following its collection revealed a mixture of blood and sperm which indicated the presence of DNA from both the victim and the Appellant.  N.T.G., 313.  The DNA profile obtained from the sperm was later determined to "match" the DNA profile obtained from a [ ] sample obtained from the Appellant following his arrest, pursuant to a search warrant.  N.T.G., 313. According to Lisa Mihalacki, a forensic scientist with the Pennsylvania State Police Crime Laboratory who examined this evidence, the probability that an unrelated person would have the exact same DNA profile would be 1 in 39 billion from the Caucasian population; 1 in 1.5 billion for the African-American population; and 1 in 29 billion for the Hispanic population.  N.T.G., 313.

The evidence further reveals that, on October 1, 2002, the Appellant had a conversation with his longtime friend, Sean Peterson, at Mr. Peterson's home a few blocks away at 336 Windsor Street in the City of Reading.  N.T.G., 246.  At that time, the Appellant told Mr. Peterson that "he had something to tell him", to which Mr. Peterson responded by saying, "if it's something bad, I don't want to know". N.T.G., 246.  Appellant then told Mr. Peterson that he had "killed the old lady on 9th Street".  N.T.G., 247.  He went on to say that he first noticed her as he was walking down the alley behind her home with another friend of his and saw her clearing some weeds from her garden.  N.T.G., 247.  He also told Mr. Peterson that, after he told this friend to leave, he continued to watch Ms. Gougler and, when she started to enter her home, he pushed her inside and ultimately strangled her. N.T.G., 247.  He also told Mr. Peterson that he went upstairs to the second floor, where he found $250.00 in cash and took it, and then proceeded to wipe down everything inside the home in order to "cover his tracks".  N.T.G., 247-248.

The next day, the Appellant turned himself in to the police and gave a written statement to Criminal Investigator Jeffrey Reichert and Criminal Investigator Joel

3

Avram of the Reading Bureau of Police, in which he admitted to strangling and killing Greta Gougler. N.T.G., 163-164, 174-178.

(Trial Ct. Op., 6-10) (footnotes omitted). Dr. Land concluded that the cause of Gougler's death was a homicide caused by asphyxia via trauma to the neck and blunt-force trauma to the head. (N.T.G., 364-65; Ex. C-66). She was likely strangled with the cloth, which the perpetrator wrapped around her neck and left tightly twisted for one to two minutes. (Id., 356, 365, 375-76, 379-80).[3]

Petitioner's jury trial lasted four days, at the conclusion of which he was convicted of all of the charges against him: Murder in the First Degree (18 Pa. C. S. § 2502(a)), Robbery (18 Pa. C. S. § 3502(a)), Burglary (18 Pa. C. S. § 3701(a)(1)(i)), Rape (18 Pa. C. S. § 3121), and Involuntary Deviate Sexual Intercourse (18 Pa. C. S. § 3121(a)(1)) ("IDSI").[4]

In accordance with Pennsylvania state law, following the entry of the jury's guilty verdict on the First Degree Murder charge (i.e., the trial's "guilt phase"), the court proceeded to conduct "a separate, sentencing hearing" (the "penalty phase"), at which the same jury was charged with determining "whether the defendant shall be sentenced to death or life imprisonment." 42 Pa. C. S. § 9711(a)(1). Also pursuant to Pennsylvania statute, the Commonwealth presented evidence of two aggravating circumstances – that the killing was committed while in the perpetration of a felony, and that Petitioner had a significant history of felony convictions involving the use or threat

---

[3]    Dr. Land took the rape kit swabs during the autopsy. (N.T.G., 98-99, 345-382). State Police Crime Laboratory Serologist Michael Brincat testified that he examined the rape kit. The only swab with anything of note was taken from the left inner thigh, which had a small amount of sperm mixed with blood. There was too little for him to analyze, so he forwarded it to the lab's DNA Unit, which requires less, together with a blood sample from the sink. (N.T.G., 281-299).

[4]    Deliberations lasted just over three hours (N.T.G., 684 (jury begins deliberating 12:32 p.m.), 689 (jury question 2:19 p.m.), 692 (jury hears testimony re-read 2:52 p.m.), 694 (deliberations resume 3:08 p.m., and verdict 3:41 p.m.)). Actual deliberations thus took two hours, twenty minutes.

of violence.[5]  42 Pa. C. S. § 9711(a)(2), (d)(6), (9).

Several mitigating circumstances were initially offered by the defense: that Pruitt's capacity to appreciate the criminality of his conduct was substantially impaired by crack cocaine, and several "catch-all" mitigators, (*i.e.*, "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense").  42 Pa. C. S. § 9711(e)(3), (8). These were:  long-time history of cocaine use,[6] police cooperation, remorse, and positive adjustment to incarceration.  (N.T.P., 15-20).

At the conclusion of the penalty phase, with no experts presented and one day of testimony in total, the jury unanimously found the conceded aggravated circumstance (the killing was committed during perpetration of a felony) beyond a reasonable doubt, although the verdict slip contained no space where the jury could specify which felony.  At least one juror found the catch-all mitigator – long history of cocaine abuse – by a preponderance of the evidence. (N.T.P., 182, 209-213).  After unanimously finding the one aggravator outweighed the one mitigator, the jury sentenced Pruitt to death.  (Id.).

Although Pruitt's trial counsel[7] continued to represent him on appeal, they missed the briefing deadline set by the Supreme Court and failed to take any action until that court reached

---

[5] Pruitt had two prior convictions for Burglary.

[6]  At the start of the penalty phase, the court read to the jury lists of aggravating and mitigating circumstances both sides intended to present, which also included "borderline mental retardation and/or personality disorder" as a catch-all mitigator.  However, just before the penalty phase's second day began, defense counsel decided not to call any expert witnesses, and in the absence of any supporting testimony for its mitigators, they were abandoned.  The one replacement mitigator – long-time history of cocaine use – was suggested by the prosecutor.  (N.T.P., 15-20, 110-112).

[7]  Pruitt was represented by two attorneys at trial, one of whom took primary responsibility for defending him in the guilt phase while the other took the lead in defending him in the penalty phase.

out.[8]  Both counsel were subsequently removed and replaced by the Supreme Court.[9]  After new

counsel submitted briefs on the claims raised by his trial attorneys,[10] the Supreme Court affirmed

both the guilt and penalty verdicts without oral argument.  Commonwealth v. Pruitt, 951 A.2d 307

(Pa. 2008) ("Pruitt I").  Represented by the Capital Habeas Unit of the Federal Community

Defender Office for the Eastern District of Pennsylvania ("CHU"), Pruitt filed a Petition for Writ

of Certiorari with the U.S. Supreme Court, but review was denied.  Pruitt v. Pennsylvania, 556

U.S. 1131 (2009).

     Following completion of the direct appeal proceedings, the CHU moved in this Court for

appointment as Pruitt's capital habeas counsel and filed a motion on his behalf to proceed in forma

pauperis.  (ECF No. 1).  The motions were granted, as was the CHU's unopposed "Motion to Stay

Federal Proceedings to Permit Petitioner's Counsel to Exhaust Claims in State Court," to enable

the  CHU, which was representing Pruitt on his newly-filed PCRA petition, to exhaust new claims

in the state courts.  (ECF Nos. 2, 5, 7).

     After entering its appearance in state court, the CHU filed an Amended PCRA Petition on

March 19, 2010, raising some thirteen claims, and was granted leave to take PCRA discovery.

(See, Comm. Ans. to Am. PCRA Pet., 12/29/10; Trial Ct. Opin. for PCRA Discov. App., 1/12/11).

---

[8]  The Pennsylvania Supreme Court automatically reviews capital cases.  42 Pa. C. S. § 9711(h).

[9]  Trial counsel filed a Concise Statement of Matters Complained of on Appeal, specifying eight
issues, but failed to timely file a brief or seek an extension by the briefing deadline.  Three months
later, the Court contacted counsel, who responded by requesting retroactive permission to file a
late brief, but failed to attach that brief to the extension request.  Instead, blaming one another for
the lateness, they sought an additional 90-day extension.  (See, Petition for Leave to File a Brief
Nunc Pro Tunc, 12/12/06).  The Supreme Court removed both attorneys from the case, referred
them to the Disciplinary Board, and remanded to the trial court with instructions to appoint new
counsel for Pruitt.  (Order, Commonwealth v. Pruitt, Nos. 477 and 508 CAP (Pa. Jan. 11, 2007).

[10]  Pruitt is not pursuing any of the eight claims raised on direct appeal in habeas.

The Commonwealth appealed but complied with the discovery order, and while that appeal was pending, Pruitt filed a *pro se* motion to terminate the CHU's representation and to represent himself due to what he alleged, without specificity, were conflicts of interest and irreconcilable differences. (See, Mot. to Term., 7/5/11).[11]  Eventually, after numerous deferrals, judicial re-assignment and following dismissal of the Commonwealth's appeal of the order granting Pruitt discovery, Pruitt withdrew his request for the CHU's removal.  (Mot. Remove, 6/9/12; Order, 7/3/12).  See also, Commonwealth v. Pruitt, 41 A.3d 1289 (Pa. 2012).  The court then denied the Commonwealth's separate motion to remove the CHU on the grounds that it was violating federal funding laws by representing Pruitt in state court, and noted that Judge Gardner's stay order had specifically authorized the representation.  The court also found that because the CHU stood ready to continue to represent Pruitt, the request for removal did not meet the state standard for replacing appointed counsel.  (Mot. to Remove, 6/29/12; Order, 7/20/12).

As a result of the discovery produced by the Commonwealth, the CHU filed a Supplemental Amended PCRA Petition raising an additional five claims, bringing the total number

---

[11]  Beginning even prior to the start of his trial and despite being represented, Pruitt has actively participated in his case.  He frequently sent *pro se* pleadings to the court, and made multiple requests to remove appointed counsel and proceed *pro se* or with new counsel.  Thus, while this was not his first such request, it bears mention because it ultimately culminated in the state court replacing the CHU.  Pruitt's prior requests to proceed *pro se* were apparently denied *sub silentio,* but the state court consistently denied his alternative requests to remove and replace his appointed counsel because he failed to show the "substantial reasons" required by Pa. R. Crim. P. 122(c) (*i.e.*, it must be impossible for appointed counsel to represent effectively due to irreconcilable differences, Commonwealth v. Spotz, 756 A.2d 1139, 1150 (Pa. 2000)).  Mere dislike, difficulty working together, complaints about communication, etc. are insufficient.  The conflict must impair counsel's ability to zealously represent the defendant despite such difficulties and the relationship must be incapable of repair.  Commonwealth v. Cook, 952 A.2d 594, 610-611 (Pa. 2008).  Previously, Pruitt's initial counsel, Richard Reynolds, moved to withdraw and presumably his motion, which is not of record, met that standard.  Trial counsel also sought to withdraw just prior to the commencement of trial, but the trial court denied leave.  That motion is of record.

of claims raised on PCRA (all of which are being pursued on habeas) to eighteen. (Suppl. Am. PCRA Pet. and Suppl. App'x, 9/12/12; see also, Petition, ECF No. 94).[12]

The PCRA court held evidentiary hearings on six dates in 2013 and 2014, during which Pruitt, represented by the CHU, extensively developed his claims.[13]  However, after the evidentiary hearing, Pruitt resumed his *pro se* complaints to the PCRA Court.[14]  On September 5, 2014, he filed a *pro se* motion to stay proceedings due to what he said was an "irreconcilable conflict."  On October 10, 2014, the CHU filed its PCRA Post-Hearing Memo, together with a certification that it had discussed the issues raised in his motion with Pruitt and they had reached agreement on the contents of the Post-Hearing Memo.  It also certified that CHU attorney Billy Nolas had traveled to S.C.I. Greene on October 10, 2014 for a visit which Pruitt had agreed to the preceding day so they could discuss these matters further, but Pruitt declined the visit.

Pruitt moved to strike the CHU's Post-Hearing Memo, alleging it was without his approval. He explained that he refused to meet with Mr. Nolas because Nolas was not his attorney of record but was merely with CHU's office, and because Nolas arrived to show him the memo on its filing

---

[12]  A complete listing of the eighteen developed claims being pursued in these habeas proceedings is contained in the Appendix attached to the end of this Memorandum Opinion.

[13]  See, N.T. 8/21 - 8/22/2013 at 1-429 (Vol. 1, testimony), 430-636 (Vol. II, hearing exhibits); N.T. 11/26/13, at 837-973 (testimony) and 974-1029 (exhibits) (both within Vol. III); N.T. 12/19 -12/20/2013, at 1030-1381 (testimony) and 1382-1432 (exhibits) (both within Vol. IV); and N.T. 1/16/14, at 1433-1491 (testimony) and 1492-1527 (exhibits) (both within Vol. V) (consecutively paginated) ("N.T. PCRA").  Although the hearings were held over multiple dates, hereafter they shall be referred to in the singular as "PCRA hearing."

Between the PCRA hearing dates in 2013, Pruitt sent another letter to the court seeking removal of the CHU for irreconcilable differences and conflicts, but in a record colloquy, he again withdrew the request. (N.T. PCRA, 1033-36).

[14]  See, Pruitt's letters to PCRA Court dated 3/13/14, 4/10/14, 5/2/14, 6/17/14, and 8/12/14 (miscellaneous complaints).

deadline leaving him no time to seek revisions.  Pruitt again sought replacement counsel, claiming the CHU was silencing him and there was a conflict of interest.  (See, Letter in Application, 10/14/14).  During a brief colloquy, when the PCRA Court asked CHU Chief Shawn Nolan whether Pruitt "was competent to make this kind of decision as to counsel," Nolan answered he would be "competent to make a choice of counsel."  The Court then denied Pruitt's motions to proceed *pro se* and to strike the PCRA Post-Hearing Memo, but removed the CHU.  In its stead, the PCRA Court appointed a local attorney, Michael Dautrich, and granted him additional time to read the record and prepare his own post-hearing PCRA memorandum.  (N.T. 12/4/14, 3-7; Order, 1/7/15).[15]

Several months later, Pruitt began complaining about Dautrich and moved to replace him, because Dautrich was allegedly trying to force him to waive claims against his will.  On September 21, 2015, Pruitt filed another motion to waive counsel and represent himself, and a *pro se* motion for summary judgment[16] on two guilt phase PCRA claims related to trial DNA evidence.  (Petr.'s

---

[15]  The Order of December 4, 2014 reads as follows:

> AND NOW, this 4th day of December, 2014, the defendant, Michael Pruitt, after colloquy with regard to his right to representation of his choice, which is his right, and the Federal Community Defender's Office for the Eastern District of Pennsylvania has been representing the defendant really *pro bono*, and we had a hearing many, many months ago, the Commonwealth wanted the Federal Community Defender's Office to be removed and we found because they – because the defendant wanted them to represent him and they were willing to do so, I was not going to interfere with that relationship.  But the relationship has gotten to a point where they can no longer continue representing the defendant's interest as he sees it.

> Therefore, the appearance of Shawn Nolan and any other Federal Community Defender attorney is hereby withdrawn from representing the defendant in these proceedings.

[16]  "A motion for summary judgment is not an appropriate filing in a PCRA proceeding." Commonwealth v. Pendleton, No. 370 WDA 2014, 2014 WL 10805991 at *1 (Pa. Super. Ct. Sept.

(footnote continued on next page)

Mot. for Self-Repr. and Waiver of Counsel, 9/21/15; Petr.'s Mot. Summ. J. Relief, 9/21/15). In the summary judgment motion, Pruitt stated his intention to preserve the rest of his guilt phase PCRA claims for later review if needed.

Dautrich's PCRA memorandum, filed October 7, 2015, was confusing. First, it explicitly waived all penalty phase claims without explanation, then stated it was filed "in support of the claims set forth in his Amended Petition for Habeas Corpus Relief Pursuant to Article I, § 14 of the Pennsylvania Constitution and Statutory Post-Conviction Relief Under 42 Pa. C.S. § 9542, et seq. and the Supplements and Amendments thereto," filed by the CHU, and attached and incorporated Pruitt's *pro se* summary judgment motion by reference. The memorandum then went on to "incorporate[] by reference as if set forth at length herein" six "claims and arguments raised by prior counsel." No explanation for disregarding the others was given.[17]  (Mem. in Supp.,

---

25, 2014).

[17]  Dautrich's October 7, 2015 Memorandum articulated the six issues as follows:

A. Mr. Pruitt was denied effective assistance of counsel at the guilt phase because trial counsel failed to effectively cross examine the Commonwealth's DNA expert and to investigate and present a DNA expert who could have rebutted the Commonwealth's DNA evidence.

B. Mr. Pruitt was denied his right to due process and the effective assistance of counsel because the Commonwealth's witnesses falsely testified that Mr. Pruitt was a DNA match to the perpetrator and concealed evidence of errors committed by a forensic scientist who testified and processed critical evidence, all without objection by trial counsel.

C. Mr. Pruitt was denied his right to due process and to confront his accusers at the guilt phase because the Commonwealth withheld exculpatory, material evidence that would have impeached the credibility of key Commonwealth witnesses.

D. Mr. Pruitt was denied his right to due process and to confront his accusers at the guilt phase as a result of the cumulative effect of all the Commonwealth's Napue and Brady violations.

(footnote continued on next page)

10/7/15).

In response to the Commonwealth's request that Pruitt be examined to verify it was his desire to waive counsel and represent himself and withdraw all penalty phase PCRA claims, the court conducted a short and very confusing claim-abandonment colloquy on November 23, 2015. Attorney Dautrich stated that Pruitt wished him to continue his representation, which Pruitt confirmed, and then replaced his October memorandum with a shorter version which Pruitt agreed should be filed.  (N.T. 11/23/15, 2-4).  The replacement version was identical to the other memorandum, except that it only discussed the first three claims, all of which also related in some way to DNA, and did not include trial counsel's failure to investigate or present evidence that Pruitt was voluntarily intoxicated or of diminished capacity at the time of the crimes.  This new filing also did not explain why it did not address or list the rest of the guilt phase claims, all of which it purportedly sought to preserve.  (Mem. in Supp., 11/23/15).  Importantly, the PCRA court did not take time at this hearing to read this memorandum in any detail, other than observing it listed only three claims.  (N.T. 11/23/15 throughout).  After a further confusing exchange with both Pruitt and Dautrich during which Pruitt stated he was seeking a ruling on the three DNA

---

E.  Mr. Pruitt was denied his right to the effective assistance of counsel at the guilt phase because trial counsel opened the door to blatant speculation by the Commonwealth's pathologist, lending expert support to the Commonwealth's claim that Mr. Pruitt tried to clean up the crime scene.

F.  Mr. Pruitt was denied his right to due process and to the effective assistance of counsel at the guilt phase because in its closing argument the Commonwealth mischaracterized evidence without objection by trial counsel, and appellate counsel failed to raise this issue on appeal.

Thus, the claim that Pruitt was denied his right to the effective assistance of counsel at the guilt phase because trial counsel failed to investigate, discover, or present readily available evidence supporting a meritorious voluntary intoxication or diminished capacity defense was not included.

11

claims and Dautrich confirmed they had discussed abandoning all claims not in the memorandum, the PCRA court dictated an Order finding that:

> defendant is knowingly, intelligently, and voluntarily abandoning any issues raised by prior PCRA counsel and/or Mr. Dautrich that are not contained in the memorandum in support of the PCRA relief petition filed this date by Mr. Dautrich. The issues raised in this memorandum relate to the DNA evidence presented at trial. The Commonwealth is given four months from this date to respond with a responsive memorandum.

(N.T. 11/23/15, 9-10; see also, Commonwealth v. Michael Pruitt, CP-06-CR-06003-2002 (Aug. 31, 2016) (Keller, J.) ("PCRA Op.")).  Although Dautrich did not object to this order at the time, he later explained that he did not hear it being dictated and that both he and Pruitt believed they were only abandoning the penalty phase claims because of what was contained in Pruitt's incorporated *pro se* summary judgment motion.[18]

In a subsequent Order entered on May 25, 2016, the Court denied the PCRA petition without comment.  Although Dautrich filed a timely appeal on June 20, 2016, he listed only the three DNA claims in his Jurisdictional Statement.  One month later, on July 18, 2016, however, in his Statement of Matters Complained of on Appeal, Dautrich for the first time indicated agreement with Pruitt when he added four more guilt phase claims[19] to the three claims discussed in the

---

[18]  See N.T. 4/20/22, 73-74 (ECF No. 176) (Dautrich's testimony).  Upon receiving the colloquy transcript, Pruitt immediately protested in a letter to the court in which he stated the stenographer had erred and insisted that at the colloquy he sought summary judgment on three DNA claims, intended to preserve the rest of his guilt phase claims, and did not intend to waive any guilt phase claims – only penalty phase claims.  Pruitt said he had asked Dautrich to correct the record, and he reiterated his objections in a *pro se* motion filed in response to the Commonwealth's brief for PCRA denial. (Letter, 1/13/16; Prot. Mot. for Correction/Modification of the Record, 5/3/16).

[19]  These were:

> D.  The District Attorney of Berks County committed prosecutorial misconduct at Pruitt's trial by knowingly and intentionally eliciting false and misleading testimony regarding the DNA results, testing and handling from its witnesses at

(footnote continued on next page)

shorter memorandum filed on November 23, 2015. (Pa. R. App. P. 1925(a) Concise Statement of Errors, 7/18/16). On July 22, 2016, Dautrich filed a *Nunc Pro Tunc* Statement to Correct the Record in which he fully endorsed the position expressed by Pruitt in his January *pro se* letter and May *pro se* protective motion – that is, that at the colloquy, Pruitt had made a "knowing, intelligent, and voluntary waiver of any and all penalty phase issues only," and "[a]ll other issues were preserved as set forth in prior filings in this case." (Def.'s *Nunc Pro Tunc* Statement to Correct Record, 7/22/16). The PCRA court did not rule on the *Nunc Pro Tunc* Statement, but simply placed a brief note in the court file that it "deems no action necessary in that the record of the November 23, 2015 colloquy speaks for itself." (Memo to Clerk of Courts Official Court File, 7/26/16).

In its explanatory opinion written for appellate review pursuant to Pa. R.A.P. 1925(a), the PCRA court focused on procedural matters and the two claims which it reviewed on the merits. The court relied exclusively on the November 23, 2015 colloquy hearing transcript, and did not examine any of the counseled or *pro se* pleadings and letters from before or after the colloquy that contradicted its interpretation. It then reiterated that Pruitt knowingly, intelligently, and

---

trial, which deprived Pruit of due process and a fair trial.

E. The PCRA Court erred in failing to grant summary judgment relief to Pruitt based upon the reasons set forth in Petitioner's Motion for Summary Judgment Relief.

F. Mr. Pruitt was denied his right to due process and the effective assistance of counsel because trial counsel failed to challenge the pretrial statements allegedly made by Mr. Pruitt to the police as involuntary and coerced.

G. Mr. Pruitt was denied his right to due process and the effective assistance of counsel at the guilt phase because trial counsel failed to research and hire a credible expert pathologist to prepare for proper cross examination of the Commonwealth's pathologist and to rebut the Commonwealth's theory of cause and manner of death.

voluntarily abandoned all but three of his PCRA claims but opined that he had since "changed his mind." (PCRA Op., 1-11, 16-18). For the first time, however, the court explained that it refused to review Pruitt's own letters and *pro se* pleadings because state law was clear that "where a defendant is represented by counsel, a reviewing court is obligated to consider only those arguments which have been advanced by counsel, rather than arguments advanced by the defendant *pro se*." (Id. at 17). Thus, even though incorporated into counsel's brief, Pruitt's *pro se* pleading was a "legal nullity." (Id.). The court, however, did not explain why it had not reviewed Dautrich's pleadings, including the sections of his pre-colloquy memorandum, that stated Pruitt intended to preserve the rest of his guilt phase claims.

Regarding the two DNA-related claims it addressed on the merits, the court found Pruitt's trial counsel were not ineffective in handling the DNA evidence presented by the Commonwealth. More particularly, the court found no error in counsel's failure to object to the testimony of Commonwealth experts Mihalacki and Brincat, as it was not false; and no error in counsel's failure to effectively cross examine Mihalacki, or in failing to present a defense DNA expert. (Id., 11-16). Without detailing the strong evidence presented at the PCRA hearings in its application of Pennsylvania's ineffectiveness standard, the court opined that the evidence developed by the CHU did not *undermine* the Commonwealth's DNA evidence, but instead was *in accord* with it. The court found that because the underlying issue had no arguable merit, defense counsel's trial strategy of trying to not call attention to the DNA evidence was reasonable. (Id., 16). The PCRA court further held there was no evidence that a defense DNA expert would have helped Pruitt's case, and found no errors in the collection, handling, or presentation of the DNA evidence. (Id.). Finally, the PCRA court found Pruitt suffered no prejudice due to the otherwise strong evidence of his guilt, his confessions to killing the victim, and the physical evidence that she was raped, and

14

thus counsel had not rendered ineffective assistance.  As to the third issue, cumulative error under Brady v. Maryland, 373 U.S. 83 (1963), and Napue v. Illinois, 360 U.S. 264, 269-272 (1959), the court found it waived for failure to present any evidence at the PCRA hearings.  (Id.).

In Pruitt's brief in support of his appeal to the Pennsylvania Supreme Court, Dautrich "vehemently disagree[d]" with the PCRA court's conclusion that he had waived guilt phase claims during the November 23, 2015 colloquy.  He explained that Pruitt had only intended to waive penalty-phase, not guilt-phase claims, and had merely sought summary judgment on the DNA claims.  Thus, he argued, the remaining guilt-phase claims were preserved for later review, and stressed that a "probing colloquy" was required before a knowing, intelligent, and voluntary waiver of important rights such as his fully-developed PCRA claims of constitutional error could be found, especially in a capital case.  (Appellant Br., 12/16/16, at 59-62).

Nevertheless, the Supreme Court affirmed the PCRA court's ruling without fully addressing Pruitt's arguments regarding his alleged abandonment of claims, upheld the finding of the PCRA court that fifteen of the eighteen fully-developed PCRA claims had been knowingly, voluntarily, and intentionally waived and only the three DNA-related claims remained.[20]  It found Pruitt's first claim and a portion of his second, both raising ineffectiveness as to the Commonwealth's erroneous DNA evidence, lacked merit.  See, Commonwealth v. Pruitt, 162

---

[20]  The Supreme Court briefly noted the shifting nature of the waiver colloquy: "Although we agree with [Pruitt] that those proceedings initially opened with a focus upon the abandonment of penalty-phase claims, as reflected above, they took a different turn toward the identification of discrete issues that counsel and [Pruitt] agreed were to be pursued, to the exclusion of all others." Pruitt II, 162 A.3d at 406.  Like the PCRA court, the state Supreme Court did not examine, with any level of detail, the counseled and pro se pleadings and letters from before and after the colloquy indicating no such agreement between Pruitt and counsel existed, contradicting the PCRA court's colloquy interpretation.  The Supreme Court also did not examine the PCRA court's explanation that the state law of hybrid representation prohibited it from considering Pruitt's pro se motion, which was attached to his counsel's memorandum.

A.3d 394,  395-406 (Pa. 2017) ("Pruitt II").

Based on its review of the PCRA evidentiary hearing record, the Supreme Court found defense counsel's performance in failing to investigate and impeach the Commonwealth's DNA evidence at trial was unreasonable.  Nonetheless, it concluded these claims failed for lack of prejudice because, in addition to the faulty DNA, there was other evidence that Pruitt was guilty of murder and there was physical evidence that the victim had been raped.  The Supreme Court added that no showing had been made at the PCRA hearing that anyone else who could have committed the rape was in the house.  The Court also found no merit to a portion of Pruitt's second claim based on Napue and agreed with the PCRA court that the third claim was waived.  Id. at 406.

One Supreme Court Justice – David Wecht – dissented.  He agreed that trial counsels' performance regarding the DNA evidence was unreasonable, but found there was a reasonable probability that Pruitt would not have been convicted of rape and IDSI had counsel performed reasonably.  Justice Wecht would have vacated those convictions and required a new penalty phase trial to be conducted due to the role those two emotionally powerful convictions likely played at capital sentencing where the jury weighed only one aggravator against one mitigator.  Id. at 406-414 (Wecht, J. dissenting).

Having exhausted his state court remedies, Pruitt returned to this Court where, through the CHU, he filed an extensive Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, raising the same eighteen claims developed at the PCRA hearings.[21]  After review of all of Pruitt's

_____

[21]  By this time, Pruitt's case had been reassigned to me from the docket of the late James Knoll Gardner, the judge to whom it had originally been assigned.  Pruitt initially asked me to replace the CHU, arguing it was ineffective in state court.  (Letter 10/16/17, ECF No. 82).  I appointed
(footnote continued on next page)

claims and for the reasons set forth below, I find that habeas relief is properly granted on Claims

1, 2, 10 and 14.[22]   Accordingly, I deem it unnecessary to address the remaining fourteen claims.

## II.    LEGAL STANDARDS APPLICABLE TO HABEAS CORPUS PETITIONS

---

attorney Jules Epstein to consult with him, and after further proceedings, denied Pruitt's request. (Order, 11/27/13, ECF No. 95; Order, 3/15/18, ECF No. 105).  On August 6, 2018, Pruitt again moved to proceed *pro se*. (ECF No. 110).  I denied that, specifically finding the CHU was more than adequately representing Pruitt's interests, but I afforded him a degree of hybrid representation, permitting him to supplement CHU pleadings, so he might enjoy any perceived benefits of self-representation, while permitting me, via counsel, fully to consider all of petitioner's arguments in deciding whether petitioner's conviction and sentence of death should stand.  (Order, 1/14/19, ECF No. 112 at 4) (quoting Fletcher v. Beard, No. 10-cv-3188, 2016 WL 2866431, at *4 (E.D. Pa. May 16, 2016)).  In his first *pro se* supplement, Pruitt stated his intent before the PCRA court was to waive only penalty-phase claims, not guilt-phase ones. (Supplement, ECF No. 118).  He reiterated that in his second supplement. (Supplement to Counsel's Memo of Law, 11/2/20, ECF No. 145).

[22]  More particularly, habeas relief shall be granted on the following claims (as paraphrased):

(1)    Trial counsel was ineffective for failing to investigate the Commonwealth's DNA evidence, failing to present a defense DNA expert who would have refuted it, and failing to effectively cross-examine prosecution DNA analyst Mihalacki.

(2)    Counsel knew or should have known of and objected to the falsity of the Commonwealth's DNA evidence and testimony by (a) serologist Brincat that he observed sperm, and (b) by DNA analyst Mihalacki that she analyzed sperm and that Pruitt was a DNA match to the perpetrator.  Trial counsel further should have known of, objected to, and brought out the involvement and errors of disgraced serologist Ranae Houtz.

(10)    Counsel was ineffective for failing to investigate, discover, and present available guilt-phase evidence supporting Pruitt's voluntary intoxication and diminished capacity defense.

(14)    Counsel was ineffective for failing to investigate, discover, and present penalty phase mitigating evidence of Pruitt's impaired capacity and extreme mental disturbance at the time of the crime, primarily of his cocaine and alcohol intoxication, long-term abuse, cocaine-induced psychotic disorder including blackouts, and pre-existing history of head injury, organic brain impairments and learning disabilities.

A.    *In General*

Pruitt's habeas petition is governed by the federal habeas statute, 28 U.S.C. § 2241 *et al.*, as revised by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which requires the reviewing federal court "to afford considerable deference to state courts' legal and factual determinations on the merits." Taylor v. Horn, 504 F.3d 416, 428 (3d Cir. 2007). Indeed, under 28 U.S.C. § 2254, which applies to petitions for habeas relief filed on behalf of persons in custody pursuant to state court judgments,

> **(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2). The habeas statute is "designed to confirm state courts are the principal forum for asserting constitutional challenges to state convictions." Harrington v. Richter, 562 U.S. 86, 103 (2011) (internal quotation marks and citation omitted). It achieves this end by establishing a modified form of *res judicata*; claims must first be presented to state courts, and if a claim has been adjudicated on the merits by the state courts, federal courts have no power to overturn the decision unless one of the narrow AEDPA exceptions applies. Id.

B.    *Exhaustion and Procedural Default*

As a threshold matter, before a state prisoner may obtain federal habeas review of a claim, he must first fully exhaust the remedies available in the state courts as to that claim. 28 U.S.C. § 2254(b)(1)(A); Anderson v. Harless, 459 U.S. 4, 6 (1982). This requires a prisoner to fairly present

each claim to each available level of the state court system before presenting it in federal habeas. O'Sullivan v. Boerckel, 526 U.S. 838 (1999) (state prisoner must present habeas claims to state courts using normal established process of appellate review).  If a state prisoner fails to present a claim to the state courts or has raised it but has failed to do so properly or fully using the state's applicable claim-preservation rules, and is precluded from returning to the state courts to properly exhaust, the claim is deemed procedurally defaulted for purposes of habeas.  See, 28 U.S.C. § 2254(b)(1)(B)(i); House v. Bell, 547 U.S. 518, 522 (2006) ("Out of respect for the finality of state-court judgments, federal courts, as a general rule, are closed to claims state courts would consider defaulted.").

However, such a default will only preclude federal review of the claim if the state procedural rule preventing full state review is both (1) independent of federal law, and (2) adequate to support the judgment.  Glossip v. Oklahoma, 145 S. Ct. 612, 624-625 (2025); Coleman v. Thompson, 501 U.S. 722, 749 (1991).  A state ground of decision is independent only when it does not depend on a federal holding, and is not intertwined with questions of federal law.  Glossip, 145 S. Ct. at 625 (citing Foster v. Chatman, 578 U.S. 488, 498 (2016) and Michigan v. Long, 463 U.S. 1032, 1040-1041 (1983)).  A state procedural rule is generally adequate to preclude federal review if it was "firmly established and regularly followed" on the date of the purported default, Johnson v. Lee, 578 U.S. 605, 608 (2016), and was "readily ascertainable." Szuchon v. Lehman, 273 F.3d 299, 327 (3d Cir. 2001) (citations omitted).  The adequacy requirement thus ensures "federal review is not barred unless a habeas petitioner had fair notice of the need to follow the state procedural rule," Bronshtein v. Horn, 404 F.3d 700, 707 (3d Cir. 2005), and the rule is applied fairly and not "by whim or prejudice against a claim or claimant." Id. at 708; Ford v. Georgia, 498 U.S. 411, 422-424 (1991); James v. Kentucky, 466 U.S. 341, 348 (1984).

19

In other words, a rule must be adequate not just generally, but also as applied. There have been instances where a generally adequate state procedural rule becomes inadequate to bar federal review because it has been applied "exorbitantly," Lee v. Kemna, 534 U.S. 362, 376 (2002), with unforeseen "pointless severity," NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, 297 (1964), or in some other unfair manner. However, a state procedural rule is not automatically inadequate because its application has been discretionary rather than mandatory. Kindler v. Horn, 642 F.3d 398, 401-02 (3d Cir. 2011), on remand from Beard v. Kindler, 558 U.S. 53, 55 (2009). In short, the purpose of the adequacy doctrine is twofold: to ensure state courts do not set traps for unwary litigants bringing disfavored claims, and to ensure habeas petitioners have fair notice of what they must do to avoid default. As the Third Circuit has explained:

> [t]he issue is not whether the state procedural default rule leaves room for the exercise of some judicial discretion—almost all do. Rather, "the issue is whether, at the relevant point in time, the judicial discretion contemplated by the state rule is being exercised in a manner that lets people know when they are at risk of default and treats similarly-situated people in the same manner.

Campbell v. Burris, 515 F.3d 172, 181 (3d Cir. 2008).

There is no necessity for the state court to apply a settled and generally independent and adequate procedural rule to a claim before a federal court may determine a state remedy no longer exists for it.[23] Lee, 534 U.S. at 382 n.13; see also, Coleman, 501 U.S. at 735 n.1 ("if the petitioner

---

[23] The PCRA time-bar is such a rule. Pruitt is now foreclosed by the PCRA's one-year statute of limitations from returning to state court to file another PCRA petition raising additional claims, given that it applies to "any petition under this subchapter, including a second or subsequent petition." 42 Pa. C.S. § 9545(b)(1). "[T]his one-year limitation is a jurisdictional rule that precludes consideration of the merits of any untimely PCRA petition, and it is strictly enforced in all cases, including death penalty appeals." Whitney v. Horn, 280 F.3d 240, 251 n.12 (also explaining that in Pennsylvania, PCRA petitioners who have received the death penalty are held to the same procedural requirements as all other PCRA petitioners.) (citations omitted). Further,

(footnote continued on next page)

failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred...there is procedural default"); Teague v. Lane, 489 U.S. 288, 299 (1989) (federal court may find claim procedurally defaulted notwithstanding state court's failure to invoke procedural rule, where claim was not presented to state court).

If a prisoner's federal claim has been procedurally defaulted in state court due to noncompliance with a state procedural rule that is independent of federal law and adequate both in general and as applied, the federal habeas court may still review the claim if the prisoner demonstrates "cause for the default and actual prejudice," excusing the default, or that the federal court's "failure to consider the claim will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 749; see also Edwards v. Carpenter, 529 U.S. 446, 451 (2000) (prisoner is required to demonstrate both cause for his state-court default and prejudice therefrom, before federal habeas review may proceed).

The miscarriage of justice exception to default requires a petitioner to come forward with new, reliable evidence of his actual innocence, which serves as "a gateway through which[he] must pass to have his otherwise barred constitutional claim considered on the merits." Schlup v. Delo, 513 U.S. 298, 314 (1995) (distinguishing substantive claim of actual innocence in Herrera v. Collins, 506 U.S. 390, 404 (1993)). See Calderon v. Thompson, 523 U.S. 538, 559 (1998) (to

---

a claim is considered waived under the PCRA if "the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding," 42 Pa. C.S. § 9544(a), and the PCRA prohibits consideration of waived claims. See 42 Pa. C.S. § 9543(a)(3) (to be eligible for collateral relief, PCRA petitioner must plead and prove that allegation of error has not been waived). The PCRA's prohibition against waived claims is also generally an adequate and independent state ground precluding federal habeas review. Lines v. Larkins, 208 F.3d 153, 159 (3d Cir. 2000).

demonstrate actual innocence sufficient to excuse procedural default, habeas petitioner must point to "reliable evidence not presented at trial" to show "it is more likely than not no reasonable juror would have convicted him in light of the new evidence"). This applies only in exceedingly rare cases, including in the capital context. Jenkins v. Hutton, 582 U.S. 280 (2017).

The existence of cause and prejudice to excuse a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. Murray v. Carrier, 477 U.S. 478, 488 (1986). Once cause has been demonstrated, the petitioner bears the additional burden of proving that prejudice resulted. Prejudice means the errors at trial "worked to [petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Id. at 494 (quoting U.S. v. Frady, 456 U.S. 152, 170-172 (1982)).

Ineffective assistance of counsel can act as cause to excuse a procedural default where counsel is constitutionally guaranteed, such as at trial. Carpenter, 529 U.S. at 451. Generally, because there is no independent federal constitutional right to state post-conviction counsel, the errors of attorneys in such collateral proceedings do not constitute cause to excuse a procedural default. Coleman, 501 U.S. at 753-54. However, in 2012, the Supreme Court created a "narrow exception" to this aspect of Coleman: if post-conviction counsel is ineffective for failing to raise, or failing adequately to pursue, a "substantial" (*i.e.* likely meritorious) claim of trial counsel ineffectiveness in a first or "initial-review" state collateral proceeding, (*i.e.*, the first opportunity to raise such a claim under state law), then such post-conviction counsel's ineffectiveness may establish cause to excuse the default of the trial-counsel ineffectiveness claim. Martinez v. Ryan, 566 U.S. 1, 17 (2012). This only applies in jurisdictions where criminal defendants are barred from raising allegations of trial-counsel ineffectiveness earlier, for example on direct appeal, and

22

must wait to raise them until such "initial-review" collateral proceedings.[24]

    C.    *Standards of Review Under AEDPA*

Claims the state courts have adjudicated on the merits are treated differently under AEDPA than those claims that were not, but which are nonetheless reviewable in habeas. As mentioned, a federal court cannot grant habeas relief under 28 U.S.C. § 2254 "with respect to any claim that was adjudicated on the merits in State court" unless the state-court adjudication resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "[T]he phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to holdings, as opposed to the *dicta*, of th[e] [Supreme] Court's decisions as of the time of the relevant state court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). In applying these deferential standards, a federal court must evaluate the state court's adjudication of the claim in light of the record that was actually before the state courts, without any federal-court supplementation. Cullen v. Pinholster, 563 U.S. 170, 181-82 (2011).

A state court decision on the merits of a claim will rarely fit within the "contrary to" clause of Section 2254(d)(1). Williams, 529 U.S. at 407-407. Such a decision is "contrary to" Supreme Court holdings if the state court either applies a rule which contradicts the governing law set forth

---

[24]    Pennsylvania has been such an "initial review" jurisdiction, barring the raising of ineffectiveness claims on direct appeal, since 2002, before Pruitt was tried. See, Commonwealth v. Grant, 813 A.2d 726, 738 (Pa. 2002). I held a Martinez hearing on April 20, 2022 to allow Pruitt's habeas counsel to clarify certain testimony from DNA expert Dr. Libby and to hear from Pruitt's PCRA counsel Michael Dautrich. (Hrg. Tr. 4/20/22, ECF No. 176).

in the Supreme Court's cases, or "confronts facts" that are "materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the result reached by the Court]." Bell v. Cone, 543 U.S. 447, 452-453 (2005) (*per curiam*) (quoting Williams, 529 U.S. at 405).

A state court merits decision involves an "unreasonable application" of Supreme Court holdings if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies the principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. Because "an *unreasonable* application of federal law is different from an *incorrect* application of federal law," a federal habeas court may not grant relief simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Id. at 410, 411. Even "clear error" will not suffice. Lockyer v. Andrade, 538 U.S. 63, 75 (2003). Relief is available only if "the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Put differently, under the "unreasonable application" standard, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Overall, the highly deferential AEDPA standard requires federal habeas courts to presume state courts "know and follow the law." Woodford v. Visciotti, 537 U.S. 19, 24 (2002).

In determining whether a state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" within the meaning of § 2254(d)(2), the question is not whether the reviewing court "would have reached a different conclusion in the first instance." Brumfield v. Cain, 576 U.S. 305, 313-14 (2015) (quoting Wood

24

v. Allen, 558 U.S. 290, 301 (2010)).  Rather, a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state-court proceeding.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also Brumfield, 576 U.S. at 314 (relief unwarranted "[i]f [r]easonable minds reviewing the record might disagree about the finding in question" (quoting Wood, 558 U.S. at 301) (second alteration in original) (internal quotation marks and citation omitted)).  And if the state courts decide only part of a federal claim (for example, one prong of an ineffective assistance of counsel claim), but left the rest unexamined, only that part of the claim addressed by the state court receives deferential AEDPA review.  Brumfield, 576 U.S. at 313-314.

In addition to the deference to factual findings provided under § 2254(d)(2), state-court determinations of factual issues are "presumed to be correct," placing the burden on the federal habeas petitioner to rebut this "presumption of correctness by clear and convincing evidence." Pinholster at 181-82; 28 U.S.C. § 2254(e)(1); see also Burt v. Titlow, 571 U.S. 12, 18 (2013).  This presumption "applies to the factual determinations of both state trial and appellate courts," Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001), and to implicit factual findings "to the same extent as express factual findings." Taylor, 504 F.3d at 433.  Whether implicit or explicit, a state court's credibility determinations are findings of fact entitled to deference under AEDPA.  See Rice v. Collins, 546 U.S. 333, 338-39 (2006); Vickers v. Sup't Graterford SCI, 858 F.3d 841, 850, 850 n.9 (3d Cir. 2017).

If a petitioner satisfies the requirements of § 2254(d), a federal habeas court still may not issue the writ, conditioned upon timely state compliance with an appropriate remedy, unless it is persuaded that "law and justice require" relief.  28 U.S.C. § 2243.  Habeas relief may only be

granted if the federal court is "firmly convinced a federal constitutional right has been violated," and it thus must determine whether the state court "reached the correct result." Vickers, 858 F.3d at 849 (quoting Williams, 529 U.S. at 389).[25]  That is, after applying the deferential AEDPA standards and finding them violated, the court "proceed[s] to review the merits of the claim *de novo* to evaluate if a constitutional violation occurred." Id.; see also Price v. Warren, 726 F. App'x 877, 884 (3d Cir. 2018) (reviewing a claim *de novo* after concluding state court's adjudication of the claim rested on unreasonable determinations of fact).

While AEDPA's standard of review applies where the state court adjudicated the merits of the federal claim, it does not apply where the state court has not addressed the merits of a claim, and the merits of the claim are properly before the federal court; in that event, the habeas court reviews the claim *de novo*. Breakiron v. Horn, 642 F.3d 126, 131 (3d Cir. 2011).  That is, the deferential standard does not apply where the state court found the claim could not be reviewed due to noncompliance with a state procedural rule, and the reviewing federal habeas court found the procedural rule was not independent and adequate to preclude habeas review, or found the default excused by a showing of cause and prejudice or a miscarriage of justice.  In those events, the Court also utilizes a non-deferential *de novo* standard of review for pure legal questions and mixed questions of law and fact, while still presuming that the state-court factual findings on the

---

[25]  As articulated by the U.S. Supreme Court, although the statute (§ 2254)

> . . . directs federal courts to attend to every state-court judgment with utmost care, it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law.  If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody – or . . . his sentence of death – violates the Constitution, that independent judgment should prevail.

Williams, 529 U.S. at 389.

claim, if any, are correct, subject to rebuttal by clear and convincing evidence. Cone v. Bell, 556 U.S. 449, 472 (2009); Breakiron, 642 F.3d at 131; Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009); Wilson v. Beard, 589 F.3d 651, 658 (3d Cir. 2009).

If a federal habeas court finds a claim has merit under *de novo* review, with or without initial review under AEDPA's deferential standard, there is one final step before a conditional habeas writ may be issued: a showing of prejudice. The petitioner is entitled to habeas relief without more if the meritorious claim is structural (*i.e.*, unlawful exclusion of members of defendant's race from a grand jury, or violation of right to self-representation or public trial), or if its analysis necessarily included a showing of prejudice. Arizona v. Fulminante, 499 U.S. 279, 310 (1991). Otherwise, the petitioner must separately demonstrate prejudice – that the violation had a "substantial and injurious effect" on the outcome of the proceeding. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).[26] If the habeas court is in "grave doubt" about this, the error cannot be deemed harmless. See, O'Neal v. McAninch, 513 U.S. 431, 445 (1995).

## III.    DISCUSSION

### A.    Claim One:  Ineffective Assistance of Trial Counsel for Failing to Investigate and Counter the Commonwealth's DNA Evidence

Pruitt advances multiple claims alleging that his defense counsel rendered ineffective assistance throughout both the guilt and penalty phases of his trial.[27] In his first claim, relying

---

[26]  Ineffective assistance under Strickland, or prosecutorial misconduct under Brady, are examples. The harmless error standard of Brecht is coextensive with the Strickland prejudice inquiry; hence both need not occur. Preston v. Superintendent Graterford SCI, 902 F.3d 365, 382 (3d Cir. 2018). See also, Brown v. Davenport, 596 U.S. 118, 134 (2022) (both AEDPA and prejudice analysis required); Whitney, 280 F.3d at 258 (purpose of both is to determine if error affected verdict).

[27]  As is clear from the case record and as the parties agree, Pruitt has fairly presented this claim of ineffective assistance of counsel to the state courts, and they are thereby exhausted. (See, Pruitt II, 162 A.3d 394 (Pa. 2017). See also, Amended PCRA Petition, 3/19/10, 17-31, and Appendix

(footnote continued on next page)

primarily on the two DNA expert opinions he presented to the PCRA court, Pruitt argues his trial counsel was ineffective in several ways for failing to investigate and refute the Commonwealth's DNA evidence. *First*, he alleges that counsel did not investigate the Commonwealth's DNA evidence adequately and thus failed to show that there was either no sperm in the sample from the swab taken from the victim's thigh, or not enough for a proper analysis. Additionally, Pruitt claims there were multiple other errors and omissions in the Commonwealth's analysis, which would have precluded the finding that he was a match, in contradiction of the misleading testimony of its DNA analyst, Lisa Mihalacki. *Second*, Pruitt asserts his counsel failed to effectively cross-examine Mihalacki and serologist Michael Brincat about the errors and weaknesses in the DNA analysis, including the fact that PSP DNA serologist Ranae Houtz, who worked on this case and whose name was in the DNA report, had been disciplined for, and ultimately resigned because of, the same kinds of errors as were made in Pruitt's case.[28] *Third*, he alleges trial counsel failed to consult with and present a defense DNA expert at trial, who, per the PCRA evidence, would have discovered and explained these errors to counsel and the jury.

Pruitt argues that in agreeing that his trial counsel performed unreasonably, but not concluding there was prejudice, the Pennsylvania Supreme Court unreasonably applied Strickland, and its findings are rebutted by and are thus unreasonable in light of the state court PCRA record. He argues that Justice Wecht was not only correct about the rape and IDSI convictions, requiring a new penalty phase, but also that the prejudice extended to his murder conviction, requiring a new trial. (Pet. for Writ of Habeas Corpus, 3-19 (ECF No. 94); Mem. of Law in Supp. of Pet. for Writ

---

thereto, Tabs 1-19; Supplement and Amendment, 9/17/12, 1-7, and Appendix thereto at tabs 1-2; PCRA Reply, 1/3/13, 8-9.)

[28] Houtz is also a subject of Pruitt's related, second habeas claim.

of Habeas Corpus (ECF No. 142), 15-36).[29]  In response, the Commonwealth asserts that the state

Supreme Court's majority correctly found no merit to Pruitt's ineffectiveness claim and this

finding is due deference under AEDPA necessitating that habeas relief be denied.  (Comm. Resp.

to Pet. for Habeas Corpus, 14-26, ECF No. 151).

As noted previously, the deferential AEDPA standard of review applies and the state

courts' adjudication is evaluated to determine if it resulted in a decision that either (1) "was

contrary to, or involved an unreasonable application of clearly established federal law, as

determined by the Supreme Court of the United States," or (2) "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."  28

U.S.C. § 2254(d).  The "clearly established federal law" applicable to this issue is that established

in Strickland.  Williams, 529 U.S. at 390-391.  Thus, to succeed on a claim of ineffective assistance

of counsel that was found meritless by state courts, a habeas petitioner must show that the state

courts' application of Strickland was objectively unreasonable.  Woodford, 537 U.S. at 25; see

also, Woods v. Etherton, 578 U.S. 113, 117 (2016) (review of ineffectiveness claims "doubly

deferential" so as "to afford both the state court and the defense attorney the benefit of the doubt")

(internal citations and quotation marks omitted).

The ineffective assistance of counsel standard under Strickland is now well known. To

prevail on an underlying or *de novo* claim of ineffective assistance of counsel under Strickland, a

petitioner must establish first, "that counsel's performance was deficient," and second, "that the

deficient performance prejudiced the defense."  Strickland, 466 U.S. at 687.  To show deficient

performance, the petitioner must demonstrate "that counsel's representation fell below an

---

[29] This first claim is very similar to the first part of Pruitt's second claim both factually and legally.

objective standard of reasonableness" under "prevailing professional norms." Id. at 688. The court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct" under the totality of the circumstances, making "every effort . . . to eliminate the distorting effects of hindsight." Id. at 689, 690. The petitioner must "overcome the presumption, under the circumstances, that the challenged action 'might be considered sound trial strategy,'" and demonstrate that counsel's "acts or omissions were outside the wide range of professionally competent assistance." Id. at 689 (quoting Michael v. Louisiana, 350 U.S. 91, 101 (1955)).

To establish Strickland prejudice, a petitioner must show "a reasonable probability [that] but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. This mandates that counsel's errors must be shown to have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. The standard "is not a stringent one," and "is less demanding than the preponderance standard." Hull v. Kyler, 190 F.3d 88, 110 (3d Cir. 1999) (internal quotation marks and citations omitted). While the petitioner "need not show counsel's deficient conduct more likely than not altered the outcome in the case," it is not enough to show "that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. Rather, confidence in the outcome must be undermined. Id. at 694.

I first observe that while the Pruitt II court cited Strickland, it used the state's three-pronged ineffectiveness standard in analyzing the ineffectiveness claim. 162 A.3d at 400, n. 6. Under the state standard, counsel is presumed effective unless the appellant shows: (1) his underlying claim has arguable merit; (2) counsel's course of conduct "did not have some reasonable basis designed to effectuate the appellant's interests;" and (3) "but for counsel's ineffectiveness, there is a

reasonable probability that the outcome of the challenged proceedings would have been different." Commonwealth v. Fulton, 830 A.2d 567, 572 (Pa. 2003). That test is consistent with and is not "contrary to" Strickland because it requires "findings as to both deficient performance and actual prejudice." Tyson v. Superintendent Houtzdale SCI, 976 F.3d 382, 391 (3d Cir. 2020) (quoting Mathias v. Superintendent Frackville SCI, 876 F.3d 462, 476 (3d Cir. 2017)). Hence, applying the state court standard was not "contrary to" federal law under Strickland.

Turning next to the question of whether Strickland was unreasonably applied, I must first resolve a dispute about what evidence was before the state court, and therefore what is before this court, in this and other claims. While I may not and do not use evidence from the Martinez hearing to consider this question,[30] the Commonwealth asserts I am also precluded from considering two expert statements of William Shields, Ph.D. which were not specifically re-introduced at the PCRA hearing through a witness, despite their inclusion in Pruitt's PCRA Appendix. (Comm. Resp. to Pet. for Writ of Habeas Corpus, 17-18, 23-24, 29-31, 36, 38, 50-51, 63-65, 87-88 (ECF No. 151)). Pruitt replies that state law requires PCRA petitioners to submit documentary evidence with their petitions to not only plead, but also to prove their allegations. (Pet.'s Resp. to Cmwlth's Ans. to Pet. for Habeas Corpus, 13-17 (ECF No. 160)). Such documents support both the request for an evidentiary hearing and for relief, state law requires the PCRA court to consider them regardless of whether an evidentiary hearing is held or not, the state rules of evidence permit their admission as bases for the opinions of testifying experts, and federal law requires the federal court to consider the entire state court record. Id. (citing, *inter alia*, Pa. R. Crim. P. 902(D) and 42 Pa. C.S. § 9545(d)).

---

[30] Shoop v. Twyford, 596 U.S. 811 (2022); Shinn v. Ramierez, 596 U.S. 366 (2022). The Martinez hearing was held on April 20, 2022. (See N.T. 4/20/22, ECF No. 176).

Pruitt's arguments are well-taken.  For one, the Commonwealth failed to cite any authority to support its position that these materials are outside the state-court record.  And, as Section 9545(d) of the PCRA makes clear, there is no entitlement to discovery or an evidentiary hearing, except with leave of court and upon a showing of exceptional circumstances.  Under Pa. R. Crim. P. 902(D), "[t]he defendant shall attach to the [PCRA] petition any affidavits, records, documents, or other evidence which show the facts stated in support of the grounds for relief, or documents, or other evidence which show the facts stated in support of the grounds for relief, or the petition shall state why they are not attached."  Within twenty days of the Commonwealth's answer deadline, "the judge *shall* promptly review the petition, the Commonwealth's answer, if any, and *other matters of record relating to the defendant's claim(s)*, and shall determine whether an evidentiary hearing is required." (emphasis added).  Pa. R. Crim. P. 909(B)(1) (applicable to death penalty PCRA petitions).  Under Pa. R. Crim. P. 902(A)(15), a PCRA petition must include any request for an evidentiary hearing, and if so, "[t]he request for an evidentiary hearing shall include a signed certification as to each intended witness, stating the witness's name, address, and date of birth, and the substance of the witness's testimony.  Any documents material to the witness's testimony shall also be included in the petition."  Under 42 Pa. C. S. § 9543(a), a PCRA petitioner must "plead and prove" eligibility for relief but even in a death penalty case, there is no entitlement to PCRA discovery or an evidentiary hearing except upon a showing of a genuine issue of material fact and with leave of court.  Pa. R. Crim. P. Nos. 907, 908, and 909.  The requirement that petitioners attach or submit documents supporting their claims to their PCRA petitions to make that showing is well settled.  See, Commonwealth v. Carson, 913 A.2d 220, 251 (Pa. 2006) (holding petitioner "must attach supporting documentary evidence for his claims or an explanation as to why such evidence was unavailable . . . we have rejected claims that were unsupported by

documentary evidence").

Such documents are not only part of the state-court record but are also before the federal habeas court as part of that record.  See Marrero v. Horn, Civ. No. 00-2155, 2008 WL 3833382 at *17, n.12 (W.D. Pa. Aug. 15, 2008) (document submitted with PCRA petition was properly before PCRA and habeas courts).  Thus, all the evidence submitted in Pruitt's PCRA appendices and/or in the PCRA evidentiary hearing was properly before the state court and did not lose its record status as a result of the PCRA hearing even if it was not introduced.  Indeed, were a PCRA petitioner required to re-introduce at a hearing all of the documents already submitted, the state courts would be bogged down even further.  Pruitt submitted Dr. Shields' reports to the PCRA court[31] and they thus may be considered here.

The Pennsylvania Supreme Court found there were three "primary lines of evidence" against Pruitt at trial: (1) his confessions to police and Peterson; (2) the pathologist's testimony that Gougler had been beaten, strangled and raped and the police testimony that she was found naked; and (3) the DNA report and testimony about the swab taken from her left thigh.[32]  As to the DNA evidence, after reviewing the testimony of serologist Brincat and analyst Mihalacki, the Court noted Pruitt's lawyer pointed out on cross-examination that the DNA data showed there was more than one contributor to the portion of the evidence sample denominated as the [fe]male component, and the remainder of the cross-examination focused on racial differences in the

---

[31]  See, Amended PCRA Appendix (3/10/10), Vol. I, Tabs 4, 5, and 6.

[32]  The Court consolidated its findings on Pruitt's claims that trial counsel was ineffective in failing to investigate and refute the Commonwealth's DNA evidence and in failing to elicit facts underlying the asserted violation of Napue v. Illinois, 360 U.S. 264 (1959). In Napue, the U.S. Supreme Court held prosecutors have a constitutional obligation to correct knowingly-false testimony, regardless of whether the false testimony goes only to the issue of witness credibility. Id. at 269.

population samples and the handling of the evidence samples.[33]

The state court record before this Court relevant to this claim contains, *inter alia*, the PCRA testimony of forensic geneticist Randal T. Libby, Ph.D., the original and amended letter reports from Dr. William Shields (as discussed above), who was a second DNA expert retained on PCRA who did not testify, and Pruitt's two trial attorneys, Michael J. Cammarano and Peter David Maynard. Dr. Libby stated that the swab contained an insufficient quantity of DNA to support reliable analysis, and the "male" component of the sample was of low-template quality which generated "a great deal of subjectivity in interpreting the testing result," a task made more complex by the fact that there were multiple contributors. Pruitt II, 162 A.3d at 398-399. Contradicting Mihalacki's testimony that there was a match to Pruitt at every marker, Libby testified her PSP report facially showed inconclusive results at five genetic locations, which Libby also attributed to the insufficient amount of DNA. Id. at 399. In Libby's opinion, Pruitt should have been excluded as a contributor, a conclusion which was further supported by Mihalacki's initial analysis of the sample, which she then discounted in favor of further testing. Id. Libby found both Mihalacki's probability estimates and her conclusion that there was any sperm inappropriate due to the inconsistencies in the data, and because sperm tails must be detectable on microscopic examination to draw that conclusion and here there were none. Id.

---

[33]    Footnote 2 of the Supreme Court's PCRA opinion reads in relevant part: "several of the genotypes reflected in Mihalacki's report assigned to the female component of the evidence sample taken from the victim's thigh contained more than two numbers, thus indicating the presence of multiple contributors." Pruitt II, 162 A.3d at 398, n.2. The court used "the male component" in its main text but here said counsel's questions pertained to the female, not the male component. The footnote – not the main text – is consistent with the transcript pages discussed, N.T.G. 316-320, and section four of the DNA report (Trial Ex. C-65), about which counsel was questioning Mihalacki. I find the phrase "the male component" is an error and that instead "the female component" was intended. I have thus made that bracketed change to the sentence in the main text above. This minor error makes no difference in the outcome.

In his two reports, Dr. Shields agreed with Dr. Libby that Pruitt was excluded by the DNA data, and that the Commonwealth's DNA evidence and testimony was false, misleading, and replete with mistakes.  (App'x to Am. PCRA Pet. 3/19/10, Tabs 4-6 (ECF No. 151); Petr.'s App'x, 49-65 (ECF No. 109)).  Dr. Shields stated that Pruitt's DNA profile was not identical at the FGA locus; this result should have "excluded [Pruitt] absolutely" as the source.  Further, in the sample, "there were 3 loci that failed to produce a genotype in the evidence and thus no one can conclude they matched Pruitt."  (Shields Report 1).  Shields further opined that Mihalacki's testimony was incorrect in stating the profiles were identical "because they were not," and that her testimony that the non-sperm fraction of the swab contained a mixture of Gougler's and Pruitt's DNA was also wrong.  (Shields Reports, 1-2; N.T.G. at 313).  Dr. Shields countered: "[n]o DNA expert can conclude they know the identity of the donors from such a mixed evidence sample."  (Shields Report 1).

The state court record also included both a declaration and PCRA testimony from Pruitt's guilt phase trial counsel, Michael Cammarano.  Cammarano's declaration stated the following with regard to DNA:

> The Commonwealth had very damaging DNA evidence against Pruitt.  We did not seriously consider retaining a DNA expert, although the judge probably would have given us money for one if we thought it would be helpful.  The probabilities in the Commonwealth's DNA report were so overwhelming that we did not believe any DNA expert could be helpful to the defense.  We did not otherwise investigate the DNA evidence.  Because the DNA evidence was damaging to the defense, I would have used any evidence that attacked the credibility of this evidence, and I would have had no strategic or tactical reason for not presenting such evidence.

(Cammarano Decl., PCRA App'x. (3/19/10), Tab 8 at 1-2, ¶5; App'x. to Pet. for Writ of Habeas Corpus, 66-69 (ECF No. 109)).

Cammarano also testified at the PCRA hearing that he was not significantly concerned with

the DNA evidence, because the Commonwealth already had adduced compelling physical evidence demonstrating the fact of rape via the testimony of a forensic pathologist, and moreover "there was only Appellant in the room." (N.T. 12/19/13 (PCRA Hrg.), 1196, 1201). He further testified:

> all the DNA did was identify, really identifying [Pruitt] as the person who committed the rape. But, you know, the fact of the rape was there, though, and there was no evidence of anybody else being there, so I didn't think it added much."

(Id., 1219).

Cammarano affirmed that the Commonwealth's DNA evidence presented a strong indication of Pruitt's culpability for rape, and he admitted that in spite of such materiality, he did not understand the data in Mihalacki's report and merely relied on her representation of a genetic match between the evidence sample and the sample taken from Pruitt. (See id., 1206-1208). He admitted that if Pruitt had not been a match at every genetic marker, that would have been less of an indication of guilt. (Id.). With reference to the data reflected in the report, Cammarano opined: "I don't imagine any lawyer would know how that got from A to B or what that means." (Id., 1208; Pruitt II, 162 A.3d at 399-400). Asked why he failed to investigate and prepare for the prosecution's DNA testimony, Cammarano said he did not want to draw attention to it, and he agreed the DNA identified Pruitt as the rapist. (N.T.G., 323; N.T. 12/19/13 (PCRA Hrg.), 1196, 1206, 1219, 1295, 1298-1299). Counsel did not seek discovery of the DNA lab files or any data underlying the report. (N.T. PCRA, 1204).

Finally, Cammarano testified he discussed the DNA evidence with Pruitt, who said it was inaccurate. (Id. at 1294). They also discussed Dr. Land's forensic findings that the victim was raped, and that the evidence indicated he was the only person in the house. (Id. at 1295). Pruitt did not say he was with someone else and he did not say he was alone; Cammarano assumed he

was alone but did not ask.  (Id. at 1298).

Cammarano also admitted he received a copy in pretrial discovery of a police interview of Robert McNair, with whom Pruitt had been smoking crack prior to Gougler's murder. (Pruitt's PCRA Ex. 54).  In the interview, McNair said he was smoking crack with not only Pruitt but also a short Hispanic male, in the afternoon just before the murder, not far from Gougler's house.  When they ran out of crack, Pruitt said he knew where he could get some money because he had been watching someone.  Pruitt and the Hispanic male left, and eventually returned with more crack. (PCRA Hrg., 1159-1160, 1198-1199 (discussing McNair Statement, Ex. 54)).   Cammarano acknowledged in hindsight that interviewing McNair might have been useful, but he never considered it and never considered investigating whether Pruitt was in the house with someone else.  (Id., 1160-1161, 1197).[34]  McNair gave an updated statement before the PCRA hearing, reiterating his earlier one, and testified at the hearing consistently with both.  McNair said he would have cooperated with defense counsel and testified to the same effect had he been contacted. (PCRA Hrg., 736-740 (discussing McNair Statement, Ex. 30), 1445-1465).

Similarly, neither defense counsel ever considered investigating the identity of the short, Hispanic male.  Instead of investigating whether this individual might have gone into the house with Pruitt and thus might have committed the sex crimes, counsel assumed he was just a passerby and, because he had not come forward of his own accord, likely would not cooperate.  (Id., 1198).[35]

---

[34]   As the Supreme Court acknowledged, evidence was presented at the PCRA hearing that the man with Pruitt when he spotted the victim in her back yard was Hispanic and that a tipster had reported Hispanic and black males in the victim's backyard on the night of the killing.  (Pruitt II, 162 A.3d at 401, n.10 (citing N.T. 12/10/13, 1198-1199, and N.T. 1/16/14, 1452-1453)).

[35]   Neither Defense counsel was asked if they had investigated what might have occurred while Pruitt was out buying and smoking more crack, leaving the victim's house open until he returned to clean up before leaving again.

In his testimony at the PCRA hearing, penalty phase counsel Maynard recalled Pruitt denied committing the rape in his police statement, and consistently and adamantly denied raping the victim in his discussions with counsel. (Id., 322-323, 408-410). Maynard did not recall speaking with Pruitt about the DNA evidence or Dr. Land's findings regarding the rape, but stated he would typically have discussed such matters. (Id., 409-410). Maynard testified the impact of the Commonwealth's DNA evidence that Pruitt matched the sample taken from Gougler's thigh was "[d]evastating" and "established for the jury beyond a reasonable doubt the charge of rape." Maynard believed the rape charge was important to the jurors, and played a detrimental and emotional role in their verdict, but he never considered trying to convince them there was reasonable doubt about the rape by impeaching the DNA evidence. (Id., 323-324).

Neither of Pruitt's defense attorneys prepared to cross examine Mihalcki, but Cammarano, who admitted he did not even try to understand the data in her report, was the one who conducted the cross examination. (Id., 324, 1203). It was Cammarano's strategy to attack the database Mihalacki had used to calculate the statistical probabilities of the alleged DNA match, with the goal of casting doubt on her report and testimony thereby undermining the Commonwealth's case. (Id., 1196, 1199, 1201, 1203, 1318). He left Mihalacki's testimony that Pruitt's profile was "identical" to the unknown male's DNA profile from the Swab at "every genetic marker . . . we checked" untouched, even though, as Dr. Libby testified on PCRA, her report contained no data for the unknown profile at three markers and only partial data at two others. (Id., 65-66).

Mihalacki's report also identified Ranae Houtz as one of two serologists who handled the DNA evidence. Houtz made at least one error that was corrected in a later report, and after she resigned, Brincat re-did her analysis. (Id., 1209-1215). However, these facts also were not revealed at Pruitt's trial. Cammarano did not cross examine Mihalacki about Houtz's involvement,

even after Mihalacki denied knowing who handled the left thigh swab before she tested it. (N.T.G., 316-323, 326-329 (cross and re-cross examination of Mihalacki)). Cammarano later testified at the PCRA hearing that he knew Houtz had been involved in this case, and that she had lost her job for errors requiring the PSP to notify prosecutors about her mistakes because he recalled reading news stories about it. (N.T. PCRA, 1209, 1212-1215). Nevertheless, he did not seek any discovery on Houtz's performance issues, nor did he cross examine Brincat about Houtz even though the report showed she was the one who found there was semen on the swab and sent it to Mihalacki for DNA testing. (N.T.G., 299-303).

In reviewing the Pennsylvania Supreme Court's factual findings in light of the foregoing evidence presented to the PCRA court, and presuming they are reasonable and correct unless rebutted, I find they are reasonable, correct, and unrebutted. 28 U.S.C. § 2254(d)(2), (e)(1). Indeed, the state Supreme Court found defense counsel should have, but did not, prepare for trial by fully investigating and understanding the Commonwealth's DNA report, which would have revealed its errors and enabled them to be refuted at trial. (Pruitt II, 162 A.3d at 397-400). It found "counsel's failure to appreciate – and exploit – the fact that the data in Mihalacki's initial report apparently indicated an affirmative *exclusion* of [Pruitt] as a contributor to the male evidence sample, is simply inexplicable." (Id., 401). Because defense counsel could not understand Mihalacki's report on their own, "plainly" they should have consulted an expert. (Id.).[36] The Supreme Court concluded that, having discovered significant differences between Mihalacki's data and her testimony, counsel should have challenged and countered it. (Id. at 397-401).

---

[36] Responding to counsel's PCRA testimony that no lawyer could understand the DNA report, the Supreme Court observed that Pruitt's post-conviction lawyers "amply comprehend it, including the multiple problems stemming from Ms. Mihalacki's interpretation of a partial genetic profile taken from a low-template evidence sample." (Pruitt II, 162 A.3d at 400-401).

But despite these alarming findings regarding trial counsel's effectiveness, the Supreme Court found no prejudice to the defendant and hence no merit to the ineffectiveness claim. If identity had been in question, it opined, "we would likely find prejudice to be manifest." (Id., 401). But Pruitt's "identity as the robber and killer" had "never seriously been put into contest, even at the post-conviction stage." (Id.). (citing to trial counsel's attestation at PCRA hearing that Pruitt consistently confirmed the facts he had related to police, including that he had violently attacked the victim). The physical evidence showed someone had raped the victim, and Pruitt "never provided any plausible explanation that would persuasively suggest any other person's involvement in the relevant events that took place in the victim's house." (Id.). Thus, the Supreme Court concluded that "while trial counsel should have provided more able stewardship relative to the DNA evidence," Pruitt failed to establish "a reasonable probability that the verdict would have been different had counsel done so." (Id. at 401-402).

As noted earlier, Supreme Court Justice David Wecht dissented. Although he agreed there was enough evidence without the DNA to convict Pruitt of the murder and other charges, in Justice Wecht's view, there was still a reasonable probability that the jury would have found reasonable doubt about rape and IDSI had defense counsel impeached the Commonwealth's experts by bringing out the PCRA-developed facts, which most importantly included, that Pruitt was actually affirmatively *excluded* by the DNA. (Pruitt II, 162 A.3d at 401-402, n.10). After all, Pruitt had repeatedly denied the rape while remorsefully confessing to the other crimes, claiming it was an accident. But rape, especially of an elderly stranger, is particularly heinous and DNA evidence understandably had a strong impact on jurors. Mihalacki's probability statistics which purported to show with near-certainty that Pruitt was the rapist likely invoked a strong emotional reaction from the jury which affected not just their verdict in the trial's guilt phase but also their weighing

of the aggravating and mitigating circumstances in the penalty phase. If the DNA testimony had been refuted, there was a reasonable probability that the jury would have weighed differently, and a life sentence imposed. (Pruitt II, 162 A.3d at 413-414 (quoting N.T. PCRA Hrg. at 323-324)).

In pointing to Pruitt's failure to show anyone else was in the house, the Supreme Court majority also overlooked the fact that the burden was not Pruitt's. Although he bore the burden at the PCRA proceedings, Pruitt did not need to show he was actually innocent of the sex crimes, but only, in the ineffectiveness context, that the jury would have found reasonable doubt had counsel performed effectively. (Id. at 412-413). If they had, Justice Wecht opined, it would have been reasonably probable that the jury would have found reasonable doubt as to the sex crimes, and Pruitt would have received a life sentence. Hence, he was entitled to a new penalty phase. (Id. at 406-414 (Wecht, J., dissenting)).

Neither Respondents nor Pruitt challenge the Pennsylvania Supreme Court's legal conclusion that his trial counsel performed unreasonably. And given the evidence adduced on PCRA, applying the deference required under AEDPA, I find the state Supreme Court reasonably applied Strickland in making this determination. Reviewing it de novo as required after finding an AEDPA violation, I also agree that defense counsels' performance was unreasonable inasmuch as under "prevailing professional norms," they should have engaged a DNA expert for this capital trial. See Padilla v. Kentucky, 559 U.S. 356, 366 (2010).

Pruitt consistently denied committing the sex crimes but confessed to the others with remorse. In preparing for trial, it was defense counsel's obligation to investigate Pruitt's position and the facts underlying the sex offenses, including the Commonwealth's DNA evidence purportedly linking him to those crimes. The fact that Pruitt was with a short, Hispanic male who knew Pruitt intended to get money from the victim for more crack contained in the pretrial

discovery statements, counsel's knowledge that original PSP serologist Houtz had resigned due to prior errors, and the DNA report itself showing blanks in certain spaces, provided obvious places to start the investigation.  As Pruitt argues, this was indeed one of those cases in which "the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence."  Harrington v. Richter, 562 U.S. 86, 106 (2011).  By his own admission, defense counsel's failure to do so was not a reasoned strategic decision but was instead "the result of inattention," or at least partially attributable to his inability to understand Milacki's DNA report. Wiggins v. Smith, 539 U.S. 510, 534 (2003).  See also Hinton v. Alabama, 571 U.S. 263, 274-276 (2014) (holding defense counsel renders inadequate assistance if he or she fails to make any effort to understand the resources available to permit retention of a qualified expert to rebut the prosecution's evidence).  Counsel simply had no reason to not investigate and the failure to do so rendered their performance alarmingly deficient and unprofessional, especially given the stakes involved.

Regarding the Supreme Court's finding of no prejudice, I conclude that that court unreasonably applied Strickland as to the rape and IDSI convictions, and I agree with Justice Wecht's dissent.  To reiterate, under the Strickland prejudice inquiry, the habeas court must examine the "fundamental fairness of the proceeding" by considering whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" – that is, there is "a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694, 696.  In undertaking this inquiry, "the hypothetical impact of evidence not presented at trial on that which was presented" must be assessed, and considered in light of "the totality of the evidence before the judge or jury."  Sanchez v. Davis, 994 F.3d 1129, 1140 (9th Cir. 2021) (discussing Strickland, 466 U.S. at 696).  The weaker the

evidence of the affected point at trial, the more likely that counsel's error was prejudicial; prejudice is also more likely if deficient performance "pervade[d] the whole trial. <u>Strickland</u>, 466 U.S. at 696. And as I have noted, in this case counsel's deficiencies were glaring.

Respondents do not contest Pruitt's argument that the Supreme Court's prejudice analysis was unreasonable because it improperly shifted the burden to Pruitt to show that no one else was involved. Nor do they challenge his argument that the Supreme Court's prejudice analysis unreasonably applied the holding in <u>Hinton v. Alabama</u>, 571 U.S. 263 (2014) when it held "the resolution of the issue again turn[ed] on Appellant's inability to establish prejudice in light of the compelling other evidence establishing his identity as the robber and killer and the fact of a rape, and the absence of any plausible alternative theory to discount that Appellant was also the rapist." These arguments are supported by the state court record from the trial and PCRA proceedings. The circumstantial evidence that Pruitt was the perpetrator of the sex crimes was not particularly strong, and on PCRA, he presented evidence about the Hispanic male with whom he and McNair had been smoking crack thus raising the possibility that someone other than Pruitt committed those crimes. Regardless, the burden was not on Pruitt to demonstrate someone else was involved. Rather, he only needed to demonstrate a reasonable probability of a different outcome had counsel performed reasonably by refuting the DNA evidence. The PCRA record demonstrates that he met that burden as to the sex crimes. The Supreme Court did improperly shift the burden to Pruitt and, in light of the credible DNA evidence developed on PCRA, its prejudice analysis was clearly an unreasonable application of both <u>Strickland</u> and <u>Hinton</u>.

What's more, had counsel performed reasonably, there is a strong likelihood that the DNA evidence strongly linking Pruitt to the rape would have been effectively negated altogether. Without the DNA evidence and Mihalacki's testimony interpreting it, the only evidence linking

Pruitt to the sex crimes would have been entirely circumstantial and wholly reliant on Pruitt's admitted presence and guilt as to the other crimes and the absence of evidence that anyone else was in the house. Circumstantial evidence of rape might be sufficient where a defendant admits tying the victim up with her own clothes, but had counsel performed effectively, that would not have been the only evidence about the possible identity of the rapist.

In failing to undertake any investigation at all, into, *inter alia*, Houtz's involvement in Pruitt's case, into the accuracy of Mihalacki's probability analysis, and into the identity of Pruitt's crack-smoking companions on the afternoon of the murder, despite having had ample time to do so, and in failing to retain a defense DNA expert, defense counsel's representation fell below the prevailing professional standards and was unreasonable. If counsel had countered the DNA evidence and produced the evidence outlined above, there indeed exists "a reasonable probability that, but for these errors, the result of Pruitt's trial would have been different." Darden v. Wainwright, 477 U.S. 168, 184 (1986) (citing Strickland, 466 U.S. at 694). Given that confidence in the outcome of the trial has been severely compromised, I find Pruitt has demonstrated prejudice with respect to his convictions for rape and IDSI, and thus those convictions cannot stand.

Pruitt also argues that his sentence was affected by his counsel's unreasonable performance during the penalty phase of his trial. The Commonwealth does not answer this argument, and because the Pennsylvania Supreme Court did not find prejudice as to the rape and IDSI, it did not evaluate the sentencing phase for prejudice.

Having found error in the guilt phase, I consider the effect of defense counsel's performance on Pruitt's sentencing *de novo*. In analyzing possible prejudice on capital sentencing under Strickland, "the question is whether there is a reasonable probability, absent [counsel's guilt phase] errors, the sentencer . . . would have concluded the balance of aggravating and mitigating

circumstances did not warrant death." <u>Strickland</u>, 466 U.S. at 695. In answering this question, it is proper to consider "the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the [state] habeas proceeding" – and "reweig[h] it against the evidence in aggravation." <u>Porter v. McCollum</u>, 558 U.S. 30, 41 (2009) (*per curiam*). Pennsylvania requires capital jury unanimity, so a reviewing court must decide if there is a reasonable probability that but for counsel's deficient performance and in light of the totality of mitigating evidence, just one juror would have weighed the aggravating and mitigating circumstances differently and voted for life. <u>Saranchak v. Sec'y, Pa. Dep't of Corr.</u>, 802 F.3d 579 , 597 (3d Cir. 2015).

Applying these principles to the instant case, I find the new evidence presented at Pruitt's PCRA hearing would have substantially "altered the sentencing profile" at the penalty phase of his trial. <u>See</u> <u>Strickland</u>, 466 U.S. at 700. Again, without the DNA evidence and Mihalacki's testimony interpreting it, the only evidence linking Pruitt to the sex crimes would have been entirely circumstantial and wholly reliant on Pruitt's admitted presence and guilt as to the other crimes and the absence of evidence that anyone else was in the house. Had counsel performed reasonably and countered the emotionally-charged DNA evidence, there is a reasonable probability that at sentencing, at least one juror would have weighed the aggravators and mitigators differently and concluded that on balance, the one mitigator which it did find (longtime history of cocaine use), outweighed the sole aggravator (the killing was committed in perpetuation of a felony, though the jury did not specify which felony). It is also reasonably probable that had defense counsel performed reasonably with respect to the DNA evidence, the jury could have found more than one mitigating circumstance and no aggravating circumstances. Either way, the jury would have been required to sentence Pruitt to life imprisonment instead of death.

And even if the jury had found Pruitt guilty of one or both of the sexual offenses, I find

that had defense counsel effectively impeached the DNA evidence, he could have utilized the impeachment in his penalty phase presentation, again making it reasonably probable the jury would have weighed the aggravators and mitigators differently and more favorably toward Pruitt. The Supreme Court's finding that there was no prejudice is therefore clearly incorrect. The writ of habeas corpus shall be granted conditioned on a new trial or disposition for the rape and IDSI convictions and a new sentencing ordered for the remaining convictions.

        B.      *Claim Two:  <u>Napue/Giglio</u> False Testimony and Ineffectiveness*

What Pruitt portrays as his second claim, stated in the alternative in two legally distinct sub-parts, is actually two claims. He argues first the Commonwealth violated due process and his right to a fair trial under <u>Napue v. Illinois</u>, 360 U.S. 264, 269-272 (1959) and <u>Giglio v. United States</u>, 405 U.S. 150, 153-155 (1972) by failing to correct the false and misleading testimony of Mihalacki that Pruitt was a DNA match to the sample, and both Mihalacki and Brincat's omission of the involvement of PSP serologist Houtz. Alternatively, Pruitt contends defense counsel was ineffective for failing to highlight and impeach that obviously false and misleading testimony. (Pet. for Habeas Corpus, 19-36 (ECF No. 94); Mem. in Supp. Pet. for Habeas Corpus, 36-57 (ECF No. 142); Reply Mem. in Supp. of Pet. for Habeas Corpus, 27-33 (ECF No. 160)). The Commonwealth responds that Pruitt's first claim is defaulted and that the state court reasonably applied <u>Strickland</u> in adjudicating the second. (Comm. Resp.to Pet. for Habeas Corpus, 26-37 (ECF No. 151)).

Pruitt's first alternative argument is confusing and his second – ineffectiveness – is closely related to his first claim. In any event, I will view these claims together as the state court did.

<u>Napue</u> and <u>Giglio</u> claims are a subset of <u>Brady</u> claims insofar as they relate to testifying witnesses. As the Supreme Court recently observed,

> To establish a <u>Napue</u> violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it "to go uncorrected when it appear[ed]." <u>Ibid</u>. If the defendant makes that showing, a new trial is warranted so long as the false testimony "may have had an effect on the outcome of the trial," <u>id</u>., at 272 – that is, if it "in any reasonable likelihood [could] have affected the judgment of the jury," <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972) (quoting <u>Napue</u>, 360 U.S. at 271). In effect, this materiality standard requires "the beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." <u>United States v. Bagley</u>, 473 U.S. 667, 680, n.9 (1985) (quoting <u>Chapman v. California</u>, 286 U.S. 18, 24 (1967)).

<u>Glossip v. Oklahoma</u>, 145 S. Ct. 612, 626-627 (2025).

> The passage of Mihalacki's testimony that Pruitt alleges the prosecutor knew was false is:

> A. So there was actually a mixture of DNA from Greta Gougler and Michael Pruitt. And in the sperm fraction which was what we tried to separate and only the sperm DNA cells, that matched Michael Pruitt.

> Q. Matched, what does it mean by matching, ma'am?

> A. It was consistent. Every genetic marker, every place we checked from this sample and Michael Pruitt's were identical to each other.

> Q. Ms. Mihalacki, what is the probability an unrelated person would have had the same DNA profile?

> A. Approximately 1 in 39 billion from the Caucasian population, 1 in 1.5 billion from the African American population, and 1 in 29 billion from the Hispanic population.

(N.T.G., 313).

Pruitt asserts this testimony is inconsistent with the DNA report, turned over before trial.

He raised and developed this first subclaim on PCRA review. (See, Am. PCRA Pet., 31-49;

App'x., (3/19/10), Tabs 1-19 (including 2010 DNA reports of Drs. Libby and Shields, plus

materials regarding errors and public resignation of PSP analyst Ranae Houtz). After the

Commonwealth complied with the PCRA court's discovery order, Pruitt developed it further at

the PCRA hearing and reviewed the evidence in his post-hearing brief. (Supplement and

47

Amendment to PCRA Pet., (9/17/12), 7-10 and App'x. thereto, Tabs 1, 2; PCRA Reply (1/3/13), 8, 16; Post-hearing Memo., (10/16/14), 10). After the PCRA court replaced the CHU, this was one of the preserved claims, but the PCRA court denied it, finding no errors in the DNA collection, handling or presentation and no arguable merit to the assertion that Mihalacki's testimony was false and misleading. (Petr.'s Memo. in Support (11/23/15), 2 ¶B; PCRA Ct. Op., 14-15).

In reviewing the claim on appeal from the PCRA court, the Pennsylvania Supreme Court recognized that Pruitt was arguing he "was denied due process and the effective assistance of counsel on the basis of [Mihalacki's] assertedly false attestation," and second, that "Mihalacki and Brincat testified falsely regarding Houtz's involvement and error in this case, concealing from the jury that crucial evidence was processed and tested by a forensic scientist whose repeated errors forced her resignation and called into question her work in over 600 cases." Pruitt II, 162 A.3d at 402. (See also Def.'s PCRA Br. (12/16/16,) 40-54). The court also acknowledged Pruitt's ineffectiveness argument. Id.

The Supreme Court nevertheless affirmed the trial court's PCRA decision. Finding the errors in Mihalacki's DNA report and Houtz's involvement were clearly apparent from the face of the report and/or were disclosed by the prosecution in a pre-trial letter, the court concluded the due process portion of the claim could have been raised at trial or on direct appeal and was therefore waived. Pruitt II, 162 A.3d at 402.[37]

However, the Pennsylvania Supreme Court opined on the merits in the alternative. The

---

[37] Under the PCRA, a claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." 42 Pa. C. S. A. § 9544(b). This provision applies to Napue and Giglio claims, as well as to due process claims that Commonwealth DNA evidence, including testimony, was invalid, misleading, and concealed. See, e.g., Commonwealth v. Bomar, 104 A.3d 1179, 1191 (Pa. 2014); Commonwealth v. Chmiel, 30 A.3d 1111, 1130 (Pa. 2011).

DNA report, disclosed to the defense before trial, showed no data at five loci, contradicting Mihalacki's testimony that "'[e]very genetic marker, every place we checked from this sample and [Pruitt's] were identical to each other.'" Id. (quoting N.T.G. at 313). The court observed, however, that Mihalacki still could have believed this constituted a match, since, as even Pruitt's PCRA expert had testified, some DNA laboratories will indeed find a match based on such a partial profile, though there is disagreement about that approach's scientific validity (and the court itself expressed disapproval of that approach). Pruitt II, at 403 (citing N.T. PCRA at 60). The court further stated:

> With regard to Houtz, before trial the Commonwealth discussed her involvement with defense counsel and explained that the serology testing had been repeated by Brincat. See, e.g., N.T. [PCRA], 1398-1399 [pretrial letter dated 5/3/04 from Assistant D.A. Adrian Shchuuka to defense counsel Cammarano, PCRA Ex. 61, also referred to in briefing as the "Shchuka letter"]. Mr. Brincat's report also indicated—in bold capital type—that the relevant samples of genetic material had been submitted to the DNA laboratory in October 2002, about five months before Brincat testified that he began his own testing of samples pertaining to Appellant's case. See N.T.G. at 301. This too, then, was information readily available to counsel.

Pruitt II, 162 A.3d at 403. Thus, the Supreme Court found that the Commonwealth did not conceal Houtz's involvement in the initial testing and in the chain of custody underlying the DNA analysis. Id.

In habeas litigation, Pruitt initially argued that the state court had denied this claim under the wrong standard, noting it failed to cite Napue in its opinion. He asserted he was entitled to *de novo* review but that even if deferential review was due, the state court's adjudication was contrary to Napue since the testimony was false. (Memo., 52-55). The Commonwealth disagreed and pointed out the state court's default ruling, which Pruitt acknowledged. (Resp., 27-30; Reply, 29-30). Reiterating that the state court did not apply the correct standard in its alternative merits

ruling, Pruitt argued he should not have been expected to raise the claim on direct appeal, even though counsel knew or should have known the information underlying this claim. He added that attorney Dautrich's preserving this claim among the three at the PCRA claim abandonment colloquy meant it was not waived. (Id.).[38]

I agree with the state courts that Pruitt did not fairly and in a timely fashion assert the Napue/Giglio variant of this claim even though, through counsel, he easily could have done so at trial through cross-examination, or on direct appeal. When he did assert it, he did so too late, thereby violating the state's established procedural rules under which errors are to be raised when they become or should have become apparent. As the state court found, that point was at trial, because the information underlying the claim had been fully disclosed beforehand. The Napue/Giglio due process claim is thus defaulted on the independent and adequate state grounds articulated by the Pennsylvania Supreme Court.[39] Because Pruitt has also failed to demonstrate cause and prejudice or a fundamental miscarriage of justice to allow review of the defaulted claim, and I can find no cause and prejudice or miscarriage of justice to excuse it, I uphold the finding of default.[40] The claim may not be reviewed.

Even if it could be reviewed, however, I agree that the Pennsylvania Supreme Court

---

[38] Both Pruitt and Respondents filed letters with this Court after Glossip was announced. (ECF Nos. 184, 185).

[39] The state court cited 42 Pa. C. S. § 9544(b) as explained in Commonwealth v. Keaton, 45 A.3d 1050, 1060 (Pa. 2012) (issue waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal, or in a prior state postconviction proceeding"). Pruitt does not challenge the adequacy and independence of this rule at the time of his direct appeal as applied in his case.

[40] Separately, in a general section applied to many claims, Pruitt asserts PCRA counsel's ineffectiveness excuses the default of any claim the state court found waived, relying on Martinez v. Ryan, 566 U.S. 1 (2012). (Reply, 9-11). Martinez, however, does not apply to "any claim" – only those of trial counsel ineffectiveness. This is not a trial counsel ineffectiveness claim.

reasonably applied <u>Napue</u> and <u>Giglio</u> in denying this due process claim in its 2017 opinion disposing of the PCRA appeal. That it did so in the alternative, after finding the claim defaulted, makes no difference. <u>See</u> <u>Rolan v. Coleman</u>, 680 F.3d 311, 319-321 (3d Cir. 2012) (AEDPA deference owed to state-court denial of claim on the merits in the alternative). Nor does the fact that the court did not cite <u>Napue</u> and <u>Giglio</u>, contrary to Pruitt's argument. <u>See</u> <u>Harrington v.</u> <u>Richter</u>, 562 U.S. 86, 97-100 (2011) (holding it does not matter whether a state court discusses federal precedent; § 2254(d)(1) applies whenever the state court decides on the merits, in whatever form).

As the state high court also found, it appears Mihalacki, Brincat, and the PSP lab in general sincerely believed that Pruitt was a DNA match and they conveyed that information to the prosecution, which had no reason to disbelieve it. I find Pruitt has not demonstrated that Mihalacki herself knew or believed that her testimony that Pruitt was a match, and/or why and how she so concluded, was false, let alone that the prosecution knew that her testimony in this regard was false at the time of trial. Moreover, as to her and Brincat's testimony concerning Houtz, I find their omission of her name when they were not asked about it but it was stated in the report about which they were being questioned, and notwithstanding that the prosecution sent a pretrial letter specifically about it to the defense, did not render their testimony false. Without false prosecution testimony, there is no <u>Napue</u> and/or <u>Giglio</u> violation.

The information Pruitt claims the Commonwealth suppressed was fully disclosed before trial. Although this aids his ineffectiveness variant as discussed below, it does not help his due process claim. His attorney knew or should have known of the information he could have used to argue that Mihalacki's testimony in this regard was misleading or false, and that Mihalacki and Brincat's failure to mention Houtz's name, when they were not asked, was arguably subterfuge

51

and thus falsity.

Although divided, before <u>Glossip</u>, some federal courts considered a <u>Napue</u> claim waived under similar circumstances.  <u>See</u> <u>United States v. Vega</u>, 813 F.3d 386, 391 (1st Cir. 2016) ("If a defendant has actual knowledge of the false testimony and fails to correct it, absent unusual circumstances, we assume the defendant did so for strategic reasons and consider the <u>Napue</u> claim waived.") (citing <u>United States v. Mangual-García</u>, 505 F.3d 1, 10-11 (1st Cir. 2007)).[41]  As the Pennsylvania Supreme Court pointed out, Pruitt never addressed this fundamental problem with the claim.  Pruitt argues that <u>Glossip</u> changed that in 2025, but I am reviewing the state court's 2017 adjudication of this claim under the deferential AEDPA standard to determine if, at that time, it violated "clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  "[T]he phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the *dicta*, of th[e] [Supreme] Court's decisions *as of the time of the relevant state-court decision*."  <u>Williams v. Taylor</u>, 529 U.S. at 412. (emphasis added).

In 2017, there were no U.S. Supreme Court decisions definitively holding that a prosecutor must correct testimony which he knows to be false when defense counsel already knows or should know of its false and misleading nature.[42]  Indeed, the U.S. Supreme Court's decision in <u>Glossip</u>

---

[41]   <u>See</u> LaFave, Israel, Kerr, King, & Leipold, 6 *Crim. Proc*. § 24.3(d) and at n. 161 (4th ed.), (discussing "[t]he duty to correct false evidence" and explaining that courts are divided on the impact on the defense that knowledge of falsity at trial has upon a defendant's due process claim under <u>Napue</u>) (collecting cases).

[42]   There was, however, an *en banc* decision by the Seventh Circuit Court of Appeals which specifically found the U.S. Supreme Court had never squarely held, in either the <u>Napue</u> or <u>Brady</u> context, that a prosecutor must "correct false testimony when defense counsel already knows" the truth (or presumably, should know it via full pretrial disclosure).  <u>See</u> <u>Long v. Pfister</u>, 874 F.3d 544, 549 (7th Cir. 2017) (*en banc*).  That meant the <u>Napue</u> claim failed under the deferential
(footnote continued on next page)

did not issue until February 25, 2025.[43]  Because <u>Glossip</u> did not exist in 2017, it cannot be utilized

in Pruitt's case to establish a violation of "clearly established Federal law, as determined by the

Supreme Court of the United States."  Because the 2017 state court adjudication was reasonable,

I find the first part of Pruitt's second claim lacks merit under AEDPA deference.

Pruitt's second "subclaim" is that because defense counsel knew or should have known of

the falsity of Mihalacki's and Brincat's testimony as regards their DNA analysis and silence about

Houtz's involvement, they rendered ineffective assistance in failing to bring these matters to the

jury's attention at trial.  Pruitt raised and developed this claim in the PCRA proceedings, and after

the Commonwealth complied with the PCRA court's discovery order, he developed it further.[44]

---

AEDPA standard in 2017.  <u>Id</u>.

[43]  At issue in <u>Glossip</u> was the State of Oklahoma's failure to disclose evidence showing that the sole witness linking the defendant (Glossip) to the murder of a hotel owner had a history of methamphetamine use and a diagnosis of bipolar disorder for which he had been prescribed lithium.  Although the defense was aware or should have been aware that the witness (Sneed) was taking lithium, there was nothing in the record showing that it knew why it had been prescribed.  When the witness testified at trial that he was prescribed the lithium for dental surgery and a cold, the prosecutor made no effort to correct him, despite knowing a prison doctor had diagnosed him as bipolar and prescribed the lithium.  Noting that under <u>Napue</u>, a conviction obtained through the knowing use of false evidence is a violation of the Fourteenth Amendment, the Supreme Court held the prosecution has an affirmative constitutional obligation to correct testimony it knows to be false, regardless of whether the defense was aware or should have been aware of the true underlying facts.  To that end, the Supreme Court stated:

> As an initial matter, Sneed's false testimony concerned the reasons for his lithium prescription, not the mere fact that he had taken it.  Glossip's counsel was aware of the latter, not of the former.  In any event, the Due Process Clause imposes "the responsibility and duty to correct" false testimony on "representatives of the State," not on defense counsel.

<u>Glossip</u>, 145 S. Ct. at 630 (quoting <u>Napue</u>, 360 U.S. at 269-270).

[44]  <u>See</u> Am. PCRA Pet., (3/19/19), 17-31, and App'x thereto at tabs 1-19 (including 2010 DNA reports of Dr. R. Thomas Libby and Dr. William Shields, and materials re: errors and public resignation of PSP analyst Ranae Houtz).  <u>See also</u> PCRA Supplement and Amendment, (9/17/12),

(footnote continued on next page)

After the PCRA court replaced the CHU and allowed Pruitt to waive all claims except the three adopted by new counsel, this was one of the preserved claims.  (Def.'s Mem. in Supp. of PCRA Relief, 11/23/15), 1-21).

The PCRA court also denied this ineffectiveness claim on the merits and Pruitt presented it on appeal to the Pennsylvania Supreme Court.  (PCRA Ct. Op., 8-14; Brief for Appellant, (12/16/16), 14-49; Reply (1/12/17), 1-5).  Again, the state high court rejected the PCRA court's analysis as to defense counsel's unreasonable performance but denied the claim for lack of prejudice.  (Justice Wecht dissenting).  Pruitt II, 162 A.3d at 397-402.  Pruitt has thus fairly presented this claim to the state courts and it is exhausted.  Respondents do not argue otherwise and hence the AEDPA deferential standard of review applies.

Given how closely related this claim is to Pruitt's first claim, I do not view it as a separate claim but as part of the first.  As such, I have already resolved it.  To be sure, Pruitt also argued as part of his first claim that his counsel was ineffective in his cross examination of both Mihalacki and Brincat by failing to object to their testimony about his alleged DNA match, and for failing to acknowledge and present evidence to the jury that serologist Ranae Houtz worked on and made at least one error in his case.  (Pet. for Habeas Corpus, 8 at ¶ 22, 14 at ¶ 33; Mem. in Supp. Pet. for Habeas Corpus, 20, 26).  In renewing those arguments within this second "subpart" of his second claim, Pruitt additionally submits his defense counsel should have also elicited the details of Houtz's public discipline for having made similar errors in many other cases, her failure to improve the quality of her work after re-training, her subsequent resignation from the PSP DNA Lab, and the repercussions for DNA analyses in myriad other prosecutions across the state.  (Pet. for Habeas

at tabs 1 and 2 (Libby Supplemental DNA Report, (7/24/12), and Document Production regarding Houtz); PCRA Reply, (1/3/13), 8-9; Post-PCRA Hearing Mem., (10/16/14), 2-20, 44-78.

Corpus, 20, at ¶¶ 48-49, 34-36 at ¶¶ 86-91; Mem. in Supp. of Habeas Corpus, 36, 49-52; Reply

Mem. in Supp. of Habeas Corpus, 31-33).

Reasonable counsel would certainly have brought those matters out to the jury.  However,

as I previously articulated in analyzing the first claim, there is no prejudice except as to the sex

crimes and there is no need to restate the analysis here.  Houtz's involvement, clear on the face of

the Commonwealth's DNA report, was not kept from defense counsel but, as with the DNA

report's facially apparent errors and Mihalacki's exaggerations, counsel failed to point this out at

trial.  That was unreasonable and ineffective performance, and it prejudiced Pruitt insofar as the

rape and IDSI convictions were concerned, as well as in the trial's penalty phase.

C.    *Default of Remaining Claims*

Pruitt argued in his habeas memorandum that certain defaults should be overcome and

those claims reviewed under Martinez v. Ryan, 566 U.S. 1 (2012) because PCRA counsel was

himself ineffective in abandoning numerous, fully-developed claims of trial-counsel

ineffectiveness.[45]  In its answer to Pruitt's habeas petition, the Commonwealth rested on the state

courts' determination that Pruitt had abandoned the rest of his PCRA claims at the oral colloquy,

and argued the waiver was valid.  In its view, if there was error, it was not on the part of PCRA

counsel, but rather was by the PCRA court or Pruitt in choosing to abandon most of his claims;

---

[45]  See Mem. in Supp. of Pet. for Habeas Corpus,  10 (any state court default finding is mistaken
and/or not based on adequate and independent ground, but if there is default, it is excused by cause
and prejudice and/or miscarriage of justice); 100-132 (claim 10, reviewing developed PCRA
factual record that trial counsel was ineffective for failing to present guilt-phase intoxication
evidence), 132-136 (Martinez argument that claim 10 is substantial and PCRA counsel was
ineffective for abandoning it), 151-167 (claim 14, reviewing developed PCRA factual record that
trial counsel was ineffective for failing to present penalty-phase intoxication/drug abuse evidence),
and 167-171 (Martinez argument that claim 14 is substantial and PCRA counsel was ineffective
for abandoning it).

thus, <u>Martinez</u> is inapplicable and the defaults are not excused.  (Comm. Resp., 2-11, at ¶5, 54-72, 80-97).  Following the <u>Martinez</u> hearing before me and in his Reply to the Commonwealth's response, Pruitt reiterated and elaborated on his arguments and in rebuttal of the Commonwealth's contentions.  (Petr.'s Reply, 2-19, 45-48, 52-55; Petr's. Post-Hearing Brief, 14-20).

I find the brief and unclear colloquy[46] during which the state courts found Pruitt abandoned 15 of the 18 claims he had fully developed at the extensive PCRA hearing to be highly unusual.  But this is not the only irregularity relevant to the default analysis.  Attorney Dautrich's confusing memorandum to which he appended Pruitt's summary judgment motion is another, as is the manner by which the PCRA court dismissed the CHU before appointing Dautrich.  Previously, the PCRA court had denied Pruitt's many motions to remove appointed counsel for failure to meet the stringent standard for substitution of appointed counsel.  But as to the CHU, despite  finding that that standard had not been met, the PCRA court apparently applied the more lenient choice-of-counsel standard for those who can pay or have found *pro bono* counsel.  In so doing, the court erroneously found, contrary to Judge Gardner's order in this case, that the CHU was not court-appointed but was instead acting *pro bono.*  It then appointed Dautrich as replacement PCRA counsel.

Events after the colloquy are also highly unusual.  For example, despite acknowledging it received them, the PCRA court failed to address and rule on the contents of Pruitt's and Dautrich's pleadings and letters which were submitted before and after the colloquy showing Pruitt intended

---

[46]  <u>See</u> <u>e.g.</u> the <u>Martinez</u> hearing testimony of Attorney Dautrich (N.T. 4/20/22, 62, 71-74 (ECF No. 176)) (discussing Judge Keller's apparent frustration with the length of time the PCRA proceedings were taking, and the cursory fashion in which he examined Dautrich's brief incorporating and preserving all of the issues raised, *inter alia*, in his consolidated memorandum and on the record at the hearings and in prior proceedings).

to waive only the penalty-phase and not any of the guilt-phase claims.[47]   The court's reliance on Pennsylvania state law which frowns on hybrid representation, is similarly odd since, from the start of this case, the court had a history of sometimes considering Pruitt's *pro se* pleadings and sometimes permitting him to participate in court more actively than most represented defendants, thereby allowing him a degree of hybrid representation.   Given that context, the PCRA court's *post hoc* statement in its opinion about why it had refused to consider Pruitt's *pro se* pleadings, *i.e.*, that it was prohibited from doing so, is non-sensical.   (PCRA Op., 17).

Pruitt briefed many of these irregularities through Dautrich, to the Pennsylvania Supreme Court on PCRA appeal.   Dautrich affirmed that Pruitt had intended to waive all penalty-phase claims at the confusing colloquy but:

> he never indicated a desire to withdraw or abandon any issues raised in his Amended [PCRA] Petition . . . filed on March 19, 2010.  Further, he did not intend to waive any issues raised as to guilt phase matters.  Simply put, Mr. Pruitt expected that the Court would make a decision on his request for Summary Judgment on the DNA claims [and] then he would be able to proceed further with all other guilt phase PCRA issues, if necessary.

(Appellant's Brief, 12/16/16, 63).

The briefing relied primarily but not exclusively on Commonwealth v. Saranchak, 810 A.2d 1197 (2002) and Commonwealth v. Starr, 664 A.2d 1326 (Pa. 1995) to support the argument that in a capital case, post-conviction courts are required to conduct a careful and "probing colloquy" before permitting each important constitutional claim or right to be abandoned on PCRA review and should reinstate the claim where there is any doubt about waiver.   Pruitt also argued that the PCRA court's reliance on Commonwealth v. Paddy, 15 A.3d 431, 471 (Pa. 2011) was

---

[47]   The PCRA court also failed to comment on a letter Pruitt sent just before the flurry of confusing pleadings that led to the colloquy, in which he complained that Dautrich was attempting to get him to waive claims against his will.  (Letter, (9/1/15)).

misplaced, since in <u>Paddy</u>, the PCRA court dismissed the petition without a hearing but here, "there were multiple days of hearings, hundreds of pages of hearing testimony, and all issues were raised, litigated, briefed and preserved for the review of the PCRA court, and ultimately for this Court on appeal." (Brief for Appellant, 65).

In its opinion, the Supreme Court recognized that Pruitt "vigorously challenge[d]" the PCRA court's claim abandonment finding, and briefly examined but disagreed with his assertion that "a developed colloquy is an essential prerequisite to the withdrawal of some claims presented in a post-conviction petition." <u>Pruitt II</u>, 162 A.3d at 405. The court did not fully address the arguments made before and after the colloquy in the written pleadings submitted by both Pruitt and his counsel that the PCRA court should have found the withdrawal to be invalid. These submissions included the January 13, 2016 letter from Pruitt himself, sent immediately after he had read the transcript for the first time. Nor did the Supreme Court acknowledge the content of those writings, which included Dautrich's shorter PCRA memorandum filed at the colloquy and its longer, almost-identical counterpart filed beforehand – which incorporated Pruitt's motion for summary judgment. Instead of examining the memo to see what claims it preserved, the Supreme Court simply and without further analysis adopted the PCRA court's view that there were only three claims remaining. <u>Pruitt II</u>, 162 A.3d at 404.

The state high court did observe in a footnote that "[s]even months after the proceeding," Pruitt filed a "*Nunc Pro Tunc* Statement to Correct the Record" stating "he intended to abandon only penalty-phase claims and all guilt-phase claims should be deemed to be preserved." <u>Pruitt II</u>, 162 A.3d at 405 n.12. The court did not mention, however, that this late pleading was not filed by Pruitt himself but by Dautrich, *i.e.*, the same attorney who was representing Pruitt on PCRA appeal. Nor did the court mention that, unlike his late-pleading attorney, Pruitt himself had acted

immediately by sending a letter with the very same arguments disagreeing with the PCRA court's order and asking counsel to take immediate action, (which obviously did not happen), or that Pruitt reiterated these points in a more developed *pro se* motion filed several months later in response to the Commonwealth's default arguments, and before the PCRA court's ruling.  (See *Pro Se* Protective Motion for Correction or Modification of the Record, 5/3/16).  Dautrich then appealed that order, depriving the PCRA court of jurisdiction.  It was only later, on July 22, 2016, that Dautrich filed his own *Nunc Pro Tunc* Statement to Correct the Record, in which he agreed with Pruitt.  Thus, the lateness was Dautrich's, not Pruitt's.

Although the Supreme Court acknowledged the PCRA court had placed a memorandum in the file finding it did not need to examine the later-filed pleading in light of the oral colloquy, it did not opine on the propriety of that action, *i.e.*, whether the PCRA court's failure to examine the contents of that pleading—or any of the other, timely-filed written materials contradicting its interpretation of the colloquy – might have been error.  Pruitt II, 162 A.3d at 405-406.  Finally, the state high court also ignored the PCRA court's statement in its opinion for appellate review that the law of hybrid representation had prohibited it from looking at Pruitt's summary judgment motion, even though it was explicitly appended to and incorporated into his counsel's memorandum.

Having failed to examine the pre- and post-colloquy pleadings and letters to the PCRA court from counsel and Pruitt demonstrating he had intended to preserve all his guilt-phase claims, the Supreme Court ignored the majority of the arguments in counsel's brief about the invalidity of the claim abandonment colloquy.  In so holding, the state high court rejected Pruitt's counseled arguments that a capital PCRA petitioner seeking to waive constitutional claims and rights  must be examined carefully at a searching colloquy, citing Starr  664 A.2d at 1335 ("probing colloquy"

59

required before capital defendant permitted to waive the constitutional right to trial counsel and proceed *pro se* at trial), and other state cases.  (Appellant's Brief, 59-63).  Distinguishing Starr, the court stated: "we differ with [Petitioner's] position that a developed colloquy is an essential prerequisite to the withdrawal of some claims presented in a post-conviction petition," and observed that the decision to withdraw some claims while pursuing others is "a strategic matter relegated to the sound judgment of counsel."  Pruitt II, 162 A.3d at 405 (citing Jones v. Barnes, 463 U.S. 745, 751-752 (1983)). [48]

Similarly, the court distinguished Saranchak from Pruitt's case on the ground that Saranchak "had withdrawn his post-conviction petition in its entirety," while here, Pruitt only abandoned the great majority of it, in "a winnowing of extensive claims presented to a post-conviction court."  Pruitt II, 162 A.3d at 406.  The court failed to acknowledge Pruitt's counseled point that these claims had not only been presented but had also been fully developed at an extensive evidentiary hearing.  The court concluded its opinion with the statement that "the record supports the PCRA court's determination that [Pruitt] abandoned claims other than those addressed in Part I of this opinion."  Id.

---

[48]    The reliance that the state courts placed upon the entirely unexamined professional judgment of PCRA counsel in this regard is curious, especially given that this is a case in which the same attorney continued to represent Pruitt on PCRA appeal, and the record and pleadings directly contradict the emphasized language.  Dautrich continued representing Pruitt on PCRA appeal and pled both before the PCRA court and on appeal that it was his contemporaneous understanding as Pruitt's counsel that he had *not* intended to abandon any guilt-phase claims, and he (Dautrich) shared this intent.  However, Dautrich failed to withdraw and seek replacement appointed counsel due to his own ineffectiveness once he became aware that, on his watch, his client's fully-developed PCRA claims had been mistakenly abandoned.  There is and has been throughout Pruitt's case an enforceable state-law right to effective appointed counsel in a first PCRA proceeding, Commonwealth v. Albrecht, 720 A.2d 693, 699-700 (Pa. 1998), though the means by which such a claim is to be raised have changed over time.  See Commonwealth v. Bradley, 261 A.3d 381, 391 (Pa. 2021) (reviewing history).  But that right to effective PCRA counsel was never asserted in Pruitt's case.

I accord no deference to this conclusion.  A state-court "determination that [a] waiver was

valid is not entitled to deference" under § 2254(d), because it is not an adjudication of a claim.

Fahy v. Horn, 516 F.3d 169, 180 (3d Cir. 2008).  Nor are any related factual findings due deference:

> We have already held that "the extent to which a state court afforded a defendant
> adequate procedural means to develop a factual record . . . might be a consideration
> while applying deference under . . . § 2254(e)(1)." . . .  Today we hold that when a
> state court's waiver colloquy fails to reveal whether the requirements of a valid
> waiver have been met due to procedural infirmities, substantive deficiencies, and
> an insufficient probing into a defendant's knowledge of the rights he is waiving,
> the findings by that court concerning the waiver are too unreliable to be considered
> "factual determinations."  They are not, therefore, entitled to the presumption of
> correctness.

Id., at 183 (internal quotation marks and citations omitted) .

The PCRA and Pennsylvania Supreme Courts' failures to closely review and carefully

consider the entirety of Pruitt's own and counsel's written submissions before, during, and after

the claim abandonment colloquy in this capital case, along with the many other irregularities

leading up to, during, and after the colloquy, constitute such "procedural infirmities" and

"substantive deficiencies," demonstrating the PCRA court "insufficiently probed" whether Pruitt

had the requisite knowledge of exactly what he was waiving.  Id.  Hence, the state courts' findings

about Pruitt's colloquy and abandonment of claims are just too unreliable to qualify as

determinations of factual issues which are due deference under 28 U.S.C. § 2254(e)(1).

Nor did the PCRA court afford Pruitt "adequate procedural means" to develop the record

on which claims he wished to preserve, which to abandon, and why.  Id.  Again, by ignoring the

written pleadings and hurriedly examining Dautrich's memorandum filed the same day as the

colloquy, and engaging in unclear and incomplete communication with Pruitt and counsel at the

rushed proceeding,  the court failed to make reliable factual findings regarding the claim

abandonment colloquy.  As such, its factual determinations are not entitled to the presumption of

correctness.  Id.  Nor are any of the Pennsylvania Supreme Court's, given its failure to thoroughly and adequately examine the record below and the arguments before it concerning the validity of the claim abandonment colloquy.  And, to the extent they might be viewed as a "determination of the facts," the findings of these courts as to Pruitt's claim abandonment colloquy are unreasonable "in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

Pruitt further argues his asserted default is invalid for three reasons:  (1) the waiver/abandonment colloquy was invalid; (2) the PCRA court applied the state hybrid representation rule inadequately; and (3) PCRA counsel was ineffective in abandoning substantial claims.  I address each in turn.

### a)    Validity of Waiver/Abandonment Colloquy

Pruitt first asserts the PCRA court's waiver conclusion is erroneous because, by refusing to consider the contrary written materials from before and after the colloquy, it failed to apply the federally mandated totality-of-the-evidence standard for a waiver.[49]  I agree.  The letters and pleadings from Pruitt and Dautrich demonstrate that Pruitt intended to preserve, not abandon, all other guilt-phase claims.  Indeed, a careful reading of Dautrich's confusing memorandum and Pruitt's *pro se* summary judgment motion appended thereto confirm that both Dautrich and Pruitt believed that all of his guilt-phase claims had been preserved, and that his testimony at the colloquy clearly conveyed that he was only abandoning his penalty-phase claims.  (See Def.'s Memo., 7; Def.'s Reply, 2-9, 11-13; Def.'s Post-Hearing Brief, 14-19).

---

[49]    Pruitt primarily relies on Oregon v. Bradshaw, 462 U.S. 1039 (1983), Wyrick v. Fields, 459 U.S. 42, 46 (1982), and Edwards v. Arizona, 451 U.S. 477, 481 (1981). Under these cases, decided in the context of "whether a valid waiver of the right to counsel and the right to silence had occurred," the salient question was "whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances."  Bradshaw, 462 U.S. at 1045 (quoting Edwards, 451 U.S. at 486 n.9).

Pruitt is correct that under federal law, a waiver of an important constitutional right must be made knowingly, intelligently, and voluntarily.  See Godinez v. Moran, 509 U.S. 389, 400-01 (1993); Edwards, 451 U.S. at 481.  Pruitt had already fully developed, at the extensive PCRA evidentiary hearing, the claims that the PCRA court later found he abandoned.  Those claims involve important constitutional rights, including the right to effective assistance of counsel at both phases of his capital trial.  At a colloquy on waiving such a right, a court must question the defendant thoroughly and probingly:

> The inquiry has two distinct dimensions.  First, the relinquishment of the right must have been voluntary in the sense it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Moran v. Burbine, 475 U.S. 412, 421 (1986).  These determinations must be made considering the totality of the circumstances.  Id.  The same is true under Pennsylvania law.  Commonwealth v. Gribble, 863 A.2d 455, 474 (Pa. 2004) ("it is the totality of the circumstances, and not the record waiver or colloquy alone, which controls.").  The totality is unique, depending "in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'"  Edwards, 451 U.S. at 482 (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).  See also U.S. v. General, 278 F.3d 389, 400-401 (4th Cir. 2002) (colloquy alone insufficient; totality required).

Strict adherence to these standards is especially critical in capital cases.  "[I]t is indisputable that the Constitution does require a waiver that literally carries with it life-or-death consequences to be made knowingly and intelligently."  St. Pierre v. Cowan, 217 F.3d 939, 948 (7th Cir. 2000) (citing Gilmore v. Utah, 429 U.S. 1012, 1013 (1976)).  Because a death sentence is final, reviewing courts are to apply heightened scrutiny to ensure its appropriateness.  Woodson v. North Carolina,

428 U.S. 280, 305 (1976) ("[T]he penalty of death is qualitatively different from a sentence of imprisonment" . . . . and "[b]ecause of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.")

The facts and circumstances concerning whether Pruitt's abandonment of claims was voluntary, intentional, and fully knowing include the written pleadings and submissions of Pruitt and his counsel, and are part of the totality of the circumstances underlying the waiver. Those writings clearly indicate Pruitt's intent was not to waive but to preserve his guilt-phase PCRA claims.[50] But the state courts did not consider them, and in failing to do so they plainly did not apply the required totality standard.

The PCRA court also violated these standards by conducting a brief, deficient colloquy, rather than one where Pruitt and Dautrich were carefully asked about each claim so as to ascertain which claims Pruitt intended to waive and which he intended to assert. See United States v. Mabry, 536 F.3d 231, 237-38 (3d Cir. 2008) ("A court has an affirmative duty both to examine the knowing and voluntary nature of the waiver and to assure itself its enforcement works no miscarriage of justice, based on the record evidence before it"). Barnett v. Mooney, No. 16-cv-2973, 2019 WL 4447588, *5 - *8 (E.D. Pa. Sept. 16, 2019) (waiver of PCRA claims invalid where counsel did not examine petitioner about each; it would be a miscarriage of justice if PCRA claims were not reviewed). The Pennsylvania Supreme Court also failed to review and address this matter fully and ignored the written pleadings and the procedural irregularities below; thus it also did not apply

---

[50] Although Pruitt's Martinez argument is considered within his third point below, it is noteworthy that at the Martinez hearing, Dautrich reiterated: "we did not intend to waive any issues in the PCRA motion [i.e., the 11/23/15 memorandum] except for penalty phase issues." N.T. 4/20/22 (ECF No. 176), 58.

the required totality standard.

Had the state courts examined Pruitt's written filings, they should have undertaken to review his claims on the merits.  I therefore find that the waiver/abandonment colloquy was invalid and the state-courts' finding that Pruitt waived claims cannot stand.

      b)     <u>Propriety of Application of State Hybrid Representation "Rule"</u>

Second, Pruitt argues that the alleged default of any claim stemming from the PCRA colloquy is based on a state procedural rule that is not independent or adequate as applied and thus the state courts erred in applying it to bar all but three of his claims for habeas relief.[51]  Although somewhat underdeveloped, Pruitt's argument apparently refers to the only rule which the PCRA court pointed to in explaining why it had refused to examine the writings articulating Pruitt's contrary intent before, during, and after the colloquy: Pennsylvania's rule against hybrid representation.  (PCRA Op. at 17).

Pruitt has long been a difficult client for both his court-appointed attorneys and the courts.  Despite being told to stop, he repeatedly sent letters and pleadings directly to the courts complaining about his appointed counsel's strategic decisions and actions, pressured counsel to do his bidding, and continued to file his own motions and irregular pleadings.  Pruitt has also persisted with inappropriate demands that his counsel do nothing without his personal, specific pre-approval, even going so far as to require pre-approval of requests to extend deadlines.  He has made numerous requests for removal of his appointed counsel, to proceed *pro se*, or be appointed

---

[51] <u>See</u>, Pet'r. Mem. in Supp. of Pet. for Habeas Corpus, 7; Pet.'r. Reply, 12-13 (citing <u>Ford v. Georgia</u>, 498 U.S. 411, 423-24 (1991) (rule inadequate as applied, not having been "firmly established and regularly followed" at time of petitioner's trial); <u>Johnson v. Mississippi</u>, 486 U.S. 578, 587 (1988) (rule inadequate as applied); and <u>James v. Kentucky</u>, 466 U.S. 341, 348 (1984) (rule inadequate as applied).

new counsel who would obey him on matters properly left to counsel's professional discretion, to which his counsel would usually respond by ignoring his demands. Although the courts often permitted him to proceed in this hybrid manner, no court has ever permitted Pruitt to proceed *pro se*.

The Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution guarantee criminal defendants the right to counsel, regardless of their ability to pay. Gideon v. Wainwright, 372 U.S. 335, 340 (1963); Commonwealth v. Brown, 476 A.2d 381, 384 (Pa. Super. Ct. 1984). If able to pay, or if he can locate an attorney willing to work *pro bono*, an accused may "'choose at his own cost and expense any lawyer he may desire.'" Commonwealth v. McAleer, 748 A.2d 670, 673 (Pa. 2000) (quoting Commonwealth v. Novak, 150 A.2d 102, 109 (Pa. 1959)). Denial of the right to choose self-paid or *pro bono* counsel is a structural error not subject to harmless-error review. United States v. Gonzalez-Lopez, 548 U.S. 140, 146-147, 150 (2006). But no such request has been made in this case, as Pruitt is and has been indigent throughout.

The standards are different for those who cannot pay, like Pruitt. The court appoints counsel at public expense for such defendants, and they may not choose their counsel. Randolph v. Sec'y Pennsylvania Dep't of Corr., 5 F.4th 362, 374 (3d Cir. 2021); Commonwealth v. Albrecht, 720 A.2d 693, 709 (Pa. 1998). Nor does the Sixth Amendment guarantee a meaningful relationship between accused and counsel, appointed or private. Morris v. Slappy, 461 U.S. 1, 13-14 (1983). Under Pa. R. Crim. Proc. 122(c), a request to replace appointed counsel will not be granted unless "substantial reasons" are demonstrated. This means counsel must find it impossible to represent the defendant effectively due to irreconcilable differences. Commonwealth v. Wright, 961 A.2d 119, 134 (Pa. 2008); Commonwealth v. Spotz, 756 A.2d 1139, 1150 (Pa. 2000). Mere dislike of

each other, problems working together, complaints about communication, strategy, etc., are insufficient. The conflict must permanently impair counsel's ability to zealously represent the defendant despite such disagreements, and the relationship must be incapable of repair. Commonwealth v. Cook, 952 A.2d 594, 610-11 (Pa. 2008).

The standard is similar under federal law. See United States v. Gillette, 738 F.3d 63, 78-79 (3d Cir. 2013) (no good cause when, despite "friction…the relationship had not suffered a complete breakdown"). Where an indigent defendant requests substitution of appointed counsel, the trial court must carefully probe why the request was made and the reasons for the alleged impairment, and enter detailed factual findings on the record; failure to do so is an abuse of discretion. See Martel v. Clair, 565 U.S. 648, 664 (2012); Commonwealth v. Prysock, 972 A.2d 539, 544-45 (Pa. Super. 2009). Although the decision is discretionary, the court must comply with these mandates, and only if it has inquired carefully is its credibility determination accorded substantial deference. See Commonwealth v. Staton, 12 A.3d 277 (Pa. 2010) (denying motion to withdraw).

What's more, every defendant proceeding with or without counsel must be competent to stand trial, showing "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and [that] he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960). In this case, the trial court found Pruitt competent under this standard just before trial began. But Pruitt has also repeatedly sought to represent himself. Although an accused has an affirmative right to reject counsel and to proceed on his or her own behalf at a state trial, there are instances in which the court may insist the defendant remain represented. Faretta v. California, 422 U.S. 806, 807 (1975). See also Indiana v. Edwards, 554 U.S. 164, 178 (2008) ("the Constitution permits States to insist

upon representation by counsel for those competent enough to stand trial under <u>Dusky</u> but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves."); Comment, Pa. R. Crim. Proc. 121.[52]

Under state law, criminal defendants have no right to hybrid representation (to proceed both *pro se* and with counsel), but trial courts have the discretion to permit or deny it. <u>See</u> <u>Commonwealth v. Staton</u>, 184 A.3d 949, 957 (Pa. 2018) (no such right); <u>Commonwealth v.</u> <u>Pursell</u>, 724 A.2d 293, 302 (Pa. 1999) (trial-level courts have discretion to allow or deny it). Hybrid representation is, however, forbidden in the state appellate courts. <u>See</u> <u>Commonwealth v.</u> <u>Ali</u>, 10 A.3d 282, 293 (Pa. 2010) (characterizing as a "legal nullity" a pleading filed by a represented appellant). Federal law is similar. Although a defendant has a Sixth Amendment right to self-representation, and a right to counsel, <u>Faretta</u>, 422 U.S. at 807, 832, there is no right to both. <u>McKaskle v. Wiggins</u>, 465 U.S. 168 (1984); <u>United States v. D'Amario</u>, 268 F. App'x 179, 180 (3d Cir. 2008). In this District, it is within the Court's discretion to permit some hybrid representation, as I have done. <u>Fletcher v. Beard</u>, Civ. No. 10-3188, 2016 WL 2866431, *2 - *3 (E.D. Pa. May 16, 2016). On appeal, however, it is prohibited. <u>See</u> Third Circuit Local App. Rule 31.3.

---

[52]    Because Pruitt refused to comply with the trial court's order directing him to meet with the Commonwealth's psychiatrist, the prosecutor asked the court to permit its psychiatrist to assess Pruitt's competency based at least in part on Pruitt's transcribed testimony in his then-recent bench trial for assault. (N.T. 2/18/05, 26-34). Based on his review of that testimony, other court documents, and his limited court observations of Pruitt, the Commonwealth's psychiatric expert found that Pruitt was competent to be tried and that he had chosen on his own volition to not cooperate with his counsel. (N.T. 4/15/05, 54-63). Pruitt's own psychiatric expert, Dr. Rotenberg, found Pruitt incompetent to stand trial based on his long addictions to alcohol and cocaine and for an unusual reason which was aggravated by the court's permitting him to proceed *pro se* or in hybrid fashion – his narcistic and unrealistic belief that he could do a better job than his attorneys. (N.T. 4/15/05, 1-32, 75-84 and Exs. D-1, D-2).

Again, the Pennsylvania Supreme Court did not examine or discuss but simply accepted *sub silentio* the PCRA court's conclusion that it was barred by Pennsylvania's so-called rule against hybrid representation from considering the written evidence undermining the conclusion that Pruitt waived 15 of his 18 claims at the colloquy. To preclude habeas review, a state procedural rule must be independent of federal law and adequate to support the judgment, both in general and as applied. Glossip, 145 S. Ct. at 624-625; Coleman, 501 U.S. at 749. A state ground of decision is independent only when it does not depend on a federal holding and is not intertwined with questions of federal law. Glossip, 145 S. Ct. at 625 (citing Foster v. Chatman, 578 U.S. 488, 498 (2016) and Michigan v. Long, 463 U.S. 1032, 1040-1041 (1983)). A state procedural rule is generally adequate to preclude federal review if "firmly established and regularly followed" on the date of the purported default, and was at that time "readily ascertainable." Johnson v. Lee, 578 U.S. 605, 608 (2016); Beard v. Kindler, 558 U.S. 53, 60 (2009) ("Kindler V") (quoting Lee v. Kemna, 534 U.S. 362, 376 (2002)); Szuchon v. Lehman, 273 F.3d 299, 329 (3d Cir. 2001). This requirement ensures "federal review is not barred unless a habeas petitioner had fair notice of the need to follow the state procedural rule," and unless the rule is applied fairly, not "by whim or prejudice." Bronshtein v. Horn, 404 F.3d 700, 707, 708 (3d Cir. 2005). A state procedural rule is not automatically inadequate and unenforceable just because it is discretionary and not mandatory. Kindler v. Horn, 642 F.3d 398, 399 (3d Cir. 2011).

That a rule has been found adequate in general, however, does not necessarily make it so as applied. "[A]dequacy is determined with reference to the particular application of the rule." Evans v. Sec'y Pennsylvania Dep't of Corr., 645 F.3d 650, 657 (3d Cir. 2011) (citations and quotation marks omitted). See also, Shotts v. Wetzel, 724 F.3d 364, 370-72 (3d Cir. 2013) (excusing default). A generally adequate state rule may become inadequate to bar federal review

when applied "exorbitantly" or with unforeseen "pointless severity." Lee, 534 U.S. at 376-380; NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, 297 (1964).[53]  Indeed, "[t]he purpose of the adequacy doctrine is twofold: to ensure that state courts do not set traps for unwary litigants bringing disfavored claims, and to ensure that habeas petitioners have fair notice of what they must do to avoid default." Kindler, 642 F.3d at 401.  Thus, the context of each application is critical, and the courts will look to whether the state rule itself provides guidance regarding how it should be applied or whether such standards have developed in practice. Id.

As outlined above, the record establishes the state trial court exercised its discretion and permitted hybrid representation throughout the pre-trial, trial, post-trial, and PCRA phases of Pruitt's case,[54] and had repeatedly denied Pruitt's numerous requests for removal of his then-existing counsel and re-appointment of new attorneys.  Pruitt's initial requests for removal of the CHU from his case were denied until, inexplicably, his request for removal was granted.  Again, prior to removing the CHU and appointing Dautrich in its stead, the court asked CHU Chief Shawn Nolan whether Pruitt "was competent to make this kind of decision as to counsel," to which Nolan replied he would be "competent to make a choice of counsel."  (N.T. 12/4/14, 3-7; Order, 1/7/15).

---

[53] There were three considerations in combination that led the Lee Court to conclude the state court rule in its case requiring continuance requests to be written and accompanied by an affidavit had been exorbitantly applied, although it noted its "as applied" analysis was not limited to just those three.  First, perfect compliance with the later-cited rules would not have changed the judge's original reason for denying the continuance – his schedule.  Second, no published state opinion required rigid compliance with those rules under last-minute circumstances.  Third, the purposes of the rules—providing the court and opposing counsel with a proffer of what witnesses would say if a continuance were granted, and ensuring a continuance would allow them to testify—had already been fulfilled when counsel made his oral motion.  All knew Lee's family members had traveled far to provide alibi testimony and were unlikely to have left. Id., at 381-85.  Lee thus makes clear that adequacy as applied depends upon the particular circumstances of each case.

[54] See, e.g. N.T. 3/7/03; N.T. 2/18/05; N.T. 4/15/05; Orders, 2/18/05, 3/14/05, 4/18/05, 8/7/06 in CP-06-CR-0006003-2002.

However, in replacing the CHU with Dautrich, the court misapplied the standards for replacement of paid counsel instead of the standard for replacement of court-appointed counsel. To reiterate, removal of a court-appointed attorney requires a showing of "substantial reasons" other than mere dislike or difficulty working together, and the differences between the two must be so irreconcilable that counsel can no longer effectively represent the defendant. Spotz 756 A.2d at 1150; Pa. R. Crim. P. 122(c). And, given that adequacy as applied depends on the circumstances of each case, I find that under the circumstances in Pruitt's case where the court had tacitly accepted his *pro se* filings and denied his requests to represent himself or to appoint new counsel until suddenly it didn't, the so-called Pennsylvania rule against hybrid representation was neither firmly established nor regularly or consistently applied here. Accordingly, it is not adequate to bar federal review of Pruitt's habeas claims.

c)    Ineffectiveness of PCRA Counsel in Abandoning Substantial Claims

In support of the third and final prong of his argument that the substantial claims developed by the CHU should not be deemed to be procedurally defaulted, Pruitt invokes Martinez v. Ryan, 566 U.S. 1 (2012). Specifically, he argues that all of the trial counsel ineffectiveness claims developed by the CHU at the PCRA hearing (whether guilt or penalty-phase) are substantial and meritorious, that PCRA counsel was ineffective for allowing them to be deemed abandoned or waived by the state courts, and that defaults of any or all of these claims should be excused. (Petr.'s Mem. in Supp. of Habeas Corpus, Petr.'s Reply in Supp. of Habeas Corpus and Petr.'s Post-Hearing Brief, throughout). Pruitt further contends that PCRA counsel Dautrich was ineffective in: (1) failing to state clearly during the colloquy and in his memorandum, that he and Pruitt intended to preserve all of the guilt-phase claims; and (2) blindly obeying Pruitt's own misguided instruction to abandon the penalty-phase claims because, in so doing, Dautrich violated his duty

71

to exercise reasonable professional judgment in representing a capital client.[55]  See Porter v. McCollum, 558 U.S. 30, 40 (2009) (capital client being "fatalistic or uncooperative . . . does not obviate the need for defense counsel" to zealously represent).  See also, ABA Guidelines for Appointment and Performance of Defense Counsel in Death Penalty Cases with commentary (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913 (2003) ("ABA Guidelines" or "Guidelines")[56]; ABA Rules 10.8 ("The Duty to Assert Legal Claims")[57] and 10.15.1 ("Duties of Post-Conviction Counsel").[58]

In Martinez, the Supreme Court found that ineffective assistance of post-conviction counsel can be "cause" to forgive procedural default of an ineffective assistance of counsel claim, but only if the State required the prisoner to raise that claim for the first time during state

---

[55]  See Petr.'s Reply Mem. in Supp. of Habeas Corpus, 9-11, 17-19, 33-34, 36-37, 41-43, 46-47, 49-52, 56-59; Petr.'s Mem. of Law in Supp. of Pet. for Habeas Corpus, 75-76, 135-136, 167-171, 173, 175, 178; Petr's Reply Mem. in Supp. of Habeas Corpus, 2-19, 37, 46-47, 54-59 and throughout.  See also, Pruitt's pro se Supplements (ECF Nos. 118, 145); Pre-Hearing Letter (10/20/21), 2 (ECF No. 166).

[56]  See Bobby v. Van Hook, 558 U.S. 4, 17 (2009) (although ABA Guidelines not "inexorable commands;" they are "evidence of what reasonably diligent attorneys would do"), and Wiggins v. Smith, 539 U.S. 510, 524 (2003) ("Counsel's conduct similarly fell short of the standards for capital defense work articulated by the . . . ABA[]standards to which we have long referred as 'guides to determining what is reasonable.'") (internal citation omitted).

[57]  Counsel "at every stage of the case" should "consider all legal claims potentially available" and "evaluate each potential claim in light of . . . the importance of protecting the client's rights against later contentions [that] . . . the claim has been waived, defaulted, not exhausted, or otherwise forfeited."  31 Hofstra L. Rev. 913, 1028 (2003).  Pruitt argues his PCRA counsel was ineffective pursuant to this rule for abandoning fully-developed, meritorious claims.  Petr.'s Mem. in Supp. of Pet. for Habeas Corpus, 170.

[58]  "Post conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation . . ."  31 Hofstra L. Rev. at 1079, and 1086-87 (commentary).  Pruitt contends his PCRA counsel violated this rule by seeking to abandon, and for causing the state courts to view as abandoned his arguably meritorious claims.  Petr.'s Mem. in Supp. of Habeas Corpus, 170.

postconviction proceedings.  Id., 566 U.S. at 9.  As noted previously, in Pennsylvania, "claims of ineffective assistance of counsel are to be deferred to PCRA review" – trial courts should not entertain such claims upon post-verdict motion nor are they to be reviewed on direct appeal.  See, e.g., Commonwealth v. Watson, 310 A.3d 307, 311 (Pa. Super. Ct. 2024).  Thus, Pruitt was entitled to use ineffective assistance of PCRA counsel as a basis for establishing cause for the default of his claim that his trial counsel was ineffective.  Martinez, 566 U.S. at 17.

However, Martinez makes clear that a prisoner may establish cause for a default of a trial counsel ineffective assistance claim in only two circumstances.  These are: (1) where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial; and (2) where appointed counsel in the initial-review collateral proceeding (where the claim should have been raised) was ineffective under the Strickland standards.  Id., at 14.  The prisoner must also demonstrate that the underlying ineffective assistance of trial counsel claim is substantial, that is, that it has some merit.  Id.

Recognizing that ineffective assistance claims often depend on evidence outside the trial record, the Martinez court acknowledged the possibility that a hearing or other evidentiary proceeding may be necessary to facilitate the development of the factual bases for the claim.  Id., at 13.  However, this is not without limitations.  Under 28 U.S.C. § 2254(e)(2):

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

(A) the claim relies on –

(i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

73

(B)  the facts underlying the claim would be sufficient to establish by clear and
convincing evidence that but for constitutional error, no reasonable factfinder
would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(A) – (B).

In 2022, the Supreme Court decided <u>Shinn v. Ramirez</u>, 596 U.S. 366 (2022).  There, it decreed that "the equitable rule announced in <u>Martinez</u>" did not "permit[] a federal court to dispense with § 2254(e)(2)'s narrow limits because a prisoner's state post-conviction counsel negligently failed to develop the state-court record." <u>Id</u>. at 371. Then, in <u>Williams v. Superintendent, Mahanoy</u>, 45 F.4th 713, 720 (3d Cir. 2022), the Third Circuit instructed, in accord with both <u>Shinn</u> and Section 2254(e)(2), that before a federal evidentiary hearing is held on whether collateral counsel's ineffectiveness caused the default of a trial counsel ineffectiveness claim thereby excusing default under <u>Martinez</u>, the habeas court must not only find the claim to be substantial and potentially meritorious, but must also first determine the underlying defaulted ineffectiveness claim "succeeds considering only the state court record." <u>Id</u>., at 724.  If the court finds the underlying ineffectiveness claim would fail based solely on the state court record, it "should deny relief without more." <u>Id</u>., 723-724.  If the claim is found to have merit based on that record, the federal habeas court may then hold a hearing.  <u>Id</u>.

I held such a <u>Martinez</u> hearing on April 20, 2022, some one month before the Supreme Court issued its decision in <u>Shinn</u>. But in deciding to hold a hearing, I did not run afoul of either <u>Shinn</u> or <u>Williams</u>, because Pruitt's initial PCRA counsel, the CHU, had fully factually developed the state-court record concerning all trial counsel ineffectiveness claims during the extensive PCRA hearing and the two DNA witnesses who testified before me, had both already testified

before the state PCRA court.[59]  Moreover, before this hearing, I had preliminarily concluded that at least one of the defaulted underlying trial counsel ineffectiveness claims that was purportedly excused under Martinez, not only had some merit, but was likely to succeed in light of the developed record from the PCRA evidentiary hearing.  Accordingly, I shall consider the Martinez hearing testimony from Michael Dautrich and the evidence concerning his ineffective assistance.

Dautrich testified that Berks County Judge Keller, who was assigned to adjudicate Pruitt's PCRA petition, appointed him to represent Pruitt following the completion of the five or six evidentiary hearings and the removal of Pruitt's prior counsel (the CHU).  (N.T. 4/20/22, 55-56 (ECF No. 176)).  Dautrich was tasked with reviewing the entire record and preparing a brief in support of Pruitt's amended PCRA petition.  (Id., at 56).  Even before Dautrich filed the brief in October 2015,[60] Pruitt moved to have him removed as counsel.  (Id., at 68).  Judge Keller held a hearing on November 23, 2015, to resolve this and other issues.  At the November 23 hearing, Pruitt withdrew his objections to Dautrich's representation based upon their having then agreed

---

[59]    Dr. Randell Libby, one of the DNA experts who testified at the PCRA hearing and William Shields were both offered by the CHU in this Court for the stated purpose of clarifying the state court record.  (See N.T. 4/20/22, 6-7, 55-76 (ECF No. 176)).  The CHU also produced Michael Dautrich.  I expressed skepticism about the admissibility of Dr. Libby's testimony at the hearing, given the restrictions on re-litigating state matters in federal court, and in fact denied the CHU's request to permit Dr. Shields to testify. Subsequently, in light of Shinn, Pruitt abandoned his request for Shields' testimony.  (Id., at 85; Petr.'s Post-Hearing Br., 2, n.1  (ECF No. 178)).  After hearing the testimony from Libby, I fully disregard it for the same reason.  I do consider the Martinez hearing testimony from Dautrich, however, since, as PCRA counsel, he had not previously testified, and his testimony was offered solely to determine whether he was ineffective in representing Pruitt in the PCRA proceedings, i.e., to overcome the procedural default barriers erected in federal habeas.

[60]    Dautrich also acknowledged that he probably did not show his original October 2015 brief to Pruitt before he filed it and that he did not raise any penalty phase claims in that brief.  (Id., 66-67, 68-69).

that Dautrich would argue that the DNA claims were of such a nature and strength that the court should immediately address them on their own and grant relief "regardless of considering the merits of anything else." (Id., 57-58). Dautrich stated they did not intend to waive any issues in the PCRA motion except for penalty phase issues, which Dautrich admitted he agreed to abandon because Pruitt told him to do so. (Id., 66-67).

Dautrich and Pruitt also agreed on the filing of a modified version of the supporting brief which stated in part: "Petitioner expressly withdraws any penalty phase issues and argument raised by prior counsel." (Id., 58-59, 69). Dautrich incorporated and attached a copy of "Petitioner's Motion for Summary Judgment Relief" which Pruitt had prepared himself and filed with the Berks County Clerk of Court, to the modified brief. (Id., 59-61). It was Dautrich's understanding that following the submission of the modified brief and the November 23, 2015 colloquy with Judge Keller that "all issues that were of a guilt phase nature were for consideration of the court, and Mr. Pruitt waived only the penalty phase issues." (Id., 62). Dautrich testified that Judge Keller "was frustrated by the length of time the proceedings in the PCRA court were taking," and said that at the colloquy, the court performed only a cursory review of his 21-page memorandum and quickly read only the list of three issues; the Judge never acknowledged and apparently never read the language at the beginning and end that preserved all of the other guilt phase claims. (Id., 62, 71-72).

At the colloquy hearing that day, following Pruitt's on-the-record statement that he was "asking for a ruling on the DNA evidence; that's the issue I'm asking for the ruling," Dautrich explained "[w]e discussed abandoning the issues that he does not want raised at this time, and he understands and I believe he's making a knowing, conscious decision to abandon those issues that are not contained in the pages of the brief," (his post-hearing memorandum). (N.T. 11/23/15, 5).

76

Testifying in the <u>Martinez</u> hearing before me, Dautrich explained that the claims he thought were "contained" in his memorandum were not just the three DNA claims the judge quickly read aloud, but all of the other guilt phase claims as well because, in the memorandum's introduction and conclusion, he expressly incorporated all other guilt phase claims as previously developed and pled by earlier counsel in the PCRA proceedings. (N.T. 4/20/22, 69-71 (ECF No. 176)).

Dautrich (mistakenly) believed that the brief he filed that day "was absolutely clear that all issues raised in the consolidated memorandum and raised on the record at the hearings and raised, . . . in the prior proceedings pertaining to the guilt phase were preserved and to be ruled on as the court ruled on the PCRA motion." (<u>Id</u>., 71-72). Thus, he did not take Judge Keller's oral order finding the "defendant knowingly, intelligently and voluntarily abandoned any issues raised by prior PCRA counsel and/or Mr. Dautrich that are not contained in the memorandum in support of the PCRA relief petition filed this day by Mr. Dautrich" to mean that the court at that point believed he was abandoning everything but the DNA claims. (<u>Id</u>., 71). I asked Dautrich why he had not objected at the time this oral order (later transcribed) was dictated by the judge in open court. (<u>Id</u>., 73). He answered that "in hindsight, that may have been a better course of action," but he "didn't know" that he "heard the entirety of that" as he may have been speaking with Pruitt at counsel table after the proceeding ended and the judge likely dictated it very quickly. (<u>Id</u>.). He also explained that he didn't see it in writing until the transcript was prepared a month or so later and he couldn't say that he had "a clear recollection" that he "heard every word the judge spoke," or "every word of the order as the judge was dictating it." (<u>Id</u>., 73-74).

Dautrich further testified he mailed the colloquy/hearing transcript to Pruitt as soon as he

received it.  (Id., 63).[61]  Approximately one month later, in early to mid-January, Dautrich received

a letter from Pruitt stating he thought there were some problems with the way the transcript was

typed up.  (Id.).  It does not appear that Dautrich took any action to address Pruitt's concerns and

following the Commonwealth's response in March 2016, the PCRA court denied the petition in

"summary fashion" in "just an order."  (Id., 63-64).[62]

Given all of the above, I find Dautrich's representation was ineffective for failing to make

any effort to correct the PCRA court's understanding of what was being waived and what wasn't,

either during or immediately after the November 23, 2015 colloquy.  Indeed, the record shows that

Dautrich did nothing until July 2016, when it was too late to take any action to protect Pruitt's

interests because the case was on appeal.  At a minimum, he should have consulted with Pruitt and

filed an emergency motion to correct the record as soon as he became aware of the court's order

and not waited until after the court ruled.

I also agree that Dautrich should have persisted in pursuing the penalty phase trial counsel

ineffectiveness claim rather than simply obeying Pruitt's direction to abandon them.  See, Porter

v. McCollum, 558 U.S. at 40; Rompilla v. Beard, 545 U.S. 374, 381-382, 387 (2005); and Wiggins

v. Smith, 539 U.S. at 524 (discussing ABA Rules 10.8, 10.15.1, and ABA Model R. Prof. Cond.

1.2 (reserving fundamental matters to client, but leaving rest to counsel), and Annot. ("a lawyer

---

[61]    The first page of the November 23, 2015 transcript is time-stamped as having been filed with
the Clerk of Court's office on December 16, 2015.  (N.T. 11/23/15), 1.

[62]    As the record reflects, although Dautrich eventually filed a motion agreeing with Pruitt and
stating he had not intended to waive any of the guilt phase claims, he waited until July – some
eight months after the November 2015 hearing and claim waiver colloquy, six months after Pruitt
himself read the transcript and immediately wrote the court and his counsel raising his concerns,
and two months after the PCRA court denied Pruitt's PCRA petition and the case was on appeal.
Although Dautrich was not questioned at the Martinez hearing about this delay, it is of record.

representing a criminal defendant must meet obligations imposed by the Constitution, as well as those imposed by the ethics rules."). While disobeying Pruitt's directive would undoubtedly have caused more problems with their attorney-client relationship given Pruitt's history of attempting to control his counsel, that does not obviate or discharge Dautrich from fulfilling his professional obligations. See, e.g. Florida v. Nixon, 543 U.S. 175, 187 (2004) (defendant's "ultimate authority" as to strategy limited to "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal").

Accordingly, I find that through his PCRA pleadings, evidentiary and Martinez hearings, Pruitt has made the necessary substantial showing that all of his claims that his trial and PCRA counsel were ineffective have merit. Thus, any default is excused and I turn now to consider Pruitt's Claim Nos. 10 and 14 – that he was denied effective assistance during the guilt and penalty phases of his trial because his attorneys failed to investigate, discover and present available evidence of his short and long-term cocaine-induced psychosis and alcohol abuse to support both meritorious voluntary intoxication or diminished capacity defenses, and failed to present readily available evidence of mitigating circumstances.

> D.    Claims Ten and Fourteen: Trial Counsel Ineffectiveness for Failure to Investigate, and Present Evidence of Intoxication, Cocaine-Induced Psychosis and Related History at Both Phases of Trial

In Claim Nos. 10 and 14, Pruitt asserts his trial attorneys were ineffective insofar as they failed to present any evidence to support the viable defenses that he was of diminished capacity at the time of the murder because he was intoxicated, and under the influence of cocaine and alcohol, (Claim 10). Pruitt also alleges counsel failed to show any such evidence to mitigate and/or avoid the death penalty (Claim 14). Indeed, Pruitt demonstrated at the PCRA hearing that a plethora of lay and expert evidence was available at the time of trial that would have provided strong support

79

for these defenses and sentencing mitigators. Among other things, this evidence would have demonstrated that Pruitt had long been addicted to, binged, and abused both alcohol and crack cocaine, and had an established pattern of blackouts, and irrational, paranoid, and violent behavior while on those binges. Pruitt had also been diagnosed with Cocaine-Induced Psychotic Disorder, and impaired brain functioning as the result of multiple traumatic head injuries, the first of which occurred when he was five years old, and had a family history of drug abuse.

The evidence also would have shown that while Pruitt was kind, caring and peaceful when he was not intoxicated, his underlying cognitive problems were severely exacerbated by the effects of his drug and alcohol abuse, and that immediately prior to the murder, he had been on a days-long crack/alcohol binge that left him severely impaired, desperate for money, paranoid, and violent. This evidence could have therefore shown that Pruitt did not have the capacity to form the specific intent to kill Gougler. Pruitt submits that had trial counsel performed reasonably and investigated, they could have discovered and presented this evidence to the jury, and there is a reasonable probability that the outcome of both phases of his trial would have been different. (Pet. for Writ of Habeas Corpus, 69-106; Petr.'s Mem. of Law in Supp. of Habeas Corpus, 100-136; Petr.'s Reply Mem. in Supp. of Pet. for Habeas Corpus, 45-49). Because claims 10 and 14 are so factually and legally aligned, I find it is appropriate to analyze them together utilizing a *de novo* standard of review in light of the default analysis set forth above as they have not been adjudicated on the merits in the state courts. See Cone v. Bell, 556 U.S. 447, 472 (2009) (*de novo* review required where state courts did not adjudicate claim).

The law is well-settled that trial counsel has a duty to effectively investigate and present possible diminished capacity defenses during the guilt phase of a capital trial, and a failure to investigate and present a reasonably available defense can constitute ineffective assistance. See

80

Strickland, 466 U.S. at 687-689; Showers v. Beard, 635 F.3d 625, 632 (3d Cir. 2011) (counsel performed deficiently by "fail[ing] to investigate readily available key evidence in support of the defense's chosen theory").  A voluntary intoxication defense is a subtype of the diminished capacity defense under Pennsylvania law insofar as voluntary intoxication can temporarily render a defendant incapable of forming the specific intent to kill, reducing culpability from first- to third-degree murder.  See Commonwealth v. Fletcher, 861 A.2d 898, 907-08 (Pa. 2004); 18 Pa. C. S. § 308 (evidence of voluntary intoxication may be offered "whenever it is relevant to reduce murder from a higher degree to a lower degree of murder").[63]  It is the Commonwealth's burden to prove the element of specific intent to kill for first-degree murder – "to enable a defendant to seek to negate specific intent by reliance on the fact of his intoxication, there must be evidence in the case sufficient to place in issue that fact concerning the defendant's mental state." Commonwealth v. Rose, 321 A.2d 880, 884 (Pa. 1974).  "Such evidence may be adduced by the defendant as part of his case, or, conceivably, may be found in the Commonwealth's own case in chief or be elicited through cross-examination." Id.

To establish the voluntary intoxication defense, a defendant must present evidence to "show [he]was unable to form the specific intent to kill because he was so overwhelmed or overpowered by drugs to the point of losing his faculties at the time the crime was committed." Fletcher, 861 A.2d at 908.  Whether a defendant was overwhelmed to the point of losing his faculties is a question of fact solely within the province of the jury, which "is free to believe any,

---

[63] First-degree murder in Pennsylvania requires the specific intent to kill, second-degree murder is a killing during the course of a felony, and "all other kinds of murder" constitute third-degree murder.  18 Pa. C. S. § 2502.  Third-degree murder consists of a killing done with legal malice but without the specific intent to kill required in first-degree murder.  Commonwealth v. Hill, 629 A.2d 949, 951 (Pa. Super. 1993).

all, or none of [the evidence] regarding intoxication." Commonwealth v. Stoyko, 475 A.2d 714, 720 (Pa. 1984).

Diminished capacity is similar but is based on less temporary and more lasting conditions than voluntary intoxication. When asserting this defense, "a defendant is attempting to prove he was incapable of forming the specific intent to kill; if the defendant is successful, first-degree murder is mitigated to third degree." Commonwealth v. Legg, 711 A.2d 430, 444 (Pa. 1998) (quoting Commonwealth v. Travaglia, 661 A.2d 352, 359 (Pa. 1995)). The diminished capacity defense requires psychiatric testimony that addresses "mental disorders affecting the cognitive functions [of deliberation and premeditation] necessary to formulate a specific intent." Commonwealth v. Zettlemoyer, 454 A.2d 937, 943 (Pa. 1982), *abrogated on other grounds by* Commonwealth v. Freeman, 827 A.2d 385, 399-401 (Pa. 2003).

As to the penalty phase of a capital trial, counsel has a duty to adequately investigate and present mitigating evidence to allow the jury to meaningfully appraise a capital defendant's moral culpability. In preparing for the penalty phase, capital counsel have an "obligation to conduct a thorough investigation of the defendant's background" and must identify "all reasonably available mitigating evidence." Wiggins v. Smith, 539 U.S. 510, 522, 524 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 396 (2000) and ABA Guideline 11.4.1) (same standard for capital investigation). "[C]ounsel's general duty to investigate takes on supreme importance . . . in the context of developing mitigating evidence to present to a . . . jury considering the sentence of death; claims of ineffective assistance in the performance of duty should therefore be considered with commensurate care." Marshall v. Hendricks, 307 F.3d 36, 99 (3d Cir. 2002). Failure to conduct a thorough investigation constitutes deficient performance under Strickland. See Wiggins, 539 U.S. at 523. Counsel may not "ignore[] pertinent avenues for investigation of which he should

have been aware." Porter v. McCollum, 558 U.S. at 39.

An attorney who obtains only "rudimentary knowledge from a narrow set of sources," despite knowing other mitigating evidence is reasonably available, is also deficient representation. Wiggins, 539 U.S. at 524; see also Rompilla, 545 U.S. 374 (2005) (counsel ineffective for failing to develop mitigating information from family members and mental health experts); Williams, 529 U.S. at 395-96, 416 (counsel performed deficiently despite presenting testimony from defendant's mother and two friends). As part of a "thorough investigation" for "all reasonably available" mitigation, counsel should, among other things, seek out and interview family members and others familiar with the client's life history and background, obtain records pertaining to the client's life history, and obtain appropriate mitigation evaluations by mental health experts. See, e.g., Rompilla, 545 U.S. 374 (failing to obtain records about defendant's prior conviction from which counsel could have developed mitigating evidence from family members and mental health experts is ineffective); Wiggins, 539 U.S. at 516 (attorney who failed to develop social history from "social services, medical, and school records, as well as interviews with [client] and numerous family members" held ineffective).

The obligation to investigate mitigation exists regardless of the expressed desires of the client. See Porter, 558 U.S. at 40 ("Porter may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct some sort of mitigation investigation."). The requirement that capital defense counsel must conduct a comprehensive investigation of the client's life history is not new. See Porter, 558 U.S. at 39 ("It is unquestioned that under the prevailing professional norms at the time of [the 1988] trial, counsel had an obligation to conduct a thorough investigation of the defendant's background.") (internal citation omitted).

As for prejudice, "[w]hen a defendant challenges a death sentence such as the one at issue

in this case, the question is whether there is a reasonable probability, absent the errors, that the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695.  In a capital case, which in Pennsylvania requires a unanimous jury verdict for death, in analyzing prejudice before the jury at the penalty phase, a reviewing court must decide if there is a reasonable probability that but for counsel's deficient performance, at least one juror would have voted for life.  See Wiggins, 539 U.S. at 537.

Weighed against the single aggravating circumstance the jury found, Pruitt argues, "there is a reasonable probability that at least one juror would have struck a different balance," Wiggins, 539 U.S. at 537, demonstrating prejudice.

1.    Evidence of Ineffectiveness From the Trial Court Record

Turning first to the evidence adduced at trial, the only evidence placed before the jury that Pruitt was voluntarily intoxicated at or around the time of the killing was provided by the Commonwealth.  The Reading police officer who took Pruitt's police statement testified that Pruitt told him he had been getting high on the day of the murder by smoking multiple bags of crack with a man in an alley behind the victim's house, and when they ran out, they had no money to buy more.  Pruitt then told the officer he had been eyeing Gougler in her back yard, told his companion he was going to get money, and his companion said he would do the same and left.  Pruitt related what happened when Gougler moved to enter her home, described how he chased and struggled with her, and how his continued struggle with her inside the house resulted in her death.  Pruitt told the officer he hadn't meant to kill her – he only wanted money for more crack but when Gougler told him there was a man upstairs in the same bedroom as the money, he became enraged and accused her of lying to him.  Pruitt admitted he was panicking and feared there really was

84

someone upstairs, so he tied Gougler up with her own clothing and a telephone cord, and tied a cloth over her mouth and around her neck to keep her quiet and prevent her from fleeing. Pruitt told the officer that before he went upstairs to look for money, he tightened the cloth.

Upstairs, Pruitt found himself alone. After searching and finding $250, he returned to Gougler, but by then she was unresponsive. Pruitt tried to rouse her by lifting her arm, but it flopped down. He pulled the cloth down from Gougler's mouth and took out his crack pipe, which was empty. Pruitt told the officer he left, bought more crack, smoked until he was no longer "jittery," then returned to Gougler's house where he wiped things down, cleaned up, and apologized to Gougler's body – telling her he didn't mean to kill her. Pruitt left again, smoked the remaining crack, then ran to his aunt's house where he confessed to his mother, who insisted he surrender and forbade him from returning. In response to the officer's questioning, Pruitt repeatedly denied raping Gougler and reiterated he never intended to kill her. He added a note of remorse and apology to Gougler's family in his statement. (N.T.G. at 170-185, 752-754; Tr. Ex. C-61 (police statement, October 2, 2002).

Pruitt's confession to his longtime friend, Sean Peterson, also contained significant information about cocaine abuse. Peterson testified that he and Pruitt, whom he had known for 20 years, would drink beer and smoke cocaine together. Peterson knew Pruitt had a serious crack addiction but he did not know if he was high at the time of the murder. The morning before he confessed to police, Pruitt appeared at Peterson's workplace and, noticing a newspaper headline, said he had killed the old lady. Peterson stressed repeatedly that when Pruitt said this, he did not believe him, since he knew him to be peaceful, at least when sober. They later met at Peterson's house, where they talked on the porch. Pruitt's account to Peterson was almost identical to his police confession, but Peterson testified Pruitt used the word "strangled" when describing what he

85

did to the victim, but also said she was "unconscious" and still alive when he went upstairs. (N.T.G. at 246-261).

Before the defense gave its deferred opening statement, Pruitt's counsel proffered that Pruitt's on-and-off former girlfriend and mother of his child, Tracy Wentzel, would corroborate the account Pruitt gave to police that he was intoxicated at the time of the killing by testifying that Pruitt would habitually go on crack binges, and that he left home on such a binge on Thursday, September 26, 2002, two days before the murder on Saturday, September 28. (N.T.G. at 444-455). But Wentzel did not so testify. Although she confirmed knowing Pruitt was a crack addict and said she could not trust him to take care of their child, she testified she had never seen him smoke crack and had never seen him high. Wentzel would have offered that Pruitt would sometimes come home from an apparent binge by which time he would no longer be high. She and Pruitt were not living together at the time of the murder, and she did not know if he was high that day. Pruitt's counsel did not ask Wentzel if she knew whether Pruitt was on a crack binge the weekend of Gougler's murder. (N.T.G. at 466-475).

Much of the trial's third day was occupied by a jury charge conference now relevant to Pruitt's ineffectiveness claims. Despite not having presented the cocaine evidence discussed above, defense counsel sought a voluntary intoxication instruction. Frustrated with counsel's poor preparation and performance, the court observed:

> THE COURT: But the defense did not submit any evidence whatsoever to substantiate that. And in all honesty, I think from the *in limine* hearing we had this morning with the young lady whose name I don't recall right now [referring to Wentzel], that you fully anticipated the mother of his child was going to testify to something far different than what she testified to. And I think that's on the record.

(N.T.G. at 588-99).

Having examined the law and proposed charge extensively, at day's end, the court

86

remained undecided whether to give it. Even if it were to do so, the court remained unsure whether to include the usual provision that defense-presented evidence of intoxication shifted the burden to the Commonwealth to disprove diminished capacity to form specific intent to kill. The court asked Pruitt's counsel to provide further legal support for his request and counsel responded by providing the front, but not the back, of the pertinent page of the Pennsylvania Standard Suggested Criminal Jury Instructions. The dispositive case – <u>Commonwealth v. Rose</u>, 321 A.2d 880, 884 (Pa. 1974), was discussed on the back, and the judge therefore had to arrive early to research it himself. Relying on <u>Rose</u>, the court decided to instruct the jury that it was permitted to determine whether Pruitt's police statement that he was intoxicated, along with Wentzel's more general testimony about his being an addict, were sufficient to establish that Pruitt was so overwhelmed by his drug usage that he was incapable of forming specific intent at the time of the crimes. The court, however, would *not* include the burden-shifting provision, since the supporting evidence was so meager. (N.T.G. at 599-604). The Court's voluntary intoxication jury instruction was in line with that decision. (N.T.G. at 622-23).

In defense counsel's closing argument, he only briefly noted Wentzel's testimony: "Now, his—the mother of his child, Tracy Wentzel, doesn't say much except he's a crack head, he goes off on crack binges just like this one and he can't even help her, he can't control himself to the extent— he can't even help her take care of his kid." (<u>See</u> N.T.G. at 643). Defense counsel also did not mention Peterson's testimony that Pruitt was addicted to crack, that he and Pruitt had smoked crack together while drinking beer, and that Pruitt was peaceful at least when he was sober. (<u>Id</u>., at 638-39). Counsel's argument about Pruitt's intoxication at the time of the killing instead relied solely on his police confession. (<u>Id</u>. at 641-44). The prosecutor countered by arguing that when he killed Gougler, Pruitt *was* able to form intent, as evidenced by his having targeted her for

87

money to get high and later returning to clean up the house to conceal his fingerprints. (N.T.G. at 657). The jury found Pruitt guilty of first degree murder, reflecting its rejection of the proposed voluntary intoxication/diminished capacity defense.

Before the jury entered for the trial's penalty phase, the court noted that defense counsel was on the phone attempting to speak with defense psychiatrist Larry A. Rotenberg, M.D.[64] (N.T.P., 3). Counsel then announced that although he had been unable to speak with him, he knew he was available for penalty-phase testimony the next day. (Id., 3-5).

The defense had identified three experts as potential witnesses during the penalty phase: Dr. Rotenberg, Dr. Taff, a private pathologist who had testified at trial, and Charles O'Brien, M.D., Ph.D., a neuropsychiatrist and addiction psychiatrist. The defense also named a possible fourth expert witness – Lawrence Guzzardi, M.D., a medical forensic toxicologist, but provided no information on him. In response to the Commonwealth's request for an offer of proof, Pruitt's counsel responded that while he initially thought Dr. Guzzardi would not be able to provide anything helpful, over the weekend, Dr. Guzzardi visited Pruitt in prison and further reviewed his records. Counsel and Guzzardi were scheduled to speak that afternoon, after which the defense would decide whether to call him as a witness. (Id., 6-7). The Commonwealth announced that depending on what the defense decided to present, it might introduce the transcript from a very recent bench trial in which Pruitt testified to how little his perception and behavior were affected by his consumption of large amounts of crack cocaine. (Id., 8-9).[65]

---

[64] Dr. Rotenberg had testified at a pretrial competency and counsel withdrawal hearing that Pruitt was temporarily not competent to proceed to trial, but the trial court discredited his testimony. See, N.T. 4/15/05, 75-80 (Ex. D-1), 80-84 (Ex. D-2) (both versions of Dr. Rotenberg's competency report).

[65] See Commonwealth v. Pruitt, CP-06-CR-0006423-2001 (Berks), N.T. 5/27-28/04 (PCRA Ex.
(footnote continued on next page)

The defense asked the court to preliminarily instruct the jury that it intended to present evidence demonstrating the following mitigating factors: borderline mental retardation, personality disorder N.O.S. (not otherwise specified), that Pruitt was under the influence of extreme mental or emotional disturbance at the time of the murder, his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired, and his addiction to crack cocaine, cooperation with the police, positive adjustment to prison, and remorse.    (N.T. PCRA, 832; PCRA Ex. D-47 ("Defendant's Request for Jury Instructions Relating to Mitigating Circumstances") (reordered)).    As requested, the court  read that preview to the jury. (N.T.P. at 19).  The first two mitigators, however, were later abandoned.

The Commonwealth presented a brief penalty-phase case, with three witnesses testifying to Pruitt's prior criminal history of two burglaries, followed by three members of the victim's family.   After the Commonwealth rested, defense counsel announced he would not call Dr. Rotenberg.  Without him, the defense could not demonstrate, and would not pursue, the initially announced "catch-all" mitigating circumstances of borderline mental retardation and personality disorder.  (N.T.P. at 66).

Defense counsel Maynard gave a seven-sentence deferred opening statement in which he argued that Pruitt's burglaries were non-violent and did not justify application of the violent felonies aggravator. (N.T.P., 68).   The defense did not contest the Commonwealth's other

---

C-3).  Attorney Cammarano also represented Pruitt in that bench trial, in which the victim testified that Pruitt was peaceful with her before they began smoking crack together, but after he smoked seven bags to her one in a 15-minute period, he became unpredictable and violent, and in Jekyll-and-Hyde fashion, attacked her.  (Id., 5-51).   The proposed relevant excerpt of Pruitt's trial testimony attempted to refute her account.  Pruitt testified he was so addicted to massive quantities of crack that smoking seven bags during what he said was a 45-minute period did not make him more violent, alter his perception, or change his memory of events, which differed from those of the victim.  (Id. at 99-109).

aggravating circumstance – that the killing had been in perpetration of a felony.  Just two witnesses were called by defense counsel:  a prison officer and Pruitt's mother.  Their combined testimony lasted five minutes.  (See Commonwealth v. Pruitt, CP-06-CR-6003-2002, Clerk's Notes, 5/2/05; N.T.P., 75).   The defense's entire penalty-phase case lasted less than twelve minutes, and consumed only seven pages of transcript.  (See N.T.P., 67-76 (1:37 – 1:49 p.m.)

Alarmed by the brevity of the Defendant's penalty phase case, the Commonwealth requested an in-chambers conference during which the district attorney expressed grave concern that defense counsel had presented so little at capital sentencing and called no experts.  In the prosecutor's view, the defense had failed to present any evidence supporting the mitigating factors it was asking the jury to find.  He therefore asked the court for a colloquy on Pruitt's decisions to not just waive his penalty-phase right to testify, but also to present any mitigating evidence, to ensure his choices were knowing, intelligent, and voluntary, and to protect the record.  (N.T.P., 75-79).

The court initially observed that because the guilt-phase evidence had been incorporated into the penalty phase, there was some record support, albeit meager, for some claimed mitigating factors, such as Pruitt's confession to police showing cooperation and remorse.  But the court agreed the defense had presented nothing to show that Pruitt's capacity to appreciate the criminality of his conduct had been substantially impaired.  The court speculated that the defense might be deemed to have presented some evidence of incapacity at the pretrial competency hearing through Dr. Rotenberg.  (Id., 77-78).  Defense counsel asserted that the substantial impairment evidence was in Pruitt's confession to police that he been smoking crack just before the murder. (Id., 78).

The court agreed to conduct a colloquy but first addressed Pruitt's attorneys:

90

> I'm just wondering whether or not there really is not any further evidence short of the defendant himself, him testifying on his own behalf. Because it would appear to me, at least in the retiring room, that this evidence of mitigat[ing] circumstances including these three catch-all items is really very, very weak. And as a result[,] what the jury may conclude, the only thing they have here is the fact this was a killing resulting from the perpetration of a felony. They really don't have anything substantial, I don't think[,] to weigh against it.

(N.T.P., 80). Maynard, Pruitt's penalty phase counsel, said his co-counsel Cammarano had spoken with Dr. Rotenberg that morning and found he would not be helpful. Id. The court responded:

> Why not[?] I mean, [Dr. Rotenberg] was very strong in his testimony the week before we did the jury selections as to Pruitt's competency to stand trial. And I would think that very same testimony would be quite helpful to the jury in this case. Now, maybe he felt that cross-examination was overwhelming or maybe he thought that the Court disagreed with him and maybe, you know, that's -- whatever. I'm sure Dr. Rotenberg is not accustomed to being questioned by the judge in that way but that had to do with his competency to stand trial. It had nothing to do with his competency on September 28, 2002 [the date of the killing]. I am really loath to just pass over this without defense counsel giving this thing more consideration.
>
> I think I could probably put Dr. Rotenberg on the stand and ask him a series of questions that would be helpful to Pruitt. I don't tend to do that.

(N.T.P., 80-81).

Defense counsel agreed to check again with Dr. Rotenberg and moved to recess the proceedings until the next day. The court granted the motion, which the Commonwealth did not oppose, and also agreed to postpone the planned waiver colloquy. The trial judge also expressed hope that Pruitt might change his mind about testifying, noting that he had nothing to lose and speculating that "maybe the jury [also] would be asking[:] what would he have to lose?" After all,

> This jury came back in four hours and found first[-]degree murder and this jury came back with that verdict with four American women of African-American de[s]cent. It is a strong — it was a strong case. . . . But at this particular point, there's got to be something that could be put into this record that would mitigate

91

against the death penalty.  You have 12 people out there that are looking for
something to at least consider.

(N.T.P., 82-85).

The next day before the jury entered the courtroom, the judge asked defense counsel "what
is the present status of this ever[-]changing[,] moment by moment, day by day, hour by hour
case[?]" (N.T.P., 103).  Defense counsel confirmed that Dr. Rotenberg would not be testifying,
and, after meeting with them and against their advice, Pruitt had confirmed he also would not
testify.  The defense would rest.  (N.T.P., 103).  The court crafted questions for a colloquy that
counsel for both sides reviewed and agreed to, and then examined Pruitt, ultimately finding he had
waived his right to testify knowingly, intelligently, and voluntarily.  (Id., 104-109).[66]

Interestingly, in the process of revising the verdict slip to reflect defense counsels' decision
to not call Dr. Rotenberg, the prosecutor proposed adding the only mitigating factor that the jury
later found.  Instead of simply removing the "catch-all" mitigators of borderline mental retardation
and personality disorder, the Commonwealth suggested that defense counsel might wish to replace
the omitted language with Pruitt's "history of crack cocaine [use] or something to effect." (N.T.P.,
110).  This suggestion was well taken, and the verdict slip was revised to include "long[-]time
history of the use of cocaine" as a possible mitigator.  (Id., 112).  The Commonwealth's closing
lasted forty minutes, occupying sixteen pages.  (Clerk's Notes 5/3/05; N.T.P., 155-171).  In
contrast, the defense closing lasted five minutes and consumed three pages of transcript.  (Clerk's
Notes, 5/3/05; N.T.P., 171-174).  After deliberating for one hour and forty-five minutes, the jury
returned a sentence of death.  The sole mitigating factor found was that Pruitt had a long-time

---

[66]  Despite the prosecutor's earlier request, the court asked no questions about Pruitt's right to
present mitigating evidence.  There is no record explanation for that.

history of cocaine use.  (N.T.P., 182).

### 2.    Evidence of Ineffectiveness From the Record on PCRA

As noted, Pruitt presented these two inter-related ineffective assistance of trial counsel claims for the first time in his PCRA petition.  (Am. PCRA Pet. (3/19/10), 66-112; PCRA App'x (3/19/10), throughout).[67]  In addition to the evidence already in the record from the trial itself, these claims were extensively developed at the PCRA hearings.  Consequently, the record now includes a significant amount of evidence showing clear ineffectiveness on the part of both of Pruitt's defense attorneys overall, both generally and specifically for their failure to investigate, find, and present the ample available evidence that Pruitt was significantly impaired at the time of the crime by his intoxication, drug abuse, and Cocaine-Induced Psychotic Disorder.  This evidence was critically important during both the guilt and penalty phases of the trial.

#### a)    Evidence from Pruitt's trial attorneys themselves

The record reflects that Pruitt's appointed trial attorneys, Michael Cammarano and P. David Maynard, essentially divided the responsibilities for his defense between them, such that Cammarano was chiefly responsible for defending him in the guilt portion of the trial and Maynard took the lead in defending Pruitt against the death penalty.  Although both counsel testified in the PCRA proceedings, Maynard was obviously unprepared to testify– he had not looked at the case file or refreshed his memory before appearing pursuant to subpoena.  (N.T. PCRA, 6-9, 406).

Cammarano submitted a four-page affidavit/declaration before the PCRA hearing and

---

[67]   The PCRA court also granted Pruitt's motion on the first day of the PCRA hearing to include additional witness certifications to permit Maynard to testify.  (See Order, 8/21/13).  Contrary to Respondent's arguments and regardless of whether each document was later re-submitted during the PCRA evidentiary hearing, that PCRA evidence was fully before the PCRA court and is now also before me, as explained above.

testified extensively.  (N.T. PCRA, 1037-1321; PCRA App'x Vol. I (3/19/20, Tab 8; Habeas
App'x, 68, (ECF 109)).  He was unsure if this was his first capital case, but it may have been.  (Id.,
1044-1046).  Before the state rules began requiring it in 2004, he had taken no specialized training
or continuing legal education in capital cases.  (Id.) (discussing Pa. R. Crim P. 801, effective
November 1, 2004).  Cammarano testified he "never prepared for [the] penalty phase.  (Id., 1093-
1094).  He did, however, handle all contacts with all of the experts except for Dr. Rotenberg, who
was the only expert Maynard met.  (Id., 320).

Maynard had represented clients in capital cases for some five years before beginning to
represent Pruitt in 2003.  He began taking Pennsylvania's required capital course CLE credits
when the state court rules changed in 2004, but was uncertain whether he had taken any specialized
training in capital representation before then.  (N.T. PCRA, 311-318).  Prior to representing Pruitt,
he had handled approximately 24 homicide cases as a defense attorney, some of which ended as
guilty pleas.  He did not know how many of those cases were capital, but he guessed two or three,
and did not know how many went to trial.  He thought he had had experience at a penalty phase
before this one, but was unsure.  (Id., 407).

Cammarano testified that from "day one," he and Pruitt had discussed "innumerable times"
that their shared goal was to "attempt to avoid the death penalty by working out a plea to life."
(N.T. PCRA, 1070).  However, later in his PCRA testimony, he said "when I first talked to [Pruitt],
he said he doesn't want to" plead guilty.  (Id., 1165).  "But I have heard those words a lot and had
opportunity to explain to a client why it was in his best interest to do it and they change their
minds.  So, I didn't think the decision became final until later on." (Id.).

Pruitt had admitted to the police, Peterson, and counsel that he had killed the victim
unintentionally and committed most of the other crimes except, from "day one," said he "didn't

commit the rape." (Id., 1194).  Maynard agreed: Pruitt was adamant that he had not raped Gougler. (Id., 408-410).  On or about December 14, 2004, Cammarano was able to get an offer from the Commonwealth that it would take the death penalty off the table if Pruitt would enter an open (non-negotiated) guilty plea to all charges, including first-degree murder (which in Pennsylvania carries a mandatory life sentence), rape, and presumably IDSI.  The proposal may have included an additional sentence for rape on top of the life sentence, but Cammarano firmly believed Pruitt would accept.  (Id., 1090-1091, 1162-64).

But Cammarano testified Pruitt rejected the offer because it required him to admit all of the charges, including the sex offenses; Pruitt  remained adamant that he did not rape Gougler, despite freely admitting the other crimes.  (Id., 1294-1295).  Believing the offer was in Pruitt's best interests, Cammarano advised him to take it and was surprised he did not.  (N.T. PCRA, 1163-65).  Without mentioning Pruitt's steadfast denial of the rape, Cammarano testified  he "had no reason to believe there would be any reluctance on Pruitt's part" to accept the plea deal.  (Id, 1092).  Whether Cammarano had attempted to negotiate a deal that did not include the rape and IDSI charges was never explored at the PCRA hearing.

Cammarano further testified he "didn't want" to go to trial because he "didn't think [Pruitt] had a chance at trial, quite frankly," an impression he formed as soon as he read the discovery materials, shortly after Pruitt became his client.  (N.T. PCRA, 1071-72).  Asked what his trial strategy was, Cammarano answered "the trial strategy at that point was primarily a fallback position," meaning "to go to trial was a fallback position," but never explained what his actual trial strategy was.  (Id., 1071).

Cammarano also stated they "hired an investigator, Skip Gochenour, to work on Mr. Pruitt's case," and tasked him with investigating both the guilt and penalty phases.  (N.T. PCRA,

1056-70). Neither defense attorney supervised or directed Gochenour's investigation and did not ask him to investigate any specific issues or interview any particular witnesses. (Id., 1061, 1314; Gochenour Decl., 1). Cammarano testified that Gochenour was given a copy of the pretrial discovery but nothing else, and they did not ask him to obtain any particular records. He described Gochenour as "very independent" and he "did not take much direction from us," "barely shared information with us, quite frankly," and never produced a report or any information. Cammarano felt that Gochenour contributed nothing to the case, was unavailable for the trial dates, and never submitted a bill for his services, presumably because he did so little work. This did not concern Cammarano, however, because it indicated to him there was nothing for Gochenour to find. (N.T. PCRA, 1051-1069, 1314-1316).

Gochenour also submitted a confirming declaration in which he attested that he did not collect any records, did not investigate Pruitt's drug and alcohol addictions and did not interview relevant witnesses. Instead, as to the guilt phase, he sought to establish an alibi, but could not. (Gochenour Decl., 1). As to the penalty phase, Gochenour concluded: "Pruitt was a violent sexual psychopath. I wanted to work that into the penalty phase at trial." (Gochenour Decl., 1 ¶6). He relied on trial counsel to tell him the trial date in advance, but instead counsel only left a voicemail the night before trial started, when Gochenour was out of town visiting his sons in Virginia. He did not receive the voicemail until he returned, after the trial ended. (Gochenour Decl., 1-2).

Mayard testified he was aware that, as counsel in a capital case, he had a duty to investigate, and that the reasonableness of his strategic decisions depended on the extent of his investigation. (N.T. PCRA, 423-24). Nevertheless, even though he said he would have used anything and everything in mitigation on Pruitt's behalf to give the jury something to convince them to spare his life, as far as Maynard could recall, he did not investigate, and had nothing other than what he

learned from Pruitt himself and from reading medical and prison records.  (Id., 426).  He did not

seek further information on Pruitt's intoxication, drug use, and possible brain damage.  (Id., 424).

Cammarano also testified to the effects the plea negotiations had on the defense's

preparation for trial, implying that he did not and would not prepare for a capital jury trial while

plea negotiations were ongoing.  He stated: "I mean, are we spending my time negotiating a plea

that otherwise if I knew the plea wasn't there it would have been spent on working on something

for trial[?]"  (N.T. PCRA, 1163).  Cammarano admitted his trial preparation was done in

> . . . very short time here because [Pruitt] turned down a guilty plea offer that would
> have spared him the death penalty and we were pretty much forced to trial pretty
> quickly . . . there was very little time after that [plea offer] was rejected and we
> started trial."

(Id., 1090-1091).  Thus, "[m]y strategy in the guilt phase was essentially formulated very close to

the end because I thought we had a plea worked out.  So there wasn't – it wasn't a lot of strategizing

until we determined the plea was not going to be worked out."  (Id., 1266).

Cammarano further admitted he never investigated or considered investigating whether

someone else might have raped the victim, despite Pruitt's rejection of the guilty plea on the

grounds that he did not do it.  He simply did not see at the time how investigating that possibility,

or the DNA evidence, could be helpful.  (N.T. PCRA, 1194-96, 1199, 1294-99).  Cammarano

explained that Pruitt never told him someone else was involved.  (Id.).

Cammarano acknowledged that Pruitt's drug use could be part of the defense.  (Id., 1073).

He was interested in how crack affected Pruitt "because what was going to be an issue here was

his behavior.  And my argument was that his behavior was affected and his intent was diminished

by the injection [sic – likely ingestion] of the drugs."  (Id.,1083).  Maynard was the primary liaison

with Pruitt, and he gave Cammarano some information about Pruitt's drug use.  (Id., 1077-1080,

1265).  Cammarano himself only spoke briefly with Pruitt when he was in the courthouse holding cell before court appearances, and while they did discuss Pruitt's drug use, he didn't think those details were of any importance.  (Id., 1081-1082).

Maynard testified that at the trial's guilt phase, their strategy was to attempt to disprove specific intent to kill so as to lower the degree of murder from first.  Thus, anything that might have shown diminished capacity and/or voluntary intoxication would have been helpful, but he could not recall what evidence, if any, they presented to show that.  (N.T. PCRA, 382-383).  Pruitt agreed with this strategy and specifically agreed that a conviction of second-degree murder, with a life sentence, would be appropriate; he admitted he was guilty of the killing (though he claimed it was accidental), burglary, and robbery.  (Id., 408).

Maynard also acknowledged that the facts of this case were such that the onus was on him to present something strong in mitigation during the penalty phase.  He confirmed that in his mitigation case, he presented just two witnesses – a prison counselor and Pruitt's mother – whose testimony combined lasted five minutes.  (N.T. PCRA, 384-385).  He could not recall discussing penalty-phase strategy with Pruitt, but he thought it likely he did.  He similarly could not recall if Pruitt had any objection to the penalty-phase strategy.  (Id., 410-411).  Maynard also did not remember drafting a request for jury instructions on mitigating circumstances, but did recall examining a draft of one, and though it was not signed, it reflected the instructions they wanted the judge to give, at least at one time.  (Id., 385-386).  The draft instructions included the "catch-all mitigators" of  borderline mental retardation and personality disorder not otherwise specified (NOS).  (Id., 386-387).

Maynard also agreed that he later signed and submitted an amended request for jury instructions in which the borderline mental retardation and personality disorder NOS were both

stricken and the wording on substantial impairment was changed.  As reflected on the copy admitted as an exhibit at the penalty phase, Judge Stallone, the trial judge, had further amended these instructions in his own handwriting, to include the last-minute changes requested by Maynard at the penalty phase suggesting the defense was not sure even then what mitigating circumstances they would be presenting.  (N.T. PCRA, 387-391).  Maynard did not recall either their indecision at the time about calling Dr. Rotenberg or Judge Stallone's expression of frustration with the defense's many last-minute changes, both of which are reflected in the record.  (Id., 391-92).

Maynard remembered handling the penalty phase closing argument but could not recall what he said.  He affirmed, after reading a portion of the closing, that he argued that Pruitt's statement to the police that he was high on crack at the time of the murder was a mitigating fact for the jury to consider.  (N.T. PCRA, 393-394).  However, Maynard could not recall if he argued there was any other evidence supporting that mitigating factor.  If he presented no other evidence to show Pruitt was using drugs at the time, Maynard admitted he would have had no strategic or tactical reason for that failure.  (Id., 394).

b)    *Evidence from available lay witnesses*

In addition to the foregoing evidence that Pruitt's trial counsel failed to provide effective assistance during both the guilt and penalty phases of his trial, a significant amount of additional evidence of attorney ineffectiveness was unearthed during the PCRA hearings.  This includes numerous witnesses who were available at the time of trial and who could have provided helpful information about, *inter alia*, whether and how severely Pruitt was intoxicated at the time of the crime, the manner in which crack affected him, and his long-term drug and alcohol abuse.  These witnesses could have testified at trial and provided valuable statements and information to defense

99

expert witnesses.  Counsel, however, did not speak with any of them.  Cammarano declared:

> We wanted to prove that Mr. Pruitt was intoxicated on crack cocaine at or around the time of the offense.  Other than Tracy Wentzel, I do not recall interviewing any witnesses who could have testified that Mr. Pruitt was using crack around the time of the offense.  If we had known of other witnesses who could support a voluntary intoxication defense, we would have called them, and we had no strategic or tactical reason for not doing so.

(Cammarano Dec., 2 ¶6).

Cammarano testified that at the time, he was under the impression that the only evidence that would be convincing, acceptable and sufficient to establish Pruitt's intoxication at the time of the crime would not be lay testimony but rather that of, for example, a doctor who had seen Pruitt that day, or the results of contemporaneous blood testing for drugs.  (N.T. PCRA, 1292).  Other than the man nicknamed Red, in whose apartment Pruitt and others apparently smoked crack before and after the killing, defense counsel did not seek out any lay witnesses who might have described Pruitt's drug use or behavior while using crack.  (Id., 1084-1086, 1309).  Thus, defense counsel did not look for or interview Eric Harrison, Robert McNair, Jenney Boukitab, or Joy (White) Pochuski.  (Id., 1085-1086, 1244, 1248-49).[68]  Cammarano did not attempt to speak with them because he thought they were "crackhead[s]" and "presumptively unreliable."  (Id., 1301).  Had he known these witnesses had helpful information about how Pruitt behaved when using crack, he would have wanted to interview them.  (Id., 1087).

Maynard also did not recall looking for any of these individuals and did not conduct any investigation into Pruitt's drug use beyond what he learned from Pruitt himself.  (N.T. PCRA, 368,

---

[68]  As detailed below, Harrison and McNair gave statements to the police, which counsel received in pretrial discovery, describing Pruitt's drug use on the day of Gougler's murder.  Harrison's statement mentioned that Boukitab also saw Pruitt that day.  Pochuski is the mother of Pruitt's older daughter; Pruitt told Maynard he had used drugs with her, a fact Pochuski later confirmed.

424).  Maynard recognized his own notes from a 2003 conversation he had with Pruitt listing details of Pruitt's extensive use of first powder and then crack cocaine and alcohol beginning at age 17, as well as the source of his money for drugs being work, stealing, theft, and burglary.  (Id., 358-366).  Per these notes, in or about 1990 or 1991, Pruitt started using crack every time he had money – at least two to three times per week – and began using it every day in 2002, with money he received from his then-girlfriend, Joy White.  (Id., 366).  Although Pruitt had had cocaine addiction counseling, he was never an inpatient.  He constantly thought about where and how he would get his next bag of crack. (Id., 366-367).  Based on those notes, Maynard remembered being interested in speaking with White, but could not recall if he and Cammarano ever attempted to find her, and did not remember ever talking with her.  (Id., 368).  He also could not remember speaking with Jenney Boukitab, Eric Harrison, Janelle Savini, Robert McNair, or Martin McNeil either, nor did he recall speaking with Tracy Wentzel about Pruitt's drug usage.  (Id., 368-69).

(1)  Robert McNair

Pruitt submitted a 2010 handwritten statement from Robert McNair to the PCRA court, to which were attached two pages of police investigation notes from October 4, 2002, that had been turned over to defense counsel in pretrial discovery.  (Declaration of Robert McNair (3/17/10), PCRA App'x. Vol. I, (3/19/10), Tab 22; Habeas App'x., 148-151 (ECF No. 109)) ("McNair Decl.").  McNair updated his declaration just before the PCRA hearing, reiterating and incorporating his earlier statements.  (N.T. PCRA, 736-40 (McNair Statement) Ex. 30).  He testified consistently with both, and said if he had been contacted, he would have testified at trial to the same effect.  (Id., 1445-1465).

The police notes initially identify McNair as "a black male with a bucket and a squeegee" . . . "who came in regarding . . . this homicide" saying "he knows what had happened with Michael

101

Pruitt and the Homicide."  (PCRA Ex. D-54, 2-3; Habeas App'x., 150-151).  According to the notes, McNair told police that on the day of the murder, he was doing the windows at the Barbershop on North 9th Street and saw Michael Pruitt, who he knew from prison, between 1 and 2 p.m. with a Hispanic Male who was approximately 21 years old.   McNair said Pruitt had six bags of crack and he asked McNair if he wanted to do some.  McNair agreed, and he, Pruitt and the Hispanic male went to "Red's" house where they did all six bags.  Afterward, Pruitt said he knew where he could get some money for more – "I've been watching someone."  McNair said Pruitt and the Hispanic male left and came back but later.  At that time, Pruitt had a lot of change in his right front pocket and McNair thought he had ripped off a soda machine until he saw his left pocket.  "In his left pocket he had a [] lot of money[;] it was all ten[]s and twenties but the majority was all $5.00 dollar[] bills." (Id.). Pruitt also had a grey telephone cord hanging out of his rear pocket.  McNair also told the police that when Pruitt returned with the money, he had more crack cocaine and they went somewhere else to do it.  McNair said the grey cord fell out of Pruitt's pocket in the doorway and when he told Pruitt it fell, Pruitt said, "Fuck it," – the cord should still be there.  McNair took the police to the Barbershop where he cleaned the windows that day in the 400 block of North 9th Street, and then showed them where Pruitt went across the street to the parking lot behind the Zig-Zag Bar and the alley behind St. Luke's Church & Parish School.  McNair also showed the police where "Red" lived at 348 North 9th Street and where the cord fell from Pruitt's pocket at 911 Elm Street.  Although they looked for but did not find the phone cord, the police did succeed in speaking with "Red" at 348 North 9th Street and learned his real name was Paul Phillips.  (Id.).

McNair added more details in his PCRA hearing testimony and later statements.  (N.T. PCRA, 1447-1461).  He testified that when they first saw each other that day, Pruitt "looked like

102

he was already messed up" and was acting "weird. Like he was, you know, like all on some drugs."

(Id., 1448). Pruitt had "a lot" of crack, id., specifically six "20 bags," twice the size of regular

"dime bags," id., 1450, 1458, and while McNair, Pruitt, the small Latino man, and the man who

lived there (presumably "Red") were smoking crack together in the apartment, Pruitt also drank

two "big old things of beer, big 40 ounce." (Id., 1448-1451). He added:

> [Pruitt] smoked most of it. But he was already messed up because, see, I could
> tell. I could tell because I smoke crack. And thank God I'm still living. And I
> don't do it. I don't mess around no more. But I can tell. . . . I can tell because I
> know the symptoms, how you act. . . .
>
> You ain't in your right sta[t]e of mind. I don't care who you is. And if you on
> alcohol, you still ain't in your right state of mind, whatever you do. I don't care
> what it is you do, you not in your right mind, state of mind when you is on drugs.
> . . .
> [When Pruitt was smoking crack, he] was like moving around, jittery, you know,
> like he was just jittery, looking out the window like he wasn't hisself. He wasn't
> hisself like he normally be like he was in prison. It wasn't like that. That's why I
> kind of feel as though he was messed up. In his head. He was on something.

(Id., 1450-1451). He testified Pruitt "was talking junk, you know, like he was just talking junk,

you know, like kind of weird, you know, like cussing and, you know, like talking about old times

and hollering and stuff." (Id.., 1460-1461).

After they had used up the six "20-bags" of crack, Pruitt left with the "little Spanish dude"

to go get more money for more crack, and McNair went back to his work on the street. (Id., 1449,

1452). Later, however, both men returned with two or three more bags and invited McNair to

smoke it with them, which he did. (Id., 1449-1453). When McNair saw Pruitt's photo in the paper

in connection with the murder, he went to police. (Id., 1453-1454).

McNair was not contacted by Pruitt's defense attorneys or investigator. (Id., 1455-1456).

Had he been, he would have given them the same information as in his police and PCRA statements

and testimony, and he would have been willing to testify. (Id., 1456-1457).

Cammarano acknowledged receiving McNair's police interview in pretrial discovery. (Pruitt's PCRA Ex. 54). He knew McNair had been smoking crack with Pruitt and an unnamed short, Hispanic male that afternoon, just before the murder at a location not far from the victim's house. He also knew that when they ran out, Pruitt said he knew where he could get some money because he had been watching someone, and that Pruitt and the Hispanic male left, and both eventually returned with more crack. (N.T. PCRA, 1159-60, 1198-99, 1387). But despite this knowledge, and agreeing that McNair might have had valuable information about Pruitt's drug use on the day of the murder such that interviewing him would have been useful, Cammarano never considered it. (Id., 1160-1161, 1197).

(2)    Eric Harrison

Pruitt also submitted to the PCRA court notes of a statement that Eric Harrison gave to Police Criminal Investigator Joel Avram. (C.I. Joel Avram Notes (3/1/04), PCRA App'x., Tab 24; Habeas App'x., 109). Avram reported:

> Eric told me he was with Michael Pruitt around the time this homicide took place. They met up at the Zig-Zag Bar at 9th and Buttonwood Streets on Friday night September 27, 2004. They were pretty much together all night[,] hustling for a drug spot that was near the victim's house. The house they were hustling for was the house with the blue tarp out back.
>
> Eric said they were using drugs during the night and ran out of money about 3-4 a.m. They then went toward Michael's house and Michael went and got more money and they went back to the spot to continue hustling.
>
> Sometime in the early morning hours Eric saw Michael talking with the victim. Eric said that he was going to go get a 40 and asked Michael if he wanted to go get one. Michael told him no and Eric left to go to the Zig-Zag Bar.
>
> After Eric came back[,] Michael was not there. Eric later saw Michael at 9th and Greenwich for a brief moment. Eric stayed there and was getting picked up by his girlfriend, Jenney Boukitab. When he saw Michael[,] he saw blood on his shirt.

104

(Avram Notes).[69]

Pruitt also submitted a PCRA declaration from Harrison in which he attested he and Pruitt had known each other for many years and would see each other some two or three times per week around the Zig Zag bar. (Harrison Declaration, PCRA App'x. Vol. I (3/19/10), Tab 25; Habeas App'x., 155-156). He elaborated:

> Every time I saw [Pruitt] he would be drinking or using crack or both. Mike had a bad addiction to crack and drank heavily.
>
> Mike used alcohol to bring him down when he was high on crack, or would use crack to bring him up when he [was] down because of the alcohol. He used crack and alcohol to control his moods.
>
> Mike was always looking for money to b[u]y more crack. He would stay up all night using crack and drinking. Using crack made Mike wild and crazy. He couldn't control himself on drugs. When he wasn't on drugs, he was funny and nice to be with. He was a different person on drugs.
>
> I met up with Mike at 6 am on the morning of the murder. Mike was acting crazy and hyper. I tried to get him to come with me to the Zig Zag Bar for a drink to calm him down, but he wouldn't listen to me.

(Harrison Decl.). He added that he was never contacted by Pruitt's counsel but that, had he been, he would have cooperated and testified. *Id.*

Harrison's testimony at the PCRA hearing was consistent with his declaration. He testified that he had known Pruitt for over twenty years, would see him in places where people would buy and use drugs, and that Pruitt was a regular crack user who would smoke and drink beer at the same time. (N.T. PCRA, 1466-1468). When Pruitt mixed alcohol and crack, he became paranoid, "just looking over your shoulder, hallucinating, that's all, thinking everybody out to get you," but when he was sober, he would "laugh and joke and have a good time" – he wasn't paranoid. (Id.,

---

[69] Harrison identified Boukitab as his wife at the PCRA hearing. (See N.T. PCRA, 1470).

1468).

Harrison's birthday was September 23, and he and Pruitt spent that week partying and smoking "eight-balls" of crack. (Id., 1468-1469).[70] They "stayed up two and three days at a time without sleep" on crack. (Id., 1475-1476). "Crack make you do that." (Id., 1476). On the night of Friday, September 27, 2002, Harrison and Pruitt smoked an eight-ball of crack all night long, making them both paranoid. (Id., 1469). They smoked "constantly" through the night. (Id.,1470). They split up around 9 or 10 in the morning, when Harrison went to meet his wife, Jenney Boukitab. (Id.). Pruitt was still paranoid and very high. (Id., 1469-70). Later that day, September 28, 2002, the day of the murder, around 2 or 3 p.m., Pruitt, who was still high, asked Harrison to ask Boukitab to take him to his mother's house. (Id., 1470-1471).

Harrison spoke with the police but was never contacted by Pruitt's trial counsel or anyone working on his defense before the PCRA hearings. (Id., 1471). Harrison was incarcerated during Pruitt's trial. (Id., 1244-1248, 1472). If he had been contacted by Pruitt's defense counsel, Harrison would have provided them with the information he gave to PCRA counsel and would have testified as he did at the evidentiary hearing. (Id,. 1471-1472, 1479-80).

Defense counsel confirmed that the police investigation documents concerning Harrison had been turned over in pretrial discovery, and that no attempts had been made to speak with Harrison, even though it might have been useful. (N.T. PCRA, 1153-1161).

    (3)    Martin McNeil (via CHU Investigator Rachel Aaron)

CHU Investigator Rachel Aaron submitted a report of a conversation she had with Martin

---

[70] Although unexplained at the PCRA proceeding, an "eight ball" of crack is 1/8 of an ounce, or 3.5 grams. That is enough for an overdose. An individual bag typically contains ½ gram and a "double" bag one gram. See https://recovered.org/stimulants/cocaine/8-ball and https://learningcorner.co/explain-anything/9664#:~:text=2.,3.

McNeil dated February 2, 2010. (Declaration of Rachel Aaron, PCRA App'x. Vol. II (3/19/10), Tab 27; Habeas App'x., 159). McNeil explained to Aaron that in 2002, just before the murder, he was at a crack house apartment on 9th Street in Reading where he and others would use drugs. McNeil said he saw Pruitt there with a "younger skinny Puerto Rican male," and when he arrived, Pruitt was "fucked up." (Id.). Pruitt smoked some crack there, before saying he was going to get some money for more and leaving with the Puerto Rican man. (Id.). Pruitt was "definitely high" when he left. (Id.). McNeil heard about the murder a few days later, and "later spoke with Detective Reichert about this matter but Detective Reichert did not ask him whether Pruitt was high." (Id.). McNeil also said that "no one from [Pruitt's] defense team talked to him before his trial." (Id.).

(4)     Unidentified Short, Hispanic Man

Not only was there PCRA evidence from McNair, Harrison, and McNeil that the man Pruitt was with in the alley when they spotted the victim in her back yard was a short Hispanic male, but a tipster had also reported Hispanic and black males in the victim's back yard on the night of the murder before police arrived to investigate at approximately 10:30 p.m. (N.T. PCRA, 1198-1199, 1452-1453 (cited in *Pruitt II*, 162 A.3d at 401 n.10)). As the above evidence suggests, this short Hispanic man who had been smoking crack with Pruitt and McNair in Red's apartment and left with Pruitt when they ran out of crack, was likely the same man with whom Pruitt smoked in the alley behind the victim's house just before the crime, and returned with Pruitt, (at least according to McNair) with more crack. Cammarano admitted he never considered investigating the identity of, or speaking with, that short, Hispanic man. Instead, he assumed the man was just a passerby who would be unlikely to cooperate, since he had not already come forward of his own accord. (Id., 1198).

(5)    Paul Phillips, a/k/a "Red"

As noted above, the police notes of Robert McNair's statement turned over in pretrial discovery revealed the name and address of the man nicknamed Red, in whose crack-house apartment it appears Pruitt and the others smoked crack both before and after Gougler's murder. Cammarano testified he looked for Red but failed to find him. (N.T. PCRA, 1309). However, had he utilized a competent investigator and mitigation specialist and acted in a timely fashion, Red might well have been found.

(6)    Jenney Boukitab

Pruitt also submitted a declaration from Jenney Boukitab to the PCRA court, and she later testified consistently with it at the PCRA hearing. (Boukitab Declaration, PCRA App'x. Vol. II (3/19/10), Tab 26; Habeas App'x. (ECF No. 109); N.T. PCRA, 965-970). Specifically, Boukitab stated she became acquainted with Pruitt through Harrison, her ex-partner. (Boukitab Decl.; N.T. PCRA, 966). She would usually see Pruitt by the Zig-Zag Bar, and when she saw him, he was usually high on crack. (Id.). Boukitab had seen Pruitt both high and sober. (Id., 966- 967). When high, he was "hyper" and "paranoid sometimes," and "if he was standing in one place[, h]e would move around a lot. And just, you know, look around to, I guess, see what's there." (Id.). He would look over his shoulder or down the street and occasionally would make paranoid comments. (Id., 967-968). When he was sober, Boukitab described him as "very calm, very friendly, very nonchalant." (Id., 967). "He was very different when he was using crack." (Boukitab Decl.).

Boukitab saw Pruitt around 10 a.m. on September 28, 2002, the morning of the murder, when she went to pick up Harrison. (Id., 968; Boukitab Decl.). Pruitt and Harrison were in an alley by the Zig-Zag Bar. Pruitt was visibly high and was "[i]n a hurry. Like just moving around a lot." (Id.). His eyes were glassy and red. (Id., 969). Boukitab also offered Pruitt a ride, but he

108

declined.  (Id.).  Boukitab was never contacted by Pruitt's trial counsel or anyone working on

Pruitt's behalf before the PCRA was filed.  (Id.).  If she had been, she would have spoken to his

defense counsel and testified as she did at the PCRA evidentiary hearing.  (Id., 970).

   (7) Tracy Wentzel

  The PCRA record also contains a declaration from Tracy Wentzel, Pruitt's ex-girlfriend

and the mother of his daughter, Alexis, who testified at trial.  (Declaration of Tracy Wentzel,

2/18/10, PCRA App'x. (3/19/10), Tab 23; Habeas App'x., 152-154).  Wentzel attested that Pruitt

had a "Jekyll and Hyde personality" depending on intoxication.  When sober, he was calm, kind,

funny, helpful around the house, and a good parent who loved kids and took care of their daughter.

Pruitt tried to keep his drug abuse separate from his life with her and their daughter, and she never

saw him do drugs.  But when he would return from a drug and alcohol binge, he was paranoid and

violent, and would hit her.  She filed several police reports of abuse, one for when he raped her

while high.  (Wentzel Decl.).  When he mixed crack and alcohol, which he frequently did, he

blacked out.  (Id.).  His binges got longer over the years, and by 2002, they could last for days.

(Id.).  Wentzel left him in September of 2002 and moved in with her parents.  (Id.).

  Although they had very recently separated and were not living together, and Wentzel did

not see him immediately before or after the murder, Wentzel knew Pruitt was on a binge that

weekend.  Her declaration states Pruitt had been doing work for her company, received his

paycheck on Thursday, dropped their daughter off with a babysitter, and left on one of his binges.

That binge lasted until his arrest for murder, which was the next time she saw him.  (Wentzel

Decl.).  Their daughter missed him.  Wentzel was convinced he would not have committed the

crime if he had been sober.  (Id.).  She would have been happy to testify to this at trial, but Pruitt's

trial attorneys did not adequately prepare her.  (Id.).  Wentzel stated:

Michael's lawyers called me to testify at his trial. Before I took the witness stand, I met with them for maybe thirty minutes at most. . . . [T]hey did not ask me how drugs and alcohol affected Michael, which seemed strange because I thought that was one of the reasons why I had been called to testify.

I was willing and able to testify at Michael's sentencing hearing. However, Michael's lawyers never asked me to testify at that hearing.

(Wentzel Decl.).

(8).    Janelle Savini

Tracy Wentzel's sister, Janelle Savini, also provided a statement that was before the PCRA court. (Declaration of Janelle Savini, PCRA App'x. Vol. II (3/19/10), Tab 29; Habeas App'x., 165). Savini did "huge amounts of coke" with Pruitt in the 1990s. Pruitt had a "bad addiction to drugs and alcohol" the whole time she knew him. (Savini Decl.). She had many experiences with Pruitt in which he blacked out after using crack and drinking alcohol. (Id.). When sober, he was friendly, helpful, respectful, and responsible, including with her children. She would leave them with him, but only if she was sure he would not be using drugs or alcohol, because when he was on drugs, he was a different person. (Id.). He became violent, and often could not remember what he had done during a drug binge. (Id.).

Savini saw Pruitt the day after the murder. Tracy told her Pruitt had said he was involved. Then Pruitt called she and Tracy at work. Savini drove to the library to meet him and talk. He was still high, fidgeting, smelled bad, and was "acting crazy and paranoid." She said he was "incredibly upset about having killed the woman on 9th Street. He kept saying how sorry he was and how he could not believe he had done it." (Id.). Savini would have so testified had anyone from the defense contacted her before trial, but they did not. (Id.).

(9).    Joy (White) Pochuski

Joy (White) Pochuski also provided a declaration that Pruitt submitted to the PCRA court,

110

and testified at the evidentiary hearing.  (Declaration of Joy (White) Pochuski, PCRA App'x. Vol. II (3/19/10), Tab 30; Habeas App'x., 167-168; N.T. PCRA, at 954-965).  Pochuski lived across the street from Pruitt as a child, they dated, and they have a daughter together.  (N.T. PCRA, 955-956; Pochuski Decl.).  She left Reading when she joined the Army and was stationed overseas from 1982 until she returned in 1994.  (Id., 957).  In 1998 or 1999, Pochuski and Pruitt resumed their relationship.  (Id.).  He was using crack cocaine, and when he did, he would "often become violent and physically fight with me. Sometimes he became sexually violent with me, too." (Pochuski Decl., ¶4.).  She began using crack with him almost daily.  (N.T. PCRA, 958-960). Pruitt drank almost every time he used crack, and would become paranoid when he mixed them. He would suspect there were people hiding in the house watching him, even when no one was around, and would accuse her of cheating or hiding drugs.  (Id., 958-959).  He would "black out" multiple times each week after using drugs and drinking, and could not remember what happened. (Id., 960; Pochuski Decl., ¶6).

When Pruitt "was not doing drugs, he was a good person.  He was kind to my kids, and I trusted him with them.  Mike was a different person when he was not doing drugs and drinking." (Pochuski Decl., ¶7).  But because his drug use "finally became too much for me," and she ended their relationship in 2001.  (Pochuski Decl., ¶8).  Pochuski was never contacted by Pruitt's counsel before trial, but would have cooperated and testified consistently with her PCRA declaration and memory if she had been.  (Id., 962; Pochuski Decl., ¶8).

(10)    Voda Pruitt

Pruitt's aunt, Voda Pruitt ("Voda"), also gave a statement that was submitted to the PCRA court.  (Declaration of Voda Pruitt, PCRA App'x. Vol. II (3/19/10), Tab 28; Habeas App'x., 161-162).  She testified consistently with her declaration at the PCRA hearing.  (N.T. PCRA, 1480-

1484).  Voda related that she lived in the same house as Pruitt while he was growing up.  He was a good, helpful, self-disciplined child.  Her father, Pruitt's grandfather, a church pastor, died when Pruitt was young, which upset him.  When Pruitt was five, he was hit by a car.  His speech had been normal before the accident, but afterward, no one could understand him, and he was referred to a speech therapist.  The injury also made learning more difficult for him, which persisted throughout his school years, though he remained good at sports.  He worked hard at school and did not get into trouble until he was approximately 18 years old, when he started drinking, and dropped out of school.  At age 19, he was imprisoned with adults who had been convicted of more serious crimes.  When he returned from prison, Pruitt was more withdrawn and began drinking heavily.  (Voda Decl.; N.T. PCRA, 1480-1484).

Maynard testified he knew Pruitt had been in a car accident, and had spent time in the hospital for it, when he was five.  (N.T. PCRA, 381).  Although he put a star next to this information in his pretrial notes to indicate that "potentially it might be important," he did not talk to Pruitt's mother, aunt or other family members about it, nor did he attempt to obtain hospital records.  He could not recall why not.  (Id., 380-82, 420-421).

Voda also related that in 1995, Pruitt returned home disoriented, apparently concussed, with a swollen and bloody head.  He said a police officer had beaten him over the head with a flashlight and dropped him off at a hospital.  He had regular headaches after that and, when intoxicated, would become aggressive, confrontational, and argumentative.  (Voda Decl.).

Voda also confirmed that she saw Pruitt shortly after the homicide, as he told police in his statement.  He came to her house "high on drugs.  He looked really out of it and told me he thought he did something bad."  (Voda Decl.).  "He said he was fiending so bad for more drugs he had to have more.  I never seen Michael so messed up before."  (Id.).  She, too, would have testified to

112

this effect had she been contacted by Pruitt's defense attorneys, but she never was.  (Id.).

(11)    Other Pruitt Family Members

Numerous other family members provided statements that were presented to the PCRA court, indicating that drug and alcohol addiction appeared to run in their family – several of Pruitt's uncles had drug and alcohol abuse problems, as did one of Pruitt's daughters.  (PCRA App'x. (3/19/10), Tab 42; Habeas App'x., 294-296 (Declaration of John Pruitt)).  Pruitt's mother, Joan Parker, stated that his life growing up was unstable, and he had few positive role models.  He was exposed to drugs and alcohol through his uncles, who were his only male role models after his biological father abandoned him as an infant.  She also confirmed the car accident when Pruitt was five years old.  (PCRA App'x. (3/19/10), Tab 41, Habeas Appx., 290-291 (Joan Parker Decl.).  His maternal grandfather, a pastor, filled the need for a positive role model during Pruitt's early years, but he died when Pruitt was young, and this loss deeply hurt Pruitt.  (Id.).

c)    *Evidence from Pruitt's Prison Intake and Medical Records*

 In addition to all of the foregoing evidence developed on PCRA, Pruitt also presented his medical records from St. Joseph's Medical Center relating to three separate incidents.  The first record, dated November 10, 1993, showed treatment for head and other injuries after a fall during a possible seizure or loss of consciousness while being escorted by a state constable; the second dated April 9, 1995, documented another head injury after a police officer allegedly hit him on the head with a flashlight; and the third was dated October 2, 2002, shortly after his arrest for this case, when he was brought in by police for a blood sample  (PCRA App'x. (3/19/10), Tab 39).  Pruitt also presented to the PCRA court records from the Reading Hospital and Medical Center dated October 7, 2002, several days after his arrest in this case, relating to an apparent fall in prison causing him to hit his head.  (PCRA App'x. (3/19/10), Tab 40).

113

Finally, Pruitt presented his Intake Assessment Form from the Berks County Prison after his arrest in this case, dated October 3, 2002. (PCRA App'x. (3/19/10), Tab 43; Habeas Appx., 297-300). It records him as being cooperative and admitting to daily use of alcohol and cocaine, with his last reported use as Monday, September 30, 2002, two days after the crimes at issue in this case. The intake form also reflects that Pruitt, who dropped out of school in tenth grade, admitted to having a drug and alcohol problem, and that he gets into fights when he uses. (Id.).

   d)    *Evidence from Contemporaneously Available Expert Witnesses*

Still further evidence of diminished capacity and proof that Pruitt's trial defense attorneys were ineffective for failing to preserve this issue included the submission to the PCRA court of multiple reports from contemporaneously available experts, dated both before and after his capital murder trial, who were available and willing to testify at his trial had they been asked. Many of these experts testified at the PCRA hearing, and the PCRA record reflects that had trial defense counsel provided the information received from the numerous lay witnesses outlined above to these available expert witnesses, along with Pruitt's medical, educational, and other background records, these experts could well have testified convincingly on his behalf. This evidence also supports the conclusion that had this testimony been offered, there is a reasonable likelihood that the outcome at both the guilt and penalty phases of Pruitt's trial would have been different.

This determination is also borne out by the PCRA testimony of Pruitt's trial attorneys themselves. As Attorney Cammarano testified, in preparing for trial, he thought it would be helpful to consult experts, since he was developing a drug-related defense for Pruitt. (N.T. PCRA, 1076). Indeed, Cammarano believed Pruitt's history of drug use alone would have affected his behavior at the time of the offense in a way that had an impact upon his degree of criminal responsibility. (Id., 1099-1100). However, although Cammarano initially consulted with several experts, he

114

either did not follow up with them in a timely fashion or at all after his initial contact.  He did not

call any of them at trial, and thus did not develop evidence that could have supported the guilt-

phase defense and/or sentencing mitigators.  Nor did either defense attorney provide anything other

than the materials received in pretrial discovery to those experts consulted.  Hence, Pruitt's

educational or medical records were not provided to those experts, nor were they informed of

Pruitt's childhood head injury.  (See, e.g., N.T. PCRA, 150-153, 220, 228-230, 1333, 1341).

Although Cammarano testified he was interested in "the physical damage done to the brain by

drugs," id. at 1098, he did not investigate the signs that Pruitt suffered from organic brain damage

or cognitive impairments, whether from drugs or other causes.  And, despite knowing that Pruitt

had suffered a head injury when he was five and that head injuries can have lasting effects, he

never spoke to Pruitt's mother, aunt or other family members about it nor did he try to obtain any

medical or educational records.  (Id., 1104-1108, 1111-1113).

Cammarano did not communicate with Maynard about developing mitigating evidence

through these experts.  He testified that he assumed Maynard was doing his own preparations for

the penalty phase.  But the evidence shows that in their unusual division of labor, Cammarano was

responsible for contact with all experts.  (N.T. PCRA, 1052-53).  Despite this responsibility, he

did not make any efforts to prepare the experts for any penalty-phase expert testimony.  (Id., 1094-

1095 (explaining he spoke with Dr. Rotenberg only about possible guilt-phase testimony).  In fact,

the only expert Maynard recalled interacting with was Dr. Rotenberg, regarding the pretrial

competency proceeding; he had no other contact with Dr. Rotenberg until just before the penalty

phase.  (Id., 320-321, 411).  For his part, Maynard had no contact with any other experts until the

weekend before the penalty phase began, when, at his request, both he and Cammarano

approached Drs. Rotenberg and Guzzardi about testifying.  The two attorneys did not discuss

115

strategy for the penalty phase, nor did they discuss mitigating circumstances.  (N.T. PCRA, 1251-1254, 1301).    Cammarano testified he "didn't get involved in the substance of what [Dr. Rotenberg] was doing," and he told Dr. Rotenberg that with respect to the penalty phase, "anything that's mitigating will suffice."  (Id., 1126).  Cammarano also never gave Dr. Rotenberg any instructions or feedback regarding his evaluation of Pruitt.  (Id., 1331).

One expert who was called by the defense to testify at trial was Mark Taff, M.D., a forensic pathologist who Cammarano found and retained through an expert witness service to explore the possibility that Gougler's death was accidental.  (N.T. PCRA, 1226-1227).  Cammarano had never worked with Taff before and made no effort to investigate his background or qualifications, aside from reading his Curriculum Vitae.  (Id.).  He thus had no knowledge that Taff had been rejected by twenty medical schools, had twice failed board certifications in clinical pathology or that he was involved in litigation involving an alleged misstatement of his qualifications, though he acknowledged it would have been important to have had knowledge of these issues given that a witness's credibility is important to a jury assessing conflicting witness testimony and that the Commonwealth brought them out on cross-examination.  (Id., at 1227-1228).

Maynard, in turn, was aware they had retained and called private pathologist Dr. Mark Taff, but only Cammarano dealt with him.  Before Dr. Taff testified, Maynard was not aware of the problems with his qualifications.  (N.T. PCRA, 335-337).  He too agreed that Dr. Taff's credibility would have been important to the jury.  (Id., 338-339).

Based on the evidence the prosecution had turned over in pretrial discovery, while preparing, Maynard came to believe Pruitt would be convicted of first-degree murder, and that a penalty phase would be necessary.  (N.T. PCRA, at 347-348).  However, he did not recall seeking or obtaining any records other than those the Commonwealth had turned over, whether medical,

116

prison, or otherwise. (Id., 349). The only witnesses he remembered interviewing for the penalty phase were members of Pruitt's family. (Id., 349-350).

Although he was aware of mitigation specialists and, in retrospect, thought it would have been useful to have one for Pruitt's case, Maynard did not hire one. (N.T. PCRA, 350-351). On cross-examination, he affirmed that it had become the norm to use mitigation specialists in capital cases beginning sometime between 1998 and 2003. He started representing Pruitt in 2003, and this trial was in 2005. Since then, Maynard has on occasion experienced how helpful mitigation specialists can be. (Id., 415-416). Likewise, Maynard did not initially recall discussing with Cammarano whether to hire a mitigation specialist for this case. He thought that instead they had looked to Dr. Rotenberg to develop mitigation, although they never called him to testify. He also realized that, as a psychiatrist, Dr. Rotenberg would typically not collect records, interview family members, and investigate in the way a mitigation specialist would, but would instead typically rely on records given to him by counsel. (N.T. PCRA, 351). Maynard subsequently recognized a memo from his file dated July 27, 2004, noting he had a conversation with Cammarano concerning his wish to amend the omnibus pretrial motion to include requests for a mitigation specialist and for a neurologist. And although his billing records also reflected their discussion and showed he had actually drafted a motion for one, Maynard did not remember filing it, it was not in the record, and so far as he could recall, they never requested a mitigation specialist. (N.T. PCRA, 352-354, 378). Maynard admitted he could think of no tactical or strategic reason for their failure to do so. (Id., 354-356).

Although Maynard filed a motion for an expert toxicologist, he could not recall if they used one. (Id., 356-357). Similarly, on December 29, 2004, Maynard drafted a motion asking the court to appoint a neurologist "[t]o see if there's specific brain damage with regard to Pruitt, how that

117

would have affected his actions." (Id., 378). However, he never filed it, and Pruitt was never evaluated by a neurologist. Thus, despite recalling that he and Cammarano were hopeful that a neurologist might have testified helpfully at the guilt phase about how brain damage, if found, might have affected Pruitt's actions, and that this could also have been used as a mitigating factor in the penalty phase, Maynard did not investigate Pruitt's possible brain damage or cognitive impairment. Maynard could provide no tactical or strategic reason for the failure to have done so. (Id., 378-380).

      (1)    Larry Rotenberg, M.D.

Included in the developed PCRA record is a copy of a pre-trial draft report dated November 2, 2004, by forensic psychiatrist Larry Rotenberg, M.D., addressed to Cammarano, setting forth the results of his psychiatric evaluation of Pruitt for the purpose of presenting mitigating circumstances. (PCRA App'x., Tab 44, (PCRA Hrg. Ex. 24); Habeas App'x, 301-313). Dr. Rotenberg also testified at the PCRA hearing. (N.T. PCRA, 1328-1377).

Cammarano testified that he had the court appoint Dr. Rotenberg, and Dr. Rotenberg performed a psychiatric evaluation of Pruitt. (N.T. PCRA, 1114). Cammarano only provided Dr. Rotenberg with a copy of the pretrial discovery but, because he never obtained them, he did not provide him with Pruitt's educational records, medical records, or statements from third parties. (Id., 1116-1117, 1333, 1341). He instead relied on Dr. Rotenberg to obtain those himself or ask for anything else he needed. (Id., 1117).

Dr. Rotenberg's extensive qualifications as a forensic psychiatric expert for 42 years were stipulated to at the PCRA hearing. He confirmed that he was court-appointed as a psychiatric expert for the defense in this case in 2003, and while his primary contact was Cammarano, he remembered meeting with both attorneys and Pruitt just before the penalty phase began. Dr.

118

Rotenberg testified he interviewed Pruitt in person six times for one to two hours each, reviewed all documents provided by counsel (limited to pretrial discovery) and Pruitt's records from Reading Hospital (since he had access to them as chair of the Department of Psychiatry at that time), spoke with Pruitt's mother and girlfriend on the telephone, obtained and reviewed medical and psychiatric information from the Berks County prison, and obtained as much information as he could from all sources about Pruitt's drug and alcohol use on the day of the killing. Because this was a complex capital homicide case, Dr. Rotenberg also took the unusual step of ordering and reviewing psychological testing by Dr. Melissa Reilly, who at the time was his intern and was also supervised by a licensed psychologist. (N.T. PCRA, 1330-38). He additionally testified that "because it was such a complex case, I spoke to Dr. [Robert] Sadoff about [Pruitt] at length." (Id., 1333).[71]

Before sending the draft report on mitigating circumstances, Dr. Rotenberg informed defense counsel there was also a good chance that Pruitt met the requirements for voluntary intoxication and/or diminished capacity defenses to first-degree murder, but he did not feel he had sufficient experience with the interface between psychiatry and intoxication to render an opinion on that yet, given the complexity of Pruitt's case. (N.T. PCRA, 1343). After speaking with Dr. Sadoff, Dr. Rotenberg recommended that counsel contact Charles O'Brien, M.D., a physician specializing in neuropsychiatry and addiction psychiatry, who was "one of the best authorities at the interface of psychiatry and drug[s] and alcohol." (Id.,1342-1343). Dr. Rotenberg did not himself speak with Dr. O'Brien. (Id., 1333).

---

[71] Dr. Sadoff, who died in 2017, was one of the founders of the field of forensic psychiatry. At the time, he was widely known as a highly respected and senior forensic psychiatrist. *See* https://www.nytimes.com/2017/04/20/us/robert-sadoff-dead-forensic-psychiatrist.html.

However, Camarano never reported back to Dr. Rotenberg.  Eventually, after a lengthy wait for a report from Dr. O'Brien which never came, on November 2, 2004, Dr. Rotenberg sent Cammarano his draft report with the results of his psychiatric evaluation of Pruitt as to possible mitigating circumstances, five of which he tentatively identified.  Dr. Rotenberg's draft report contained the detailed information about Pruitt's drug and alcohol use on the day of the offense that he had gathered.  (N.T. PCRA, 708-719, 1120, 1126-1133, 1344-1346; <u>see also</u>, PCRA App'x. (3/19/10), Tab 44;  PCRA Ex. D-24; Habeas App'x., 301-313, 301-13).

In a cover letter accompanying his draft report, Dr. Rotenberg asked Cammarano for  a copy of the statutory mitigating circumstances so he could amend his wording to more precisely address the statutory requirements.  (N.T. PCRA, 1126, 1346, 1382; PCRA Ex. D-50).  But Cammarano never did, and never provided Dr. Rotenberg with any comments or feedback on his draft report.  (<u>Id</u>., 1347, 1359).  Cammarano also had no recollection of ever providing Dr. Rotenberg's draft report to Maynard or discussing it with him.  (<u>Id</u>., 1127-28).

In his report, Dr. Rotenberg diagnosed Pruitt with crack cocaine dependence, alcohol dependence, and personality disorder not otherwise specified (NOS).  (PCRA Ex. 24, 11; N.T. PCRA, 718); Habeas App'x., 312).  He gave the following opinion(s) to a reasonable degree of medical certainty:

1.  While the status of [Pruitt's] level of use of crack cocaine and alcohol was undetermined, it is clear that he used a significant amount of both of these drugs a day before, and part of his situation at the time of the alleged crime was a product of his disinhibition, resulting from the use of these drugs, and in particular the cocaine.

2.  Another mitigating issue[] is the fact that everyone who knows him[] reports him as being a different person when he is sober, and a very different person when he uses drugs or alcohol.

3.  Another mitigating issue is the fact that he did not have any difficulties with the

120

law until he was an adult.  In other words[,] he did not have the conduct disorder usually associated with adult violence.

4. Another mitigating issue is his own general remorse; the presence of a conscience structure; [and] his feeling of sorr[ow] about the pain and suffering he has caused.

5. Finally, another mitigating issue[] is his own acquiescence and his need to be punished[] for something he regards as having been a heinous crime.

(PCRA Ex. D-24, 12; N.T. PCRA, 719; Habeas App'x., 313).

Dr. Rotenberg testified that while he did not feel qualified to render an opinion on the guilt-phase defenses of voluntary intoxication and diminished capacity and deferred to Dr. O'Brien for that, it was clear to him that Pruitt was indeed substantially impaired by his consumption of crack and alcohol:

> And he was clearly committing a crime which appalled him.  It appalled him.  I mean, and, Your Honor, I have evaluated enough people of criminal offenses to know when somebody is talking the talk or walking the walk.  And this man was not just talking the talk.  He was appalled and abhorred.  And I really think the idea that he was capable of what he been convicted of was so ego-alien to him.  It was truly like a Dr. Jekyll and Hyde.

(N.T. PCRA, 1371-1372).  Dr. Rotenberg concluded, "So there was never any question about the fact that I thought he had a good chance at diminished capacity." (Id., 1372).

As for mitigation, Maynard did not recall providing Dr. Rotenberg with any documents nor did he recall if Rotenberg evaluated Pruitt.  He also did not remember if there was any mitigating information in any report from Dr. Rotenberg.  (N.T. PCRA, 371).  After reviewing passages of Dr. Rotenberg's draft mitigating circumstances report, Maynard testified that he did not remember reading it before trial.  (Id., 372).  Maynard agreed it would have been helpful and would have provided support for the mitigating circumstances he argued the jury should apply at the penalty phase.  (Id., 374).  Indeed, Maynard characterized the strength of the mitigation case as "not the

121

best," and admitted "[t]here's a great deal more in hindsight I possibly could have done." He did not recall Judge Stallone's contemporaneous statement during the penalty phase that the evidence of mitigating circumstances was "very, very weak." (Id., 395). He did not know why he did not present Dr. Rotenberg at the penalty phase, and did not recall Judge Stallone encouraging the defense to put Dr. Rotenberg on the stand or the Judge's statement that he (Judge Stallone) could probably put Dr. Rotenberg on the stand and ask him a series of questions that would be helpful to Pruitt. (Id., 396).

Maynard simply had no explanation for his failure to present Dr. Rotenberg's testimony and November draft report or any of the other available evidence that Pruitt's behavior was very different when he was drunk and high than it was when he was sober and Pruitt's expressed remorse for the crime. (N.T. PCRA, 396-398). Maynard agreed these findings supported the mitigating circumstances for which he argued, and there was no strategic or tactical reason for not presenting this evidence. (Id.).

(2)    Melissa Reilly, Ph.D.

Dr. Rotenberg's November 2, 2004 draft report included a summary of the results of Pruitt's testing by psychologist Melissa Reilly, Psy.D., which revealed no evidence of antisocial personality disorder, and that his responses "were consistent with symptoms of depression," remorse, sadness, shame, and negative self-esteem. (PCRA Ex. 24, 10-11; N.T. PCRA, 717; Habeas App'x., 311-312, 319-321 (full original report of Dr. Reilly, included within Dr. Rotenberg's competency report). Dr. Reilly also noted that Pruitt "is prone to miss more subtle emotional expressions and does not fully appreciate the nuances and complexities of social interaction . . . he tends to react to situations in a hasty manner" and "tends to react quickly resulting in inappropriate behavior." (Id.).

At the PCRA hearing, Dr. Reilly also testified consistently with the contents of the Rotenberg draft report and her PCRA certification; she also stated that she found Pruitt to have an IQ of 85. (N.T. PCRA, 208-234, 376-377, 601-603; PCRA App'x. (3/19/10), Tab 46; PCRA Ex. D-22). Dr. Reilly said she never spoke with Pruitt's trial attorneys but would have done so if they had contacted her, and would have testified in the same manner at trial, had she been asked to do so. (N.T. PCRA, 208-234; Certification of Dr. Melissa Reilly, August 2013, 2, ¶3; Supp. App'x. (ECF No. 143), 47-48).

In his PCRA testimony, Maynard examined Dr. Reilly's testing report, and her findings that there was "no evidence of severe psychopathology, psychosis, thought disorder, or antisocial personality disorder," that Pruitt was "experiencing intense feelings of sadness and shame," had "negative self-esteem," and "regret and remorse," had an IQ of 85, which was a "low average intellect," was "prone to miss more subtle emotional expressions, does not fully appreciate the nuances and complexities of social interaction," and that he "[s]cans [the] social environment quickly and [is] prone to miss social cues." (Id., 376-377, 601-603; PCRA Ex. D-22). Maynard agreed this information would have been useful to present at trial and sentencing, but he and Cammarano failed to do so. (Id., 377-378). Maynard recognized that Dr. Reilly's observations regarding Pruitt's sadness and shame would have supported the mitigating circumstance of remorse, and her finding that Pruitt did not fully appreciate nuances and complexities of social interactions and was prone to miss social cues would have lent support to his argument for the mitigating circumstance that Pruitt was substantially impaired in his ability to conform to the law. Reilly's finding that Pruitt was not antisocial but suffered from depression and negative self-esteem would likewise have supported these mitigating circumstances. (Id., 398-400). Maynard could think of no strategic or tactical reason for his failure to present any of this evidence. (Id.).

123

Although Cammarano recognized that Pruitt's remorse might have been potentially mitigating and helpful in humanizing Pruitt at the penalty phase, he testified he would not have presented this evidence at the guilt phase.  (Id., 1140).

      3.     Allan M. Tepper, J.D., Psy.D.

      Cammarano also contacted forensic psychologist Allan Tepper, J.D., Psy.D., about assisting with the mitigation and penalty-phase presentation on March 11, 2005, a little over one month before jury selection began on April 20, 2005.  In a letter dated March 13, 2005, Tepper told Cammarano he was available to assist:

> As per your request, I am available to conduct a psychological evaluation with Michael Pruitt to explore death penalty and mitigation issues.  It is my understanding Pruitt currently is incarcerated at the Berks County Correctional Facility.  It further is my understanding trial in this matter is scheduled to commence on April 20, 2005.

(Letter from Dr. Tepper to Cammarano, (3/13/05), PCRA App'x. (3/19/10), Tab 4, PCRA Ex. 57; N.T. PCRA, 1391-1392, Habeas App'x., 326-327).  In a second letter from Dr. Tepper to Cammarano, Dr. Tepper stated he had no records and detailed what records he needed.  (PCRA Ex. D-58, N.T. PCRA, 1393-1394).  As with Dr. Rotenberg, however, Cammarano failed to follow up, and thus Dr. Tepper never undertook a mitigation evaluation.  (Declaration of Allan M. Tepper, J.D., Psy.D., PCRA App'x. (3/19/10), Tab 49; Habeas App'x., 328).  Although Dr. Tepper did not testify at the PCRA proceeding, the PCRA court's record contained his Declaration in which he stated that had he been retained by trial counsel to conduct a mitigation investigation, he also could have provided helpful testimony supporting the mitigating factors of impaired capacity and history of cocaine and alcohol abuse.  (Tepper Decl., ¶3).

      4.     Charles O'Brien, M.D., Ph.D.

      Cammarano did follow up on Dr. Rotenberg's recommendation and contacted

neuropsychiatrist and addiction psychiatrist Charles O'Brien, M.D., Ph.D., but gave him only the discovery provided by the Commonwealth and nothing else. (N.T. PCRA, 1144-45). He therefore never provided Dr. O'Brien with the records and facts that could have supported his expert opinion. (Declaration of Charles O'Brien, M.D., Ph.D., PCRA App'x. (3/19/10), Tab 36; Habeas App'x., 57-260).

> Cammarano declared:
>
> We consulted with Dr. Charles O'Brien . . . about whether Pruitt's use of crack cocaine established a voluntary intoxication or diminished capacity defense at the guilt or penalty phase. Well before trial, Dr. O'Brien told me he thought he might be helpful, but I had doubts about how useful this would be so I never asked him to evaluate Pruitt. . . . . If a toxicologist had diagnosed Pruitt as suffering from Cocaine-Induced Psychotic Disorder at the time of the offense, I would have wanted to use that at trial.

(Cammarano Decl., 2-3, ¶7).

Dr. O'Brien also testified at the PCRA hearing. (N.T. PCRA, 1322-1326). He met with Cammarano on April 8, 2004, at which time he told Cammarano that before he could render an opinion on the impact of intoxicants on Pruitt's mental state at the time he killed Gougler, he would need more information about Pruitt's use of crack and alcohol around the time of the offense. (N.T. PCRA, 1100). Dr. O'Brien also asked to meet with and evaluate Pruitt. (Id., 1325). Dr. O'Brien believed Cammarano would get back to him and arrange for the follow-up he had requested so he could eventually write a report and testify. However, Cammarano never contacted Dr. O'Brien again, and never responded to any of Dr. O'Brien's telephone calls, emails, or invoices. (N.T. PCRA, 1324-1326). Dr. O'Brien testified, "[a]t some point I threw away the records because after he visited me, trial counsel became absent without leave …. He just disappeared from the face of the Earth." (Id., 1324).

Cammarano acknowledged he knew the names of witnesses who might have had the

information Dr. O'Brien sought about Pruitt's drug use on the day of Gougler's death, but, at the time, he was under the misimpression that it was impossible or unacceptable for him to obtain such information from lay witnesses. (N.T. PCRA, 1148-1149). Cammarano testified (Dr. O'Brien) "told me what he would need in order to reach the conclusion that I was hoping he could reach. And he didn't conclude that he didn't have it. I did." (Id., 1240). Cammarano never spoke to Dr. O'Brien again, and made no further attempts to obtain a toxicology witness until after the trial started. (N.T. PCRA, 1313). Meanwhile, in the more than one year before Pruitt's trial commenced, Dr. Rotenberg provided Cammarano with his November 2, 2004 draft report which contained precisely the detailed drug-use information requested by Dr. O'Brien. (PCRA Ex. D-50; Habeas App'x. 301-313). Cammarano nevertheless failed to give that information to Dr. O'Brien. (N.T. PCRA, 1145-46; O'Brien Decl.).

     5.     Lawrence Guzzardi, M.D.

Dr. Lawrence Guzzardi, a forensic toxicologist specializing in the effects of drugs on the human body, similarly provided both a declaration and testimony at the PCRA hearing. (Guzzardi Declaration, 2/22/10, PCRA App'x. Vol. II (3/19/10), Tab 47; N.T. PCRA, 137-200). Maynard had no contact with Dr. Guzzardi, and did not supply him with any documents but he knew Cammarano contacted him just prior to the start of the trial's penalty phase regarding his willingness to testify about the effects of cocaine and other drugs on Pruitt's actions on the date of the murder. (N.T. PCRA, 148, 151-153, 186, 369-370, 1234-1235). Although Cammarano had not tried to obtain the evidence sought by Dr. O'Brien regarding the amount of drugs and alcohol Pruitt consumed on the day of the crimes, he explained that instead of doing that: "[w]e were taking a shot at Dr. Guzzardi[,] hoping he would be able to give us a favorable opinion. We couldn't change the evidence but could change experts perhaps." (N.T. PCRA, 1241) (Cammarano Decl.

126

at 2-3, ¶7).

The weekend before the penalty phase commenced, Cammarano gave Dr. Guzzardi some materials on the case, but they did not include Pruitt's police statement in which he detailed his crack cocaine use immediately before and after Gougler's murder or the reports of Dr. Rotenberg (which included the psychological testing report from Dr. Reilly) or Dr. Timothy Michals. (N.T. PCRA, 151-153, 186). Dr. Guzzardi also did not recall receiving any medical or educational records or any statements of third parties regarding Pruitt's behavior while on drugs either. (N.T. PCRA, 153). Dr. Guzzardi met with Pruitt for two to three hours that Sunday, May 1, 2005, after which he felt he could provide helpful testimony and informed Cammarano he was willing to testify. (N.T. PCRA, 155-156, 1236-1237). Upon receiving confirmation that he would be called, Dr. Guzzardi cleared his schedule. (Id., 159). He did not have time to write a report, but since he anticipated testifying, he asked Cammarano to get back to him with a confirmed date for his testimony. But Dr. Guzzardi never heard back from Cammarano, and when he called to ask when he would be needed, he learned the penalty phase had already concluded and he would not be needed. This upset him. (N.T. PCRA, 137-162).

The CHU later retained Dr. Guzzardi and provided him with Pruitt's police confession and more records, including lay witness declarations and expert reports. After a full review of these additional materials, along with his time-of-trial interview, Dr. Guzzardi submitted a letter report dated August 9, 2013. (PCRA Ex. D-17; N.T. PCRA, 661-65). As outlined in the report, Dr. Guzzardi found that, at the time of the crimes, Pruitt was significantly impaired by his long-term use of alcohol and cocaine, and was so intoxicated by both alcohol and crack cocaine that his capacity to form specific intent to kill was significantly diminished. The duration between the murder and his actions of wiping fingerprints and cleaning up was likely several hours, which

127

decreased the merit in using those actions as valid indicators of his capacity to form specific intent to kill, contrary to the prosecutor's argument. Dr. Guzzardi also found Pruitt's short-term intoxication and long-term impairment together acted as a substantial mitigating factor for sentencing purposes. Had he been called to testify as planned, Dr. Guzzardi would have so testified in the penalty phase. Had he been contacted with more time before the guilt phase of trial began and had more time to review the records he had only recently seen for the first time and conduct a more complete and less-hurried interview with Pruitt, he could also have so testified in the trial's guilt-phase. (N.T. PCRA, 178-79; PCRA Ex D-17).

However, because Dr. Guzzardi had not interviewed Pruitt since 2005, and his 2005 interview was limited to penalty-phase matters, he carefully limited his PCRA testimony to mitigation. He stated he could only apply the conclusions of his report to the guilt phase if he interviewed Pruitt again. (Id., 178-179). He further opined, however, that he believed a diagnosis of cocaine-induced psychosis at the time of crime, as reported by a different expert, Dr. Stewart, was reasonable in light of all he had learned. (N.T. PCRA at 162-200, PCRA Ex. D-17).

Maynard was informed that Dr. Guzzardi had testified at the PCRA proceeding that Pruitt was significantly impaired by his use of cocaine and alcohol, and, in light of his cognitive impairments, could not fully form a specific intent to commit the crime. (Id., 402). Although Maynard could not recall if Dr. Guzzardi was hired by the defense, he agreed such evidence would have supported their requested mitigating circumstance of substantial impairment, and he could recall no strategic or tactical reason for not presenting Dr. Guzzardi at the penalty phase. (Id., 402-403).

6.    Carol Armstrong, Ph.D.

Carol Armstrong, Ph.D., a neuropsychologist focusing on brain function and dysfunction,

128

also did an evaluation and testified at the PCRA hearing.  (Armstrong Report, 12/21/09, at PCRA App'x. (3/19/10), Tab 35; PCRA Ex. D-21; N.T. PCRA, 235-311).  Dr. Armstrong was retained by the CHU to perform a neuropsychological evaluation to determine whether Pruitt had any neurocognitive impairments.  She met with Pruitt on December 21, 2009, and reviewed his prior records, including Dr. Reilly's 2003 report.

At the PCRA hearing, Dr. Armstrong testified that there were two head injuries documented in Pruitt's medical records, and that Pruitt's mother and aunt reported a third was suffered when he was hit by a car at the age of five, knocked unconscious, and admitted to the hospital.  (St. Joseph Medical Center Records; Reading Hospital and Medical Center Records (PCRA App'x. (3/19/10), Tabs 39 and 40; PCRA Exs. D-19 and D-20); N.T. PCRA, 279-280).  After his childhood accident, Pruitt's speech was affected – no one could understand what he was saying, and he was eventually referred to a speech therapist.  (Id.).  (Habeas App'x., 290-293 (Declaration of Joan Parker); Habeas App'x., 161-163 (Voda Pruitt Decl.).  In Armstrong's opinion, Pruitt's existing brain dysfunctions, present in less than one percent of the general population, are almost certainly a result of the three concussions he sustained before the murder, an additional concussion suffered afterward, and his long-term abuse of crack cocaine, marijuana, and alcohol which began at age 17, leading to his severe alcoholism, cocaine addiction, and frequent blackouts. (Id.).

Dr. Armstrong further noted that a history of head injury is a red flag for brain dysfunction, and both Pruitt's medical and school records demonstrate that his dysfunctions and impairments existed well before Gougler's murder.  (N.T. PCRA, 296)  She observed that Pruitt's educational record was consistent with his neurological impairments, "[b]ecause . . . these impairments are not just in one area. They span a number of areas.  And that suggests there's multiple regions of

129

dysfunction or multiple brain regions didn't develop correctly." (Id., 273). Dr. Armstrong also testified that Pruitt's cognitive impairments affect many aspects of his life. (Id., 286). Pruitt has difficulty reasoning, and thinking ahead and assessing the possible consequences of his actions. (Id., 288-289). His impairments cause him to be impulsive, and prevent him from thinking things through and learning from his experiences. (Id., 289).

Dr. Armstrong concluded that "Pruitt's impairments mean his ability to identify important information in his environment, whether visual or auditory, is impaired, and he is likely to miss it." (Armstrong Report). These deficits are the result of brain injury likely resulting from Pruitt's numerous head injuries and his longstanding abuse of alcohol and cocaine. (Id.) (recounting four head injuries, drug dependence, frequent blackouts, and co-existing depression); N.T. PCRA, 244, 264-267 (testifying as to Pruitt's impairments)).

Had Dr. Armstrong evaluated Pruitt before the penalty phase, she could and would have testified that these long-term impairments, together with his crack and alcohol intoxication on the day of the crimes, provided numerous mitigating factors, including substantial impairment of his ability to conform his behavior to the requirements of the law, and extreme mental or emotional disturbance at the time of the offenses. However, although she generally agreed on direct examination that Pruitt had a diminished capacity to form specific intent to kill, during her cross-examination at the PCRA hearing, Dr. Armstrong limited her conclusions, by stating she never opines about capacity to intend – only about capacity to reason and be aware. (N.T. PCRA, 235-311; PCRA Ex. D-21).

Upon being informed that neuropsychologist Dr. Carol Armstrong testified to finding that Pruitt had severe cognitive deficits at the time of the offense, both Cammarano and Maynard agreed her expert testimony would have been helpful to establishing the diminished capacity

defense at the guilt phase, as well as the requested mitigating circumstance of substantial impairment, and neither attorney could recall any strategic or tactical reason for not finding and presenting her. Both counsel also said they would have wanted the jury to hear her testimony. (Id., 401-402).

(7)    Pablo Stewart, M.D.

Another expert obtained by the CHU acting as Pruitt's PCRA counsel, was Pablo Stewart, M.D., a forensic psychiatrist. Dr. Stewart provided a letter report of his forensic mental health evaluation of Pruitt and testified at the PCRA evidentiary hearing. (Report of Pablo Stewart, M.D. – Letter to David Osborne, (3/9/10), PCRA App'x. (3/19/10), Tab 33; Habeas App'x., 169-182; N.T. PCRA, 841-954).

Dr. Stewart reviewed extensive background material and conducted an approximately five-hour-long clinical interview of Pruitt on January 6, 2010. (N.T. PCRA, 851-853, 870-880). Dr. Stewart diagnosed Pruitt as suffering from Cocaine-Induced Psychotic Disorder and Polysubstance Dependence at the time of the offense. (Stewart Report, 1). Dr. Stewart concluded to a reasonable degree of medical certainty that Pruitt's Cocaine-Induced Psychotic Disorder rendered him incapable of forming the intent to kill at the time of the offense. (Id.).

According to Dr. Stewart, persons suffering from Cocaine-Induced Psychotic Disorder:

experience extreme paranoia, impaired perception, delusions and hallucinations. When suffering from this psychosis after ingesting cocaine, persons demonstrate a gross distortion of their mental capacity, communication, interactions with others, ability to recognize reality, and affective response. These distortions interfere with their ability to cope with even the ordinary demands of everyday life, let alone highly stressful or frightening situations.

(Stewart Report, 13).

In support of his conclusions, Dr. Stewart observed:

131

> Prior to the offense in question, Michael ingested crack cocaine and beer almost continuously for nearly a full day, and possibly longer.  He ingested crack cocaine almost until the time he entered the victim's house.  As a result, it is likely Michael was suffering from psychotic symptoms at the time of the offense, including extreme paranoia, delusions, and impaired perception.  When combined with the highly stressful events that occurred at the time of the offense, there is no question Michael's capacity and ability to formulate specific intent was significantly impaired as a result of his psychosis.  To the extent Michael does not remember certain events related to the offense, it is likely he suffered from a blackout as a result of his significant beer consumption in the time period leading up to the offense.

(Id.).

Dr. Stewart testified consistently with his report at the PCRA hearing that Pruitt had been using cocaine and alcohol heavily in the days before Gougler's death, and was smoking crack and drinking all through the previous night until just before the offense.  (N.T. PCRA, 894).  Regarding Pruitt's inability to form specific intent, Dr. Stewart explained:  "[W]hen a person is psychotic and they're operating under psychotic delusions, as Pruitt was at that time; . . . I certainly can't and I don't know if anybody can assign intentionality or assign anything else because his thinking process is not based in the reality as we are all in today."  (Id., 924).  Dr. Stewart did not believe any of the actions described in Pruitt's statement to the police demonstrated his ability to deliberate and form the specific intent to kill, but instead showed he was acting based on his psychotic delusions.  (Id., 921-932).  These opinions were based on the extent and history of Pruitt's drug use and heavy crack cocaine use in the hours before the crime, and his history of "psychotic symptoms, auditory hallucinations, visual hallucinations, as well as delusional thinking mainly of a paranoid nature."  (Id., 895).

Dr. Stewart agreed that Pruitt's brain dysfunction, as documented by Dr. Armstrong, impaired his ability to deal with the stress induced by his use of crack cocaine:

> [A]ll of this cocaine-induced psychotic disorder I've been describing this morning

132

didn't occur in a vacuum. It occurred with Pruitt who had documented cognitive problems that predated the incident in question. And so not only is he psychotic behind the cocaine, but [he's] psychotic behind the cocaine with a low IQ and impaired brain functioning to begin with.

And there's both based on my clinical experience and the literature would suggest a person with an intact brain might be able to override some of the psychotic symptoms that the drug is causing and to realize what they're thinking as far as paranoia or auditory hallucinations was, in fact, not real and was, in fact, secondary to the drug.

But based upon the descriptions Pruitt gave, he didn't have any insight that this was not true.

(Id., 897-898).

Dr. Stewart also explained the diagnosis of cocaine-induced psychotic disorder was recognized in the DSM-IV-TR, the version in effect at the time of trial, which provides three criteria for diagnosing cocaine-induced psychotic disorder, and noted that Pruitt met all three:

The first criteria you have to demonstrate is the fact a person is displaying psychotic symptoms, they are having these things: auditory, visual hallucinations or delusional thinking. And again, based on not just Pruitt self-reporting to me but also from these witness statements, they demonstrate he had prominent psychotic symptoms.

Usually, they had noted in the delusional type tending to be very paranoid. That there were people looking at him. There were people were monitoring his conversations. That there were people hiding in the house where he was with these people. And he was accusing them of infidelity. It was quite extensive, the documentation of his psychotic symptoms. Again, in his case, predominantly paranoid delusions.

(N.T. PCRA, 883-885). He additionally testified that the second criterion is symptoms that occurred in relationship to the use of cocaine and not from another etiology; here, there was no evidence Pruitt suffered from a psychotic disorder or symptoms unrelated to his use of crack cocaine. (Id., 886). The third criterion is that the symptoms did not occur in a period of delirium, and again, Dr. Stewart testified there was no evidence Pruitt suffered from delirium. (Id., 887).

Dr. Stewart additionally testified that polysubstance dependence is another diagnosis recognized in the DSM-IV-TR. It is appropriate when a person abuses more than one substance, the substance abuse results in significant personal, legal, and financial difficulties, and the person develops a tolerance to the euphoric effects of the drugs and demonstrates withdrawal symptoms. (Id., 887-888). Drug dependency is a "higher form of use than just abuse," and Dr. Stewart opined that Pruitt "clearly" met these criteria too. (Id.). Dr. Stewart was provided with the witness declarations obtained by post-conviction counsel showing there was a history of substance abuse and mental health issues in Pruitt's family, suggesting a genetic predisposition to Pruitt's drug and alcohol use, and confirming the extent of Pruitt's drug and alcohol habits and use, and the psychiatric complications which he experienced as a result. (Id., 860-861, 881-882). Based on all of these materials, Dr. Stewart concluded that, at the time of the offense, Pruitt was "incapable of formulating the required intent for first degree murder," and he believed that Pruitt's history of drug use, psychotic symptoms and cognitive impairments were mitigating and satisfied the statutory requirements for the mitigating circumstances set forth in 42 Pa. C. S. §§ 9711(e)(2),[72] (e)(3),[73] and (e)(8).[74] (Stewart Report, 13-14; N.T. PCRA, 903-909).

Upon being informed that, well after the trial, in 2010, Dr. Pablo Stewart diagnosed Pruitt with Cocaine-Induced Psychosis at the time of the crime, Maynard agreed that this expert would also have supported the defense of diminished capacity at the guilt phase and would have supported

---

[72] Section 9711(e)(2) provides: "The defendant was under the influence of extreme mental or emotional disturbance."

[73] Section 9711(e)(3) provides: "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired."

[74] Section 9711(e)(8) provides: "Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense."

the mitigating circumstance of substantial impairment at the penalty phase; he could recall no strategic or tactical reason for their failure to find Dr. Stewart or to present his testimony. (N.T. PCRA, 400-401).

      D.    *Claims Analysis*

As the Supreme Court emphasized in <u>Kyles v. Whitley</u>, 514 U.S. 419, 422 (1995) and <u>Burger v. Kemp</u>, 483 U.S. 776, 785 (1987), "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." This is because "death is a punishment different from all other sanctions in kind rather than degree." <u>Woodson v. North Carolina</u>, 428 U.S. 280, 303-304 (1976).

Here, Pruitt's defense attorneys were initially determined to negotiate a guilty plea on his behalf in exchange for removal of the death sentence. By their own admission, they thus spent very little time preparing for a trial in this matter. But the Commonwealth offered to take the death sentence off the table only if Pruitt pled guilty to *all* of the crimes and, because he was adamant that he did *not* commit the sex crimes, to his counsels' surprise, Pruitt refused the offer. Thereafter, Defense Counsel decided to pursue a diminished capacity defense premised upon their client's heavy use of drugs and alcohol. Having done so, it was therefore incumbent upon them to explore the feasibility and likelihood of successfully invoking this defense by locating and contacting appropriate experts, and investigating such matters as Pruitt's history of drug and alcohol abuse, both in general and in the hours and days leading up to the crime, his medical, educational and social history, as well as any other mental health issues that may have affected his ability to form the requisite specific intent to kill, and to provide that information to the appropriate experts.

However, Pruitt's defense lawyers did none of these things. As the mountain of evidence from the trial court record and the fully-developed record from the PCRA hearing reflect, there

135

were no fewer than five lay witnesses whose identities were disclosed in the police statements and reports and other Commonwealth files which were provided to the defense well before trial, and several other witnesses (such as Pruitt's mother, aunt and uncle) who could easily have been discovered and interviewed had even a minimum amount of effort been made.

Robert McNair, Eric Harrison, and Jenny Boukitab all had information about Pruitt's days-long drug binge which led up to the crimes and each could have provided compelling evidence that Pruitt had consumed massive quantities of alcohol and crack cocaine at or around the time these offenses occurred and that he was looking for money to buy more. Cammarano testified he did not try to interview these witnesses because he considered them to be unreliable "crackheads." (N.T. PCRA, 1301). But trial counsel cannot choose to ignore a significant and readily identifiable avenue just because he believes, without conducting any investigation, that the witnesses he may find on that path are not ideal. See e.g. Chambers v. Armontrout, 907 F.2d 825, 830 (8th Cir. 1990) (*en banc*). (where trial counsel failed to interview witness, counsel's determination that witness was not credible was unreasonable). And Cammarano's explanation is especially unreasonable given that the nature of the evidence he was seeking – information about Pruitt's drug use – was almost certain to come only from other individuals who also used drugs.

Additionally, Joy Pochuski, Janelle Savini, and Tracy Wentzel (had Cammarano and Maynard done any preparation for her testimony), all would have testified that Pruitt was a different person when he was sober – kind, thoughtful, helpful – than when he was high, and that when high, he was paranoid, unpredictable, jittery, and violent. Pruitt's mother, aunt and uncle (Joan Parker, Voda Pruitt and John Pruitt) all could and would have testified that Pruitt had a family history of alcohol and drug abuse, and that Pruitt himself had a history of personal trauma and serious head injuries, and that he had suffered from speaking and learning difficulties since

136

the age of five after he was hit by a car. Their testimony would have been further bolstered by Pruitt's medical and educational records.

The record shows that Pruitt's trial lawyers also dropped the ball with the few experts that they did consult, by failing to provide them with the documents and materials requested to enable them to properly evaluate this case and failing to follow up and stay in touch with them. As a result, the jury never heard what would have undoubtedly been compelling testimony from Drs. Rotenberg, Reilly, Tepper, O'Brien and Guzzardi, regarding Pruitt's intellectual and mental impairments, alcohol and drug abuse and dependence, overall level of functioning and feelings of remorse, all of which would have supported a diminished capacity defense at the guilt phase and various mitigating circumstances at the penalty phase of trial.

Defense counsel was similarly derelict in following up with their hired investigator, giving him no guidance as to what to look for or who to contact and neglecting to provide him with any information and failing to notify him as to the trial date so he knew to make himself available. As a result, there was no logical starting place for the investigator and any testimony which he could have offered was foreclosed. Moreover, in failing to make any efforts to locate other qualified expert witnesses such as Drs. Armstrong and Stewart who were unearthed by the CHU in developing the PCRA record, Pruitt's trial attorneys missed further opportunities to show their client did not possess the specific intent to kill necessary to sustain a first degree murder conviction and/or to give the jury the opportunity to choose a life sentence rather than death.

Given all of the above-cited record evidence, neither of Pruitt's trial attorneys provided him with the effective assistance of counsel required under the Constitution, at either the guilt or the penalty phases of his trial. As Pruitt argued before the PCRA court and again argues to this court, had his court-appointed lawyers made any serious efforts to investigate his case, they could

137

easily have discovered the material facts, witnesses and history outlined above and presented it to

the jury at both the guilt and penalty phases.  Had they done so, there is a reasonable likelihood

that Pruitt would not have been convicted of first degree murder or rape and it would not have

been necessary to conduct a separate, death penalty trial.  And even if he had been found guilty of

first degree murder, it is also reasonably likely that Pruitt would not have been sentenced to death.

Prejudice under Strickland has been demonstrated here – there is a reasonable probability that but

for Cammarano's and Maynard's unprofessional errors, the result of Pruitt's trial would have been

different.  Pruitt was deprived of a fair trial with a reliable result such that confidence in its outcome

has been seriously undermined. Pruitt is therefore also entitled to habeas relief on Claims 10 and

14, and his convictions on first degree murder, rape and IDSI and his death sentence shall be set

aside.

## IV.     CONCLUSION

As detailed in the preceding pages, I find that Petitioner Michael Pruitt is entitled to habeas

relief from his convictions on first degree murder and rape and his sentence of death on the

following grounds:

(1)     Defense counsel were ineffective for failing to investigate the Commonwealth's DNA evidence, failing to cross-examine the Commonwealth's expert, and failing to present a defense DNA expert, who could have excluded Petitioner as the perpetrator of the victim's rape.

(2)     Petitioner was denied his rights to due process and a fair trial as a result of his defense counsels' failure to object to the falsity of the Commonwealth's DNA evidence and testimony by its serologist and DNA analyst that Petitioner was a DNA match to the perpetrator of the rape, and defense counsels' failure to discover, object to, and bring out the involvement and errors of the Commonwealth's disgraced serologist.

(10)     Defense counsel were ineffective in failing to investigate, discover, and present available guilt-phase evidence supporting Petitioner's voluntary intoxication/diminished capacity defenses.

138

(14)    Defense counsel were ineffective for failing to investigate, discover and present penalty-phase mitigating evidence of Petitioner's impaired capacity and extreme mental disturbance at the time of the crime, caused by his cocaine and alcohol intoxication, long-term drug and alcohol abuse, cocaine-induced psychotic disorder which caused blackouts, and his pre-existing history of head injuries, organic brain impairments and learning disabilities.

An appropriate Order follows.

# A P P E N D I X

As stated in footnote 12 on page 8, the complete listing of Petitioner's habeas claims are as follows:

(1)     Counsel was ineffective for failing to investigate the Commonwealth's DNA evidence, failing to effectively cross examine the Commonwealth's expert, and failing to present a defense DNA expert, who could have excluded Petitioner as the perpetrator.

(2)     Petitioner was denied his rights to due process and a fair trial because the Commonwealth presented false evidence and/or allowed false testimony to stand uncorrected when it elicited testimony that Pruitt was a DNA match to the perpetrator, and concealed evidence of errors committed by a forensic scientist who tested and processed critical evidence.  Defense counsel was ineffective for failing to recognize the falsity, impeach the witnesses and to object.

(3)     Petitioner was denied his rights to due process and to confront his accusers at the guilt phase of the trial because the Commonwealth withheld material exculpatory evidence that would have impeached the credibility of the Commonwealth's witnesses.

(4)     Petitioner was denied his rights to due process and to confront his accusers at the guilt phase as a result of the cumulative effect of the Commonwealth's Napue and Brady violations.

(5)     Petitioner was denied his rights to due process and reliable sentencing because he was convicted and sentenced to death on the basis of false and unreliable scientific testimony.

(6)     Petitioner is actually innocent of the crimes for which he was convicted.

(7)     Petitioner was denied his rights to due process, to confront his accusers, and to the effective assistance of counsel at the guilt phase because trial counsel failed to adequately investigate, discover, and present evidence impeaching key Commonwealth witness Sean Peterson, the Court improperly limited inquiry into Mr. Peterson's motive, trial counsel failed to make an adequate record of the Court's error and appellate counsel failed to raise the court's error on direct appeal.

(8)     Petitioner was denied his rights against self-incrimination and to due process and effective assistance of counsel at the guilt phase because his statement to police was coerced and trial counsel failed to adequately litigate and argue the

140

motion to suppress that statement.

(9)     Petitioner was denied his rights to an impartial jury, reliable sentencing, and due process because one of the jurors who voted to convict him and sentence him to death made material misrepresentations during voir dire.

(10)     Petitioner was denied his right to effective assistance of counsel at the guilt phase because his trial counsel failed to adequately investigate, discover, and present readily available evidence supporting a meritorious voluntary intoxication or diminished capacity defense, including evidence of cocaine-induced psychosis.

(11)     Petitioner was denied his right to effective assistance of counsel at the guilt phase because trial counsel opened the door to blatant speculation by the Commonwealth's pathologist, lending expert support for the Commonwealth's claim that Petitioner tried to clean up the crime scene.

(12)     Petitioner was denied his right to effective assistance of counsel at the guilt phase because trial counsel failed to adequately investigate the background of the defense's pathologist and withdrew meritorious pretrial motions.

(13)     Petitioner was denied his rights to due process and effective assistance of counsel at the guilt phase because, in its closing argument, the Commonwealth mischaracterized evidence without objection by trial counsel and appellate counsel failed to raise this issue on appeal.

(14)     Petitioner was denied his right to the effective assistance of counsel and to reliable sentencing at the penalty phase because trial counsel failed to adequately investigate, discover, and present readily available mitigating evidence.

(15)     Petitioner was denied his right to due process and to effective assistance of counsel at the penalty phase because, without objection by trial counsel, the prosecution told the jury it should not consider mercy, and appellate counsel failed to raise this issue on appeal.

(16)     Petitioner was denied his rights to due process, reliable sentencing and to effective assistance of counsel at the penalty phase because the court allowed the Commonwealth to introduce evidence of an inadmissible prior bad act by Petitioner and appellate counsel failed to raise this issue on appeal.

(17)     Petitioner was denied his right to the effective assistance of counsel at the guilt and penalty phases of his trial because trial counsel failed to advise him that his testimony in an unrelated assault trial would undermine key guilt and penalty phase defenses in his capital trial.

(18)     Petitioner was denied his rights to due process, reliable sentencing, and to

141

the effective assistance of counsel throughout his trial because of the cumulative effect of the errors set forth above.

(Supplemental Amended PCRA Petition and Supplemental Appendix, 9/17/12; see also, ECF No. 94).